# EXHIBIT C

M1rWave1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4              v.                        19 Cr. 374 (JMF)

 5   MICHAEL AVENATTI,

 6              Defendant.
                                         Trial
 7   ------------------------------x

 8                                       New York, N.Y.
                                         January 27, 2022
 9                                       9:00 a.m.

10   Before:

11
                     HON. JESSE M. FURMAN,
12
                                         District Judge
13                                       –and a Jury–

14                      APPEARANCES

15   DAMIAN WILLIAMS
          United States Attorney for the
16        Southern District of New York
     BY:  MATTHEW D. PODOLSKY
17        ROBERT B. SOBELMAN
          ANDREW A. ROHRBACH
18        Assistant United States Attorneys

19   MICHAEL AVENATTI, Defendant Pro Se

20   DAVID E. PATTON
          Federal Defenders of New York, Inc.
21        Attorney for Defendant
     BY:  ROBERT M. BAUM
22        ANDREW J. DALACK
          TAMARA L. GIWA
23        Standby Assistant Federal Defenders

24   Also Present:  Special Agent DeLeassa Penland
                    U.S. Attorney's Office
25                  Christopher de Grandpre, Paralegal Specialist
                    Juliet Vicari, Paralegal
```

M1rWave1

                    (Trial resumed; jury not present)

1                   THE COURT:  You may be seated.  I don't want

2   Mr. Macias in here just yet, but is he ready to go?

3

4                   MR. PODOLSKY:  I'm told he is right in the room back

5   there.

6                   THE COURT:  Great.

7                   Anything to discuss from the government?

8                   MR. PODOLSKY:  I suppose two discovery-related matters

9   just to put on the record, and I don't know that there's relief

10  at the moment, but first is 26.2 material.  We raised this, I

11  think, yesterday or the day before.  We spoke to standby

12  counsel.  We understood there wasn't a great quantity but it

13  would be produced last night.  It still hasn't been produced.

14  We don't know how long the cross of Ms. Daniels will go, but

15  we're prepared to rest as soon as tomorrow, depending on the

16  length, and we've received nothing.  So we want to put that on

17  the record.

18                  THE COURT:  Is she your final witness?

19                  MR. PODOLSKY:  We have two more witnesses after that.

20  They're relatively brief.  We have the book publisher --

21  someone from the book publisher, and we have a summary witness

22  who will offer a, like, timeline chart of the various

23  communications in this case.

24                  THE COURT:  OK.  I'm guessing the cross is going to

25  take a while, but I could be wrong.  Understood, and I'll hear

M1rWave1

 1    from Mr. Avenatti on that in a moment.

 2              Second issue.

 3              MR. PODOLSKY:  I think we had referenced this in court

 4    as well.  We had issued a trial subpoena to Mr. Avenatti for

 5    the materials he had represented in court that were relevant

 6    and he had obtained from a server.  We understood he was going

 7    to comply with that.  We had conversations with standby counsel

 8    about that as well.  We understood they were going to be

 9    produced last night.  We haven't received anything.  Obviously,

10    again, we're drawing closer to the end of the government's

11    case.

12              THE COURT:  All right.

13              Mr. Avenatti.

14              MR. AVENATTI:  Yes, your Honor.  Good morning.

15              My understanding is that the 26.2 materials are very,

16    very limited.  They will be produced today.

17              THE COURT:  Can you speak into the microphone, please.

18              MR. AVENATTI:  The 26.2 materials are very, very

19    limited.  They will be produced today.  We have already been

20    producing materials off of the servers as we've been acquiring

21    them and becoming aware of them.  But the materials off the

22    servers, we're going to continue to do so pursuant to the

23    rolling production that was previously discussed with the

24    Court.

25              As it relates to Ms. Daniels, for the Court's

M1rWave1

information, we are informed that the government's direct is

three hours.  I estimate my cross is going to be approximately

six hours.  I also intend to re-call Ms. Daniels in my case in

chief to cover areas not covered in my cross-examination.  So I

expect her to be a witness in my case in chief.  She's been

under subpoena, under defense subpoena for about two or three

weeks at this juncture.

So I just inform the Court of that this morning to

make the Court aware of it as well as make the government aware

of it.

THE COURT:  OK.  Well, we'll see about that six hours.

As you know, I'm not averse to exercising my authority under

Rule 611 to control cross-examination, but be that as it may.

Mr. Podolsky, your response to the prospect of calling

her in the case in chief, I guess my -- certainly in civil

cases my practice is to just have witnesses testify once even

if they're on both sides' lists and not have them here twice

and permit cross to go beyond the scope of the direct.  I don't

know if I should do the same here.

MR. PODOLSKY:  I've certainly been amenable to that in

prior cases and will do the same here.

I will note that I'm skeptical of the notion that

there's six hours of cross-examination and then additional

questions that would go beyond that and not be irrelevant or

cumulative.  But to the extent that there are some relevant

M1rWave1

         questions that go beyond the specific confines of the direct,

         we'll certainly be reasonable and don't see any reason to call

         her back just to waste everyone's time.  So we agree with your

         Honor.

                   THE COURT:  Mr. Avenatti.

                   MR. AVENATTI:  Your Honor, I'm not interested in

         wasting anyone's time.  I am interested, though, in putting on

         a case for this jury, a case in chief, which I'm entitled to

         do.  I'm also entitled to elicit testimony from the witness on

         cross-examination and complete the impeachment in my case in

         chief.  I'm specifically allowed to do that.

                   THE COURT:  I want authority from you for the

         proposition that you're entitled to call her a second time as

         part of your case in chief as opposed to being allowed to go

         beyond the scope of the direct in your cross.  That is to say,

         my inclination is to have her testify a single time and permit

         you latitude to go beyond the scope to elicit information that

         you would be allowed to elicit if she were testifying as part

         of your case in chief.  If you can present authority to me that

         that would be error, I'm certainly happy to reconsider.

                   Since we're not going to get there this morning,

         you'll have an opportunity to present that to me before it's

         ripe.  All right?

                   MR. AVENATTI:  Fair enough, your Honor.

                   THE COURT:  As for the six hours, obviously, we'll see

M1rWave1

                1   that as it comes.

                2           I guess you got your answer with respect to the

                3   defense materials.  It sounds like they are coming, and I will

                4   trust that Mr. Avenatti complies with his obligations.

                5           MR. PODOLSKY:  Your Honor, just one thing, and maybe

                6   Mr. Sobelman has some additional facts to address with respect

                7   to these materials.

                8           I do want to just point out the defendant has elided

                9   his obligations under the subpoena with his exhibit production.

               10   He specifically represented to the Court that he identified a

               11   wealth of materials that were relevant.  That's what we've

               12   asked for.  Instead, what he's done is produce isolated

               13   exhibits, often late, the night before.  What we're looking for

               14   are the materials that he has in his possession that are

               15   responsive to our subpoena.  And frankly, we will move to

               16   compel if he won't do that, particularly since we're drawing

               17   close to the end of our ability to offer them in our case.

               18           THE COURT:  All right.  If you move to compel, I will

               19   consider that.  If there is some appropriate instruction to the

               20   jury if he fails to comply with his obligations, then I'll

               21   consider that.  Until there's a ripe issue or any application,

               22   I'll leave it there.

               23           Mr. Avenatti filed a letter with respect to the issue

               24   that we had discussed at the end of yesterday.  I want to raise

               25   two issues for you to just put on your radar and raise as a

M1rWave1

possibility for you to submit things.

No. 1, I don't know whether Mr. Avenatti will testify or not. The time will come where I inquire, but I think it pays to think ahead about what that looks like if he does, since he's now representing himself. I think there are different approaches taken to that. I would welcome your thoughts on what that would look like, recognizing that it may be a moot point if he doesn't testify. But I think we should all be prepared for that possibility.

No. 2 is the *quantum meruit* business. I've read the case that Mr. Avenatti cited to me yesterday and it really isn't particularly on point since it pertains to, No. 1, a lawyer who has been discharged by the client -- that's not my understanding of the circumstances here; and No. 2, a contingency fee agreement, which is not what we have here. Be that as it may, it also doesn't discuss the factors that are relevant to the *quantum meruit* analysis.

That being said, the *quantum meruit* argument is an interesting one, and I want to think through how it figures here. One question is whether and to what extent Mr. Avenatti can inquire on cross of Ms. Daniels. That's the one that we obviously are focused on in the short term.

I think we can distinguish between two things. One is her opinions of the quality of his work. I don't see any relevance to that whatsoever. That's not a factor in *quantum*

M1rWave1

*meruit* under any case law that I have seen.

The second is the objective quality of his work and the results that he secured, and my inclination is that he should be permitted to delve into that to a limited extent so long as it's not cumulative, it's not confusing, it's not misleading. I'm inclined to let him build at least some record on that to potentially support the argument that he's trying to make.

I think the broader and bigger question is sort of how this ultimately gets to the jury, if it gets to the jury at all, and I guess there, too, I think there are two ways to think about it. One is whether the doctrine applies at all. My understanding of *quantum meruit* is that it arises almost always, if not always, in the context of a former relationship; that is, where the attorney-client relationship is over, usually the lawyer has been fired and the lawyer is seeking to get compensation for the reasonable value of his services. Again, here, Mr. Avenatti apparently fired Ms. Daniels, not the other way around.

No. 2, the allegations in this case concern conduct during the attorney-client relationship, not afterwards. So in that sense, I wouldn't think *quantum meruit* applies at all. It doesn't strike me as a doctrine that is relevant. I am not aware of authority that would justify a lawyer taking money during the attorney-client relationship on the grounds that

M1rWave1

under some *quantum meruit* notion he would be entitled to it if
he sought it from a court; that is to say, I think it is a
cause of action.  I think it's a cause of action that generally
arises after the attorney-client relationship has come to an
end.  So I don't think objectively it applies here.  That being
said, I think Mr. Avenatti is onto something if he had a good
faith belief that he was entitled to it.  I think that probably
is a valid defense to a claim of fraud; that is to say, even if
it's a mistaken belief that he had a good faith belief and the
jury agrees that he had a good faith belief, as crazy as it may
have been, then I think that may be a valid theory.  The
question is can he make that argument without testifying to the
jury that he had that belief based solely on the record as
developed through Ms. Daniels or otherwise?  And is he entitled
toe an instruction if he doesn't testify?

          These are the issues that I'm thinking of and just
flagging for consideration and potential briefing.

          I don't think we need to get into it any further now.
As I said, I think I'm inclined to let him elicit some of the
sort of objective facts of results that he obtained for
Ms. Daniels to develop the record on it, but I think there are
some larger issues here that I just wanted to flag for you to
start thinking about and we can decide and discuss how best to
raise them.

          Mr. Podolsky.

M1rWave1

         1          MR. PODOLSKY:  If I may?

         2          I won't address the substance, we can put in a letter

         3    on this.  I think there are even additional reasons that this

         4    doctrine or idea really has no relevance to this case, but we

         5    can develop them in a letter rather than spend our time now.

         6          I think the one thing that may be relevant to say now,

         7    however, is to the extent Mr. Avenatti seeks -- two points.

         8          One, to the extent he seeks to put in the quality of

         9    his work, we may well seek to put in evidence that the cases

        10    were dismissed, had negative results.  I don't really want a

        11    mini trial on this, but to the extent that he tries to press to

        12    the jury the success of his cases, we may offer evidence to the

        13    contrary.  And so I just want to say that.

        14          THE COURT:  Certainly if he starts to elicit positive

        15    results, I certainly think it opens the door to you developing

        16    the record that that is not an accurate picture.  So

        17    understood.

        18          MR. PODOLSKY:  No. 2, I don't know, again, that this

        19    is necessarily -- well, it could actually be relevant today.

        20          The defendant yesterday, and as I understand the

        21    *quantum meruit* theory, was that he had some entitlement to a

        22    reasonable amount of the book proceeds based on his work on the

        23    book.  I believe that's what he said in open court yesterday.

        24          As I understand that, the relevance, therefore, of all

        25    of the work he did on the many lawsuits is actually completely

1    irrelevant, because his theory, as articulated yesterday in

2    open court, is that what entitled him, in his mind, to take

3    some of Ms. Daniels's book proceeds without her knowing was all

4    the wonderful, important, hard work he did on the book.  And if

5    that's the case, I fail to see the relevance of however many

6    hours he spent and however well he did on other lawsuits that

7    have nothing to do with that contract.

8              THE COURT:  All right.  Understood.  And certainly

9    that will be part of what we need to discuss.  I'm not inclined

10   to discuss it further now.  Mr. Avenatti will have ample

11   opportunity to address it, and my guess is having something in

12   writing, including, for instance, whether you think any

13   instructions to the jury on this issue are appropriate or

14   necessary would be probably in order.  But we'll discuss that

15   in due course.

16             Let's get Mr. Macias out here so that when the jury

17   arrives we're ready to go.

18             MR. AVENATTI:  Your Honor, I have one exhibit that I'm

19   going to use for impeachment.  I'm going to hand a copy to the

20   government and to the Court now in the interest of time.

21             THE COURT:  Please.

22             MR. AVENATTI:  May I approach, your Honor?

23             THE COURT:  Give it to my law clerk, please.

24             MR. PODOLSKY:  Your Honor, I'll say this.  I have no

25   idea what this is.  It has no Bates number.  I've never seen it

M1rWave1

 1    before.  I don't know who it's between.  I know nothing about

 2    this document or whether it's authentic or anything.

 3            THE COURT:  All right.  Perhaps a foundation will be

 4    laid.  We'll see.

 5            I would like the witness.

 6            MR. PODOLSKY:  Your Honor, I understand he had just

 7    gone to the restroom.  I'm sorry.

 8            THE WITNESS:  Good morning, your Honor.

 9            THE COURT:  Good morning.  You're welcome to remove

10    your mask now.

11            MR. AVENATTI:  Your Honor, to alert the Court, I am

12    going to refer to pages 760 and 761 from the transcript of

13    yesterday.

14            THE COURT:  Thank you.

15            (Continued on next page)

16

17

18

19

20

21

22

23

24

25

M1rWave1                         Macias – Cross

```
 1          (Jury present)
 2          THE COURT:  You may be seated.
 3          Good morning.  Welcome back.  You guys are earning
 4   your gold stars as a jury.  I love that you've been here on
 5   time every day and allowed us to start promptly.
 6          We will continue the cross-examination of Mr. Macias.
 7    SEAN ERNESTO MACIAS, resumed.
 8          THE COURT:  Mr. Macias, I remind you that you remain
 9   under oath.
10          Mr. Avenatti, you may proceed.
11          MR. AVENATTI:  Thank you, your Honor.
12   CROSS-EXAMINATION CONTINUED
13   BY MR. AVENATTI:
14   Q.  Good morning, Mr. Macias.
15   A.  Hello.
16   Q.  I'm sorry.  I couldn't hear you.
17   A.  Hello.
18   Q.  Between the time that you left yesterday and this morning,
19   you saw some of the press reports about the trial day
20   yesterday, did you not?
21   A.  I did not.
22   Q.  Is it your testimony that you have not seen any press
23   reports about this trial since it started?
24   A.  I was asked not to look at any press reports.
25   Q.  That's not my question.  Is it your testimony that since
```

1   the trial started you have not seen any press reports about

2   this trial?

3   A.  I saw a headline.  But then I didn't click on it.

4   Q.  Is it your testimony that you have seen no social media

5   posts about this trial since it began?

6   A.  No Instagram or Facebook.

7   Q.  OK.  Well, have you seen any social media post about this

8   trial since it began, whether it was Facebook or Instagram or

9   some other social media platform?

10  A.  I'm a little bit confused with your question.  Was it from

11  last night or from the time that it began?  What did you say?

12  Q.  Since the trial began, have you seen any social media posts

13  about this case, whether they be on Twitter, Facebook,

14  Instagram, or some other social media platform, Mr. Macias?

15  A.  I did.

16  Q.  OK.  And on what social media platforms did you see posts

17  about the trial?

18  A.  I saw a post that had my name on it from a Twitter account.

19  I believe it was Ron Richards.

20  Q.  And did you read the post?  It's a yes-or-no question.

21  A.  Yes.

22  Q.  OK.  Is that the only social media post that you have seen

23  since the trial began?

24  A.  That I have seen, no.  I have seen them, but I haven't read

25  them.

M1rWave1                    Macias - Cross

1    Q.  OK.  Well, how was it that you saw them?

2    A.  When I -- I guess I just looked on my phone and it was

3    there.

4    Q.  Well, what do you mean you just looked on your phone and

5    they were there?

6    A.  I can't explain anything more than that.  That's pretty

7    detailed.

8    Q.  Well, you testified on direct in excruciating detail about

9    conversations that happened --

10             THE COURT:  Sustained.

11   Q.  -- two or three years ago?

12             THE COURT:  Sustained.

13   BY MR. AVENATTI:

14   Q.  Mr. Macias, you made an effort to read some social media

15   posts about this trial since it began, did you not?

16   A.  No, I didn't make an effort.

17   Q.  OK.  Well, how was it exactly that you came to read these

18   posts; for instance, the one from Mr. Richards?

19   A.  I don't recall.  Someone sent it to me, and then I opened

20   it up and it said -- it had a letter from Dalack to the Court

21   regarding --

22   Q.  I don't want to get into the details yet.  And so you saw

23   that there was a letter that had been filed by Mr. Dalack, is

24   that right?

25   A.  Yes.

1   Q.  OK.  And you've also had occasion to see other social media

2   posts about the trial on your phone; I think you just testified

3   to that --

4   A.  I did.

5   Q.  -- correct?

6   A.  Yes, I did.

7   Q.  And who were those social media posts by?

8   A.  I don't know.  I just saw a headline.

9   Q.  Well, what do you mean you saw a headline on your phone?

10  A.  It was on a headline saying that you were going to court.

11  Q.  So is it your testimony that you only saw two social media

12  posts since the trial began?  Yes or no.

13  A.  I would say no, because there was, like, a chain of posts

14  that had -- that you were going to trial.

15  Q.  OK.  So how many social media posts have you seen since the

16  trial began?  Is it two, or is it a number greater than two?

17  A.  Well, I'm getting confused with seeing it and reading, like

18  reading them.

19  Q.  I'm asking you about seeing it right now, sir.

20  A.  I don't know.  There was a handful of or a couple posts

21  that were lined up that said you were going to trial from

22  different media sources.

23  Q.  OK.  So could you estimate for the jury; are we talking

24  three, five, ten?

25  A.  I don't guess.

1   Q.  OK.  I'm not asking you to guess.  It wasn't that long ago,

2   right?  The trial just started a few days ago; you know that,

3   right?

4   A.  So what's your question?

5   Q.  You know the trial started just a few days ago --

6   A.  Yes.

7   Q.  -- on Monday?

8   A.  Yes, it started on Monday.

9   Q.  OK.  So we're talking about something that happened over

10  the last 72 hours, right?

11  A.  No.  I think I saw that post on fry -- the post with

12  Richards was Friday.

13  Q.  So is it your testimony that since Monday you haven't seen

14  any social media posts?

15  A.  I didn't say that.  What I said was I saw my phone, and

16  there were some posts that were on -- that said you're going to

17  trial.  Stormy Daniels.

18  Q.  Those are all the posts, social media posts that you've

19  seen?

20  A.  That I can recall.

21  Q.  Well, it's only been three days, right; we just established

22  that?

23  A.  There's a lot going on in these three days.  I have to face

24  my old friend --

25          MR. AVENATTI:  Move to strike, your Honor.

M1rWave1                    Macias - Cross

1   A.  I have to be here.  There's a lot going on.

2                THE COURT:  Move on.  Next question.

3   BY MR. AVENATTI:

4   Q.  Mr. Macias, has there been a lot going on in the last two

5   years?  Yes or no.

6                MR. PODOLSKY:  Objection.

7                THE COURT:  Sustained.

8   A.  That would be --

9                THE COURT:  Mr. Macias, sustained.

10               THE WITNESS:  Oh, I'm sorry.

11               THE COURT:  Sustained.  Don't answer if I sustain the

12  question.

13               Next question.

14  BY MR. AVENATTI:

15  Q.  Mr. Macias, does your memory generally get better or worse

16  over time?

17  A.  I have a pretty good memory when things are important.

18  Q.  Have you seen any news reports on the television about this

19  case since it began?

20               THE COURT:  Sustained.

21  A.  No.

22               THE COURT:  Asked and answered.

23               THE WITNESS:  No.

24  BY MR. AVENATTI:

25  Q.  Now, Mr. Macias, I think you estimated that it was about

1    five times you've met with the government in connection with

2    this case.  Am I right about that or wrong about that?

3    A.  Give me -- give me a beat.

4        Approximately five.  Could be -- yeah, five times.

5    Q.  And that was five times beginning in 2019 and continuing

6    until when?

7    A.  I believe it was sometime last week.

8    Q.  And when you met with the government last week, who did you

9    meet with?

10   A.  I believe it was this gentleman, Michael or Matthew

11   Podolsky; this young lady over here.

12            MR. AVENATTI:  Let the record reflect he's identified

13   Agent Penland.

14   A.  And then there was another guy, and I think it might be

15   him, but I'm not sure.

16            MR. AVENATTI:  Let the record reflect that the witness

17   has pointed at Mr. Rohrbach.

18            THE WITNESS:  Rohrbach, yes.

19   Q.  Was that in person or via Webex?

20   A.  Webex.

21            THE COURT:  Is that a platform like Zoom or Teams or

22   something like that?

23            THE WITNESS:  I have no idea.

24            THE COURT:  A video?

25            THE WITNESS:  Yes.  Yes, your Honor.

1           THE COURT:  OK.

2   BY MR. AVENATTI:

3   Q.  And each of those five times, including last week, you

4   insisted on having a lawyer present, isn't that true?

5   A.  Yes.

6   Q.  And you believed you needed an attorney because you had

7   criminal exposure, true?

8           MR. PODOLSKY:  Objection.

9           THE COURT:  Sustained.  Asked and answered.

10  A.  Not at all.

11          THE COURT:  Sustained.  You don't have to answer.  In

12  fact, you may not answer if I sustain the objection.  So please

13  wait for my ruling.  Thank you.

14          THE WITNESS:  Thank you, your Honor.

15  BY MR. AVENATTI:

16  Q.  Sir, as you're on the stand today, you're concerned that

17  the government is going to charge you for things completely

18  unrelated to me, isn't that true?

19          MR. PODOLSKY:  Objection.  Asked and answered.

20          THE COURT:  Sustained.

21  BY MR. AVENATTI:

22  Q.  In fact, Mr. Macias, isn't it true that your home was

23  previously searched by the federal government?

24          THE WITNESS:  Can I answer that?

25          THE COURT:  You may.

M1rWave1                    Macias - Cross

1    A.  Absolutely not.

2    Q.  Isn't it true your offices were previously searched by the

3    federal government?

4             THE WITNESS:  Can I answer?

5             THE COURT:  You may.

6    A.  Absolutely not.

7    Q.  Is it your testimony, Mr. Macias, under oath, that no

8    location or company that you have been affiliated with has ever

9    been searched by the federal government?

10             MR. PODOLSKY:  Objection, your Honor.

11             THE COURT:  Can I have a sidebar with counsel and Mr.

12   Avenatti, please.

13             (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1          (At sidebar)

2          THE COURT:  Can you please tell me your good faith

3     basis for these questions.

4          MR. AVENATTI:  Yes.  About two years ago, Mr. Macias

5     informed me that his home and his offices had been previously

6     searched by the FBI in connection with an investigation that

7     resulted in criminal charges, certainly around Mr. Macias, and

8     that he was concerned at the time that he was going to be

9     criminally prosecuted, your Honor.  That's my good faith basis.

10         MR. PODOLSKY:  I have never heard of such a thing.  I

11    have no ability to evaluate this.  As far as I know, the

12    federal government in the last few years has conducted no

13    searches of any project related to Mr. Macias.

14         MR. AVENATTI:  That's in the last two years, your

15    Honor.  This was before the last two years.

16         MR. PODOLSKY:  I think you just represented it was in

17    the last two years.

18         MR. AVENATTI:  No I didn't.

19         THE COURT:  He said approximately two years ago.

20         MR. PODOLSKY:  OK.

21         As far as I know, there has been no such federal

22    search related to Mr. Macias.  I'm aware of no charges against

23    Mr. Macias.  In fact, we check these things, and I'm aware of

24    no basis for this.

25         MR. AVENATTI:  Your Honor, to be clear, two years ago

M1rWave1                          Macias - Cross

1    he told me that the searches had been conducted previously, not

2    contemporaneously at the time.

3              THE COURT:  OK.

4              MR. AVENATTI:  I want the record to be clear.

5              THE COURT:  And what relevance does that have to his

6    bias or motive to lie in his testimony today?  In excess of two

7    years ago, is there any basis to argue that he has a reason to

8    believe that he's in jeopardy of prosecution today?

9              MR. AVENATTI:  Yes, your Honor.  If it's within the

10   statute of limitations, absolutely.  I was not expecting him to

11   claim on the stand that it didn't happen.  I was expecting him

12   to admit that it happened, at which point I was going to

13   explore when it happened.

14             MR. PODOLSKY:  I believe Mr. Avenatti got the answer

15   he got.  There's nothing to contradict it.  The man has

16   repeatedly said, under frankly, separate questioning, that he

17   has no concerns about his exposure.  I think it's time to move

18   on.

19             THE COURT:  All right.

20             MR. AVENATTI:  Your Honor, I think I have a pending

21   question.  I'd like that last question answered, and I'll be

22   happy to move on.

23             THE COURT:  What was the pending question?

24             MR. AVENATTI:  I believe the question was is it your

25   testimony that no company that you were ever affiliated with

M1rWave1                           Macias - Cross

1   had their offices searched.

2              MR. PODOLSKY:  Relevance, your Honor.

3              MR. AVENATTI:  Your Honor, he was at the company at

4   the time.

5              MR. PODOLSKY:  Relevance.

6              MR. AVENATTI:  And he was an executive at the company.

7              THE COURT:  All right.  I'm not going to allow it.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (In open court)

2    BY MR. AVENATTI:

3    Q.  Mr. Macias, what is a legal malpractice lawsuit?

4    A.  A legal malpractice lawsuit, if you fall -- if a lawyer

5    falls below the standard of care and is sued for some sort of

6    negligent activity or omission.

7    Q.  Have you ever been a defendant in a legal malpractice

8    lawsuit or arbitration proceeding?

9              MR. PODOLSKY:  Objection.

10             THE COURT:  Sustained.

11   BY MR. AVENATTI:

12   Q.  Mr. Macias, what is an expert witness?

13   A.  It's a witness that has expertise above and beyond a

14   reasonable person that can explain about a certain topic or

15   process to a court, mainly to a jury, and that can give and

16   opine and make an opinion about a process or situation and a

17   determination.

18   Q.  Do you ever hire expert witnesses?

19   A.  Absolutely.

20   Q.  For what purpose?

21   A.  To provide legal opinions -- or, excuse me, to provide

22   professional opinions regarding a certain matter in court; to

23   assist the trier of fact, which would be the jury; to help them

24   make their opinions and judgments.

25   Q.  Are you careful when you select your experts?

1              MR. PODOLSKY:  Objection.

2              THE COURT:  Sustained.

3    BY MR. AVENATTI:

4    Q.  Mr. Macias, isn't it true that in late 2018, you hired me

5    to serve as an expert witness in a very high-profile matter for

6    you, sir?  Yes or no.

7    A.  Yes.

8    Q.  Mr. Macias, are you careful when you select your expert

9    witnesses?

10             MR. PODOLSKY:  Objection.

11             THE COURT:  Sustained.

12   BY MR. AVENATTI:

13   Q.  Mr. Macias, who is Mel B?

14             THE WITNESS:  I just want to know what the relevance

15   of this is.

16             THE COURT:  Just answer the question.  If there's an

17   objection --

18   A.  Mel B is a Spice Girl, an iconic rock star, a beautiful

19   lady.

20   Q.  Mel B is a client of yours, correct?

21             MR. PODOLSKY:  Objection.

22             THE COURT:  Sustained.

23   BY MR. AVENATTI:

24   Q.  Mr. Macias, isn't it true that you hired me as an expert

25   witness in a matter involving Mel B in late 2018?

M1rWave1                          Macias - Cross

1           MR. PODOLSKY:  Objection.

2           THE COURT:  Sustained.

3           MR. AVENATTI:  It goes to bias.

4           THE COURT:  I understand.  Sustained.

5    BY MR. AVENATTI:

6    Q.  Mr. Macias, isn't it true that, in fact, you had me serve

7    as an expert witness in the capacity of an attorney in an

8    arbitration proceeding where you offered my testimony as an

9    expert on the law?

10          MR. PODOLSKY:  Objection.

11          THE COURT:  Sustained.

12   BY MR. AVENATTI:

13   Q.  And isn't it true, sir, that that matter dealt with the

14   issue of legal malpractice?

15          MR. PODOLSKY:  Objection.

16          THE COURT:  Sustained.

17          Let's move on, Mr. Avenatti.

18   BY MR. AVENATTI:

19   Q.  Now, Mr. Macias, you recall you gave testimony here

20   today -- or here yesterday, correct?

21   A.  I can't hear you, Michael.

22   Q.  Mr. Macias, you recall you gave testimony here yesterday,

23   right, under oath?

24   A.  Yeah, I was here yesterday.

25   Q.  OK.  And all of that testimony was truthful and accurate,

M1rWave1                        Macias – Cross

1    wasn't it?

2    A.  To my best of my ability, as I sit here today, absolutely.

3    Q.  OK.  I want to ask you about some of your testimony at the

4    end of yesterday.

5         MR. AVENATTI:  Could we please have the transcript,

6    pages 760 and 761.

7         THE COURT:  For the witness only, please.

8    A.  Is there a line you would like me to look at?

9    Q.  Do you have the testimony there, sir?

10   A.  I do, Michael.

11   Q.  OK.  Mr. Macias, I'd like you to follow along with me, if

12   you would, please.

13   A.  Well, what page and line, sir?

14   Q.  Page 760, line 3.

15   A.  Got it.

16        MR. AVENATTI:

17   "Q.  Mr. Macias, on direct examination, you were asked a number

18   of questions about your efforts to raise money for me in August

19   and September of 2018.  Do you recall that?"

20        MR. PODOLSKY:  Objection.

21        THE COURT:  Well --

22        MR. PODOLSKY:  Asked and answered.

23        THE COURT:  Mr. Avenatti, can you just get to the

24   point here.  Let's not reread the transcript.  The jury's

25   recollection of testimony will govern, and as I will tell them

Macias - Cross

 1  later, if they want any read backs of the testimony, they can

 2  get that during their deliberations.  So just ask your

 3  question, please.

 4  BY MR. AVENATTI:

 5  Q.  Mr. Macias, directing your attention to page 760, towards

 6  the bottom, you were asked a question relating to the fact --

 7  isn't it true that your efforts to find money for me related to

 8  my campaign, and you answered "absolutely not" --

 9           MR. PODOLSKY:  Objection.

10  Q.  -- is that correct?

11           MR. PODOLSKY:  Objection.

12           THE COURT:  Overruled.

13  BY MR. AVENATTI:

14  Q.  That was your testimony, right?

15  A.  You can't -- you've got to give me a beat.  Let me answer

16  one question at a time, Michael.

17      "Absolutely not."  Yes, that's what I said.

18           THE COURT:  Can you keep your voice up.

19           THE WITNESS:  Yes, that's what I said.

20           THE COURT:  All right.  Let's take this down, please.

21           MR. AVENATTI:  Could I have exhibit DX-AB for the

22  witness only.

23           THE WITNESS:  Is it in the book?

24           THE COURT:  I think it's on your screen, sir.

25  BY MR. AVENATTI:

M1rWave1                          Macias - Cross

1    Q.  Sir, can you see DX-AB on your screen?

2    A.  I see --

3    Q.  That's a yes-or-no question.

4    A.  Stop.

5        I see it, but it doesn't -- it's -- it doesn't look like a

6    text, but yes, I see it.  I see words on a screen.

7    Q.  Mr. Macias, isn't it true that on August 29, 2018, in

8    response to me informing you that I liked Tulsi Gabbard from

9    Hawaii in connection with my campaign, that you informed me

10   that you were going to get me, quote, some do-re-mi so I could

11   run like a banshee?

12           MR. PODOLSKY:  Objection, your Honor.

13           THE COURT:  Overruled.

14           You may answer.

15   A.  I do use the phrase "do-re-mi."

16   Q.  Sir, just answer my question, please.

17   A.  I can't decipher if this is my --

18   Q.  Sir --

19   A.  -- text.

20           THE COURT:  Mr. Macias, he's not asking you about

21   what's on the screen.

22           In fact, let's take down what's on the screen, please.

23           The question is did you send a text to him stating

24   that on August 29?  Yes or no.

25           THE WITNESS:  The document that I saw --

M1rWave1                          Macias - Cross

1            THE COURT:  No.

2            THE WITNESS:  -- doesn't refresh --

3            THE COURT:  No.

4            THE WITNESS:  -- my recollection.

5            THE COURT:  No.

6            THE WITNESS:  No.

7            THE COURT:  That's not the question.

8            Sitting here today, do you know, did you send him that

9    text that said that?  Yes, no, or I don't remember.

10           THE WITNESS:  I don't remember.

11   BY MR. AVENATTI:

12   Q.  Are you denying that you sent a text that said that?

13           MR. PODOLSKY:  Objection.

14           THE COURT:  Sustained.

15   BY MR. AVENATTI:

16   Q.  Mr. Macias, isn't it true that on August 29, 2018, you sent

17   me a text that said:  "I am getting you some do-re-mi so you

18   can run like a banshee.  We'll need you for a meeting"?

19           MR. PODOLSKY:  Objection.

20           THE COURT:  Sustained.  Asked and answered.

21   Q.  Mr. Macias, take a look at DX-AB.

22           MR. AVENATTI:  If we could have it on his screen,

23   please.

24           THE COURT:  You may.  Just for the witness.

25   BY MR. AVENATTI:

M1rWave1                    Macias - Cross

1   Q.  Mr. Macias, looking at DX-AB, does that refresh your

2   recollection that, in fact, on August 29 you did send me that

3   text?

4            THE COURT:  Mr. Macias, now the question is having

5   looked at this document, whatever it may be -- the question

6   isn't what the document says.  It is sitting here today, does

7   it refresh your recollection that you sent a text stating what

8   Mr. Avenatti said on August 29?

9            THE WITNESS:  This document doesn't refresh my

10  recollection.

11           MR. AVENATTI:  Your Honor, I offer DX-AB.

12           MR. PODOLSKY:  Objection.

13           THE COURT:  Denied.  I mean sustained as to the

14  objection, and the offer is denied.

15  BY MR. AVENATTI:

16  Q.  Mr. Macias, I think I only have one last question, but I

17  reserve the right to maybe ask a couple more, so here's my last

18  question.

19           THE COURT:  Mr. Avenatti, just limit yourself to the

20  questions, please.

21           MR. AVENATTI:  Understood, your Honor.  Thank you.

22  Q.  Mr. Macias, you currently serve as my estranged wife's

23  lawyer in connection with our divorce proceeding, isn't that

24  true?  Yes or no.

25  A.  Yes.

M1rWave1                          Santos - Direct

```
 1              MR. AVENATTI:  Nothing further at this time.

 2              THE COURT:  Redirect?

 3              MR. PODOLSKY:  No, your Honor.

 4              THE COURT:  All right.  Mr. Macias --

 5              THE WITNESS:  Am I excused, your Honor?

 6              THE COURT:  -- you are excused.  Put your mask on

 7      before you leave the box.

 8              (Witness excused)

 9              THE COURT:  Counsel, can you, while you call your next

10      witness and get the witness, just retrieve whatever's in the

11      witness box.

12              Can you call your next witness, please.

13              MR. SOBELMAN:  The government calls Enrique Santos.

14       ENRIQUE SANTOS,

15          called as a witness by the government,

16          having been duly sworn, testified as follows:

17              THE COURT:  You may proceed.

18      DIRECT EXAMINATION

19      BY MR. SOBELMAN:

20      Q.  Good morning, Mr. Santos.

21      A.  Good morning.

22      Q.  What organization do you work for?

23      A.  The U.S. Attorney's Office for the Southern District of New

24      York.

25      Q.  How long have you worked for the U.S. Attorney's Office?
```

1    A.  I'll have 14 years this March.

2    Q.  What position do you hold with the U.S. Attorney's Office?

3    A.  I'm an investigative analyst.

4    Q.  What unit do you serve in at the U.S. Attorney's Office?

5    A.  The district criminal intelligence unit.

6    Q.  What are your duties and responsibilities in the criminal

7    intelligence unit?

8    A.  I perform forensic examinations of multiple devices, such

9    as cell phones, computer tablets, and GPS devices.  And I also

10   operate an evidence vault.

11   Q.  What do you mean by forensic examinations?

12   A.  It use -- it means that we use technology guided by the

13   scientific principle to try to recover data from mobile devices

14   in a manner in which the data isn't altered.  We try to

15   maintain it in the condition it was in when it was first found.

16   Q.  Can you please generally describe your training with

17   respect to your work with cell-phone data?

18   A.  I currently have approximately 160 hours worth of formal

19   classroom training regarding forensics.  I've attended numerous

20   forensics-related webinars, conferences, and similar events.

21   And I've received certifications for each of the forensic tools

22   that I use.

23   Q.  During your time working at the U.S. Attorney's Office,

24   approximately how many cell phones have you examined?

25   A.  Over 2,000.

1   Q.  What, if any, experience do you have with examining

2   cell-phone data stored in the cloud?

3   A.  I've currently examined between -- probably close to a

4   hundred extractions like that.

5   Q.  What types of cloud data do you have experience examining?

6   A.  Apple iCloud extractions generally, but also Google,

7   Facebook returns, Instagram, things like that.

8   Q.  Approximately how many iCloud accounts have you

9   forensically processed?

10  A.  Between 50 and a hundred.

11          MR. SOBELMAN:  Your Honor, at this time the government

12  would offer a stipulation marked for identification as

13  Government Exhibit S2, and we would also read it at this time.

14          THE COURT:  Admitted, and you may.

15          (Government Exhibit S2 received in evidence)

16          MR. SOBELMAN:  Government Exhibit S2, paragraph 1,

17  states that:

18          "The parties agree iCloud is a file hosting, storage,

19  and sharing service provided by Apple that can be used to back

20  up or store data and files from devices, including an iPhone."

21  Q.  Mr. Santos, next to you on the witness stand there's an

22  object marked for identification as Government Exhibit 401.  Do

23  you see that?

24  A.  Yes.

25          MR. SOBELMAN:  Now reading from paragraph 2 of

M1rWave1                        Santos - Direct

1    Government Exhibit S2:

2            "Government Exhibit 401 is a flash drive that contains

3    an authentic copy of documents -- sorry, authentic copy of the

4    contents from iCloud account 280926611 as they existed on

5    Apple's systems at the time they were produced pursuant to a

6    court-authorized search warrant on or about August 22, 2019.

7    The name of the subscriber of the iCloud account 280926611 was

8    Michael Avenatti, the defendant, and the associated email

9    account was mavenatti@eaganavenatti.com."

10   Q.   Mr. Santos, next to you on the witness stand is another

11   object marked for identification as Government Exhibit 402.  Do

12   you see that?

13   A.   Yes.

14   Q.   What is it?

15   A.   This is another flash drive that contains the data provided

16   to us by Apple in the form of an iCloud account.  The data

17   that's stored in Government Exhibit 401, except on this drive

18   I've loaded that data into a forensic tool called Cellebrite,

19   and that tool parsed out that data and created a report.  So

20   that's what's on this drive; it's a report.

21   Q.   And what do you mean by parsed out the data and created a

22   report?

23   A.   The forensic tool that we use, Cellebrite, parses out the

24   data -- means it categorizes that data that's found as part of

25   the iCloud production -- and puts it into a format that's easy

1   to read, easy to navigate through.  You can search, you can do

2   key-word searches of the data.  You can filter out certain

3   pieces of data.  You can sort the data.  So it just makes it

4   more manageable.

5           MR. SOBELMAN:  Please show the witness what's marked

6   for identification as Government Exhibit 612.

7   Q.  Mr. Santos, do you recognize this?

8   A.  I do.

9   Q.  What is it?

10  A.  This is a screenshot from the forensic tool Cellebrite.

11  Specifically, it's from the device information section of the

12  report, and part of the iCloud production included an iPhone,

13  the backup of an iPhone 10S.  So that's what we're seeing here,

14  is a description of the phone.

15          MR. SOBELMAN:  The government offers Government

16  Exhibit 612.

17          THE COURT:  Any objection?

18          MR. AVENATTI:  None.

19          THE COURT:  Admitted.

20          (Government Exhibit 612 received in evidence)

21          MR. SOBELMAN:  Let's please display it for the jury.

22  Q.  Mr. Santos, again, this is a screenshot you took?

23  A.  Yes, sir.

24  Q.  And what do we see here?

25  A.  This is a description of the phone that was backed up to

1    the iCloud account.  Specifically, it shows unique identifying

2    numbers of the device, including an IMEI number, a phone number

3    related to the device, the make and model of the device, any

4    connected Apple IDs and as well as some of the settings that

5    were present on the device at the time of the preservation by

6    Apple.

7    Q.  What is an Apple ID?

8    A.  An Apple ID is basically sort of like a username that's

9    used by Apple so that people can log in to their accounts and

10   sort of navigate through their data.

11   Q.  And what was the Apple ID on this iCloud backup file?

12   A.  It's mavenatti@eaganavenatti.com.

13   Q.  And what kind of device did this account back up to the

14   iCloud account?

15   A.  This specific device is an iPhone 10S.

16          MR. SOBELMAN:  We can take this down.

17   Q.  Mr. Santos, what, if anything, did you do to prepare for

18   your testimony today?

19   A.  I went through the production that was, that I was provided

20   for this case and I loaded it into the Cellebrite, and I was

21   asked to focus on one specific conversation between this device

22   and a contact saved as Stormy Daniels.

23          MR. SOBELMAN:  Can we please show the witness what's

24   been marked for identification as Government Exhibit 613.

25   Q.  Mr. Santos, do you recognize this?

1   A.  I do.

2   Q.  What is it?

3   A.  This is another screenshot from the forensic tool that I

4   took.  Here, we're focusing on a, on identifying information

5   from a WhatsApp chat string between Stormy Daniels and the

6   owner of this device.

7              MR. SOBELMAN:  The government offers Government

8   Exhibit 613.

9              THE COURT:  Any objection?

10             MR. AVENATTI:  None.

11             THE COURT:  Admitted.

12             (Government Exhibit 613 received in evidence)

13             MR. SOBELMAN:  Please display it for the jury.

14  Q.  Mr. Santos, please describe what we see here on this

15  document.

16  A.  So, in this section, we would see the participants of the

17  specific conversation.  So here, you have -- Stormy Daniels is

18  listed as the first participant, and where you see the

19  redaction, it would be her phone number, because that's her

20  sort of contact on WhatsApp.  And below that is the other

21  person that's part of the conversation.  It reads "unknown."

22  Usually you would see the owner's -- of that device's or that

23  WhatsApp account's name.

24       Cellebrite usually gets these numbers from the contacts

25  list, but for this specific device, the phone number wasn't

1  present in his own contact list.  So that's why you see the

2  word "unknown."  But Cellebrite also puts the phrase "owner" to

3  make it clear who's the owner of the device so you can see

4  which messages are the outgoing messages when you're looking at

5  the chat string.

6  Q.  So just to be clear, there are two participants in the

7  conversations that you examined, is that correct?

8  A.  Yes.

9  Q.  And one was saved as Stormy Daniels, correct?

10  A.  Yes.

11  Q.  And the other is listed as unknown, but it has the

12  designation "owner," is that right?

13  A.  Correct.

14  Q.  And can you tell us again, what does owner mean in this

15  context?

16  A.  So, owner's a designation that's made by Cellebrite, by the

17  forensic tool that I use.  It usually -- it's usually listed

18  next to the messages that are outgoing on the device to make it

19  clear, you know, which are the outgoing messages, which side of

20  the conversation is from that device.

21          MR. SOBELMAN:  Can we put up Government Exhibit 612

22  next to this, please.

23  Q.  Just to be clear, owner in Government Exhibit 613 refers to

24  the person using the phone reflected in Government Exhibit 612,

25  is that right?

1    A.  Yes.

2            MR. SOBELMAN:  OK.  We can take these down.  And just

3    show the witness what's been marked for identification as

4    Government Exhibit 5.  And if we could put up the first page

5    and the last page, please.

6    Q.  Mr. Santos, do you recognize this?

7    A.  I do.

8    Q.  What is it?

9    A.  This is the entirety of the WhatsApp conversation between

10   Stormy Daniels and the owner of this device.

11   Q.  And how do you know what this document is?

12   A.  I created it.

13   Q.  How did you create it?

14   A.  Using the forensic tool Cellebrite, I navigated towards the

15   conversations between Stormy Daniels and the device, and I

16   created a report.  And I specifically chose the bubble-chat

17   version to make it easy to follow in court.

18           MR. SOBELMAN:  Can we take this down, please.

19   Q.  Mr. Santos, did you review government exhibits marked for

20   identification as 6 through 60 and their subparts in

21   preparation for your testimony today?

22   A.  Yes.

23   Q.  And what are those?

24   A.  Those are just excerpts of the chat conversation.

25   Q.  So each of those exhibits is a smaller part of what was in

M1rWave1                          Santos - Direct

1   Government Exhibit 5, is that right?

2   A.  Correct.

3   Q.  And with respect to some of the exhibits, they have A, B,

4   or C or D after them, is that right?

5   A.  Yes.

6   Q.  For example, 16, Government Exhibit 16 also has Government

7   Exhibit 16A, correct?

8   A.  Yes.

9   Q.  And what do the A, B, C, D exhibits contain?

10  A.  Some of the chats included attachments, in the form of

11  photos.  So that's what those are; they're just attachments to

12  the conversation.

13          MR. SOBELMAN:  At this time, your Honor, the

14  government will offer a number of exhibits.  I'll read them

15  slowly, two or three dozen of them.

16          THE COURT:  OK.  Slowly, please.

17          MR. SOBELMAN:  Yes, your Honor.

18          The government offers Government Exhibit 6, 16, 16A,

19  17, 19, 20, 21, 25, 26, 27, 28, 28A, 29, 32, 33, 33A, 34, 35,

20  36, 37, 38, 39, 40, 41, 42, 44, 45, 46, 47, 48, 49, 50, 50A,

21  51, 52, 53, 54, 55, 55A, 56, 57, 58, 59, 60, and 60A through D.

22          THE COURT:  Any objections?

23          MR. AVENATTI:  Objection, your Honor.  Foundation.

24  Hearsay.

25          THE COURT:  All right.  Give me a moment, please.

1          Overruled and admitted.  And just to be clear -- all

2     right.  Overruled and admitted.

3          (Government Exhibits 6, 16, 16A, 17, 19, 20-21, 25,

4     26-28, 28A, 29, 32-33, 33A, 34-42, 44-50, 50A, 51-55, 55A,

5     56-60, and 60A-60D received in evidence)

6          MR. SOBELMAN:  Let's take a look at just a few of the

7     messages.  If we could put up what's now in evidence as

8     Government Exhibit 6.

9     Q.  Mr. Santos, let's just get oriented with looking at these.

10    There are blue bubbles and green bubbles, correct?

11    A.  Correct.

12    Q.  And what account were the blue bubbles sent by?

13    A.  The contact saved as Stormy Daniels.

14    Q.  And what account were the green bubbles sent by?

15    A.  The owner of the Apple iCloud account, so it would be

16    Michael Avenatti.

17    Q.  And it says Stormy Daniels on the blue messages at the top,

18    is that right?

19    A.  Yes.

20    Q.  On the green, though, it says unknown?

21    A.  Correct.

22    Q.  Do you see that?

23    A.  Yes.

24    Q.  Can you just remind us, why does it say unknown?

25    A.  So, the name of the person sending or receiving these

1   messages would usually be derived from the contact list saved

2   on the phone.  For this specific device, the device phone

3   number for this iCloud account isn't saved in his contacts.  So

4   the Cellebrite tool doesn't have something to cross-reference

5   the account with.

6   Q.  And although the name doesn't show up, you can tell what

7   account it was sent and received by, right?

8   A.  Yes.

9   Q.  And it's the one associated with the phone we talked about

10  earlier?

11  A.  Yes.

12  Q.  At the bottom of the messages, there's a date and time.  Do

13  you see that?

14  A.  Yes.

15              (Continued on next page)

16

17

18

19

20

21

22

23

24

25

M1R8AVE2                          Santos - Direct

1    Q.  What does that reflect?

2    A.  The time and date that the message was set to receive.

3    Here it is set to New York Eastern Standard -- Eastern Daylight

4    Time.

5    Q.  There is something beneath the messages that says "status."

6    Do you see that?

7    A.  Yes.

8    Q.  What does that mean?

9    A.  On an incoming device, it could tell whether the message

10   was read or not.

11          Sorry, the directionality of the message.

12   Q.  So here, the first message says "read."  What does that

13   tell you about the directionality of the message?

14   A.  That it was an incoming message and the device detected

15   that it was read by the device, the message was looked at.

16   Q.  The Stormy Daniels account sent it to the device that these

17   messages were from, correct?

18   A.  Yes.

19   Q.  And that the Stormy Daniels -- this device, the defendant's

20   device, read that message, correct?

21   A.  Yes.

22   Q.  Underneath that it says "platform mobile."  What does that

23   mean?

24   A.  It means it's coming from a cell phone or some sort of

25   mobile device, maybe a tablet or probably the iPhone.

1    Q.  Let's read these messages.

2              If you could please read the blue and I will read the

3    green.

4    Q.  "Who is Judy?"

5    A.  "My trusted assistant who I trust with my life.  Number one

6    on my list of trusted people close to me.  She can be trusted

7    with anything.  Knows more about my life than I do."

8              Mr. Santos, can you just remind us, what is the date

9    on these messages?

10   A.  February 28, 2018.

11   Q.  Let's take a look at a couple more.

12             MR. SOBELMAN:  Please put up Government Exhibit 48.

13   Q.  Mr. Santos, what account sent this message?

14   A.  This is from the Stormy Daniels contact to the phone.

15   Q.  What account was it sent to?

16   A.  The Michael Avenatti iCloud.

17   Q.  If you can just lean into the microphone.  I am in a glass

18   box and it's a little hard to hear.

19   A.  Into the Michael Avenatti account.

20   Q.  What is the date on this message?

21   A.  December 5, 2018.

22   Q.  Can you please read the message on the screen?

23   A.  "When is the publisher going to cough up my money?"

24             MR. SOBELMAN:  Please go to the next page.

25   Q.  Mr. Santos, what account sent this green message?

1    A.  This is an outgoing message from the Avenatti account.

2    Q.  This is the same day as the prior message, correct?

3    A.  Yes.

4    Q.  It reads, "As for publisher, working them and threatening

5    litigation.  They need to pay you the money as you did your

6    part and then some."

7        Let's take a look at the rest of the messages on the page.

8        Mr. Santos, can you please read what is in the blue

9    bubbles?

10   A.  The next message says, "Ummm, yes."

11           Then below that, "How can they think for one moment

12   that they can get away with not paying me?"

13   Q.  Let's go to the next page.

14       Who sent this message?

15   A.  This is an outgoing message from the Avenatti account.

16   Q.  It reads, "No, they will have to pay you, Stormy."

17           Let's take a look at Government Exhibit 52.

18           "Any word from the publisher?"

19           Let me just pause.  I am going to ask you this just to

20   make sure there is no misunderstanding.

21           Who sent or from what account sent the blue messages?

22   A.  This is an incoming message from the Stormy Daniels

23   contact.

24   Q.  To the Avenatti account?

25   A.  Correct.

1    Q.  And on the right, in the green bubble, who sent that

2    message?

3    A.  An outgoing message from the Avenatti iCloud account.

4    Q.  What is the date on these messages?

5    A.  January 15, 2019.

6    Q.  Mr. Santos, can you please read the first bubble?

7    A.  "Any word from the publisher?"

8    Q.  "Not yet, but I expect this resolved this week.  Will be

9    good to get you the money.  When do you look at the property?"

10   A.  "Supposed to next week but going to book it till" -- excuse

11   me.  "Supposed to next week, but not going to book it till I

12   have the money."

13            MR. SOBELMAN:  Please go to the next page.

14   Q.  "Got it."

15       Just one more.  Let's take a look at Government Exhibit 60.

16       Mr. Santos, who are these messages sent by?

17   A.  The Avenatti iCloud account.

18   Q.  What account was it sent to?

19   A.  The Stormy Daniels.

20   Q.  What date are these messages?

21   A.  February 15, 2019.

22   Q.  This message reads, "I have good news re the book.  I can

23   call you in about two hours."

24            "Just got out.  Can you call me?"

25       "Trying to reach you.  Can you call me?  Thanks."

1    "Can you give me a call re the book payments, etc."

2          MR. SOBELMAN:  Let's go to the next page.

3    Q.  What is the date on these messages?

4    A.  February 18, 2019.

5    Q.  "Been trying to reach you since Friday re the book

6    payments, etc.  Please get back to me.  Thanks."

7    Q.  What are in the next two messages, the blue messages on the

8    left?

9    A.  These are file attachments, one of them looks like a

10   screenshot of a contract.

11   Q.  When you spoke earlier about the A, B, C, D exhibits, is

12   this what you meant that there are attachments to some of the

13   messages?

14   A.  Correct.

15   Q.  So let's take a look at -- if we can put up next to this

16   60A.

17         Mr. Santos, is what we see in 60A the attachment to

18   that first message on the left?

19   A.  Correct.

20         MR. SOBELMAN:  Let's put up 60B instead of 60A,

21   please.

22   Q.  60B, is that what we see in the second attachment message

23   on the left?

24   A.  Yes.

25   Q.  And these were being sent from the Stormy Daniels account

1    to the Avenatti account?

2    A.  Yes.

3           MR. SOBELMAN:  You can take down 60B and focus back on

4    60.

5           Page 2, please.

6    Q.  Let's read the message on the bottom.

7    A.  "I never received this payment that was sent to you.  Last

8    payment you gave me was number two via a check you deposited on

9    September 5."

10          MR. SOBELMAN:  Let's go to the next page, please.

11          Enlarge the top half of the page.

12   A.  "I didn't even know you had a trust account with my name on

13   it."

14   Q.  "Let me find out if we even received this payment."

15   A.  "Here is the wire proof.  You also waited over 30 days to

16   give me payment number two.  You have had payment three for

17   over five months.  Last payment, which is number four, is not

18   due quite yet."

19      Then there is an attachment below that.

20          MR. SOBELMAN:  Let's put government 60C next to this.

21   Q.  Mr. Santos, is this the attachment that's depicted on the

22   left?

23   A.  Yes.

24   Q.  So to be clear, the Daniels account sent this attachment to

25   the Avenatti account?

M1R8AVE2                         Santos – Direct

1    A.  Yes.

2    Q.  Let's just take a look back at 60, page 3.

3        The last message says, "Let me find out what is going on."

4        Let's look at the last page of this document, Exhibit 60.

5            MR. SOBELMAN:  We can take down 60C.

6    Q.  What is this, Mr. Santos?

7    A.  This is another attachment that was sent from the Stormy

8    Daniels contact.

9    Q.  Can you please read the title that's listed here?

10   A.  "I have retained Clark Brewster.  Here is his contact

11   details.  You can reach out to him directly."

12   Q.  Aside from the WhatsApp messages between the defendant and

13   Ms. Daniels, did you review any other contents of the

14   defendant's iCloud account?

15   A.  No.

16   Q.  Why not?

17   A.  I wasn't asked to do that.

18   Q.  Is that your role?

19   A.  No.

20   Q.  Aside from preserving and processing digital evidence, did

21   you have any other role in the investigation of this case?

22   A.  No.

23            MR. SOBELMAN:  No further questions.

24            THE COURT:  Cross-examination.

25   CROSS-EXAMINATION

 1    BY MR. AVENATTI:

 2    Q.  Mr. Santos, good morning.

 3    A.  Good morning.

 4    Q.  Now, if I understand your testimony correctly, you did work

 5    utilizing, is it Exhibit 401 and 402?

 6    A.  401 was provided to me.  They are the results from an Apple

 7    production.  So I didn't create those or touch those.  That's

 8    just what Apple gave us.

 9        402 is the result of a report that I created using the

10    forensic tool, yes.

11    Q.  OK.  So you obtained 401 from Apple, and then you used your

12    forensic tool Cellebrite to make a forensic copy that you then

13    worked off of, and that forensic copy is 402.  Do I have that

14    correctly?

15    A.  Yes.

16    Q.  Who told you to do that?

17    A.  The prosecution.

18    Q.  Who exactly on the prosecution team?

19    A.  I don't remember exactly, but I believe it might have been

20    Mr. Sobelman.

21    Q.  OK.  What exactly did he ask you to do?

22             MR. SOBELMAN:  Objection.

23             THE COURT:  Sustained.

24    Q.  Mr. Santos, you made a Cellebrite report, or a Cellebrite

25    forensic image, and you saved that on 402, correct?

M1R8AVE2                          Santos - Cross

1    A.  So that's not exactly accurate.  We use the phrase forensic

2    images when we are talking about extractions of devices.  This

3    was a production from Apple, which is a little bit different,

4    because that part, what we would consider an acquisition, is

5    just data provided to us by Apple pursuant to a search warrant.

6    So they have already given that to us, and I just put that data

7    into the Cellebrite tool and it just makes it a little bit

8    easier to navigate through.

9    Q.  OK.  So the Cellebrite report is on Exhibit 402?

10   A.  Yes.

11   Q.  OK.  What does that Cellebrite report allow you to do?  I

12   think you said something about searching?

13   A.  We can search key words, we can filter out data, we can

14   sort data, things of that nature.

15   Q.  Did you ever run the name Daniels in that Cellebrite

16   report?

17   A.  No.

18   Q.  Why not?

19   A.  Excuse me.  Correction.  I searched for the name Stormy

20   Daniels when trying to search for the specific conversation.

21   Q.  Well, my question is a little different.  Did you only

22   search the Cellebrite report for the specific conversation that

23   you were told to search or did you search the Cellebrite report

24   for all conversations with Ms. Daniels?

25   A.  I searched the report for other conversations with Stormy

1    Daniels, and then I was specifically asked to focus on this

2    WhatsApp conversation.

3    Q.   When you searched the report for other conversations with

4    Ms. Daniels, did you locate any?

5    A.   Yes.

6    Q.   What other conversations with Ms. Daniels did you locate?

7    A.   I saw there was at least one other iMessage string of

8    conversations, and I saw other chats in which she was a

9    participant in which there were sort of like group chats.

10   Q.   How long did it take you to find those when you searched

11   your Cellebrite report?

12   A.   Once I had the report loaded in front of me it just took

13   seconds to find.

14   Q.   And when did you do that, by the way?

15   A.   Approximately, about two months ago, maybe.

16   Q.   So you took the Cellebrite report, you searched for Ms.

17   Daniels's name, and you found multiple conversations, some

18   iMessage conversations, some WhatsApp conversations, some

19   conversations where it was just me and her and other

20   conversations where there was a third or a fourth party.  Do I

21   have that correct?

22             MR. SOBELMAN:  Objection.

23   A.   Yes.

24             THE COURT:  Sustained as to form.

25   Q.   We will break it down.

1      You searched the Cellebrite report for Ms. Daniels's name,
2  right?
3  A.   Correct.
4  Q.   You found the WhatsApp communication string that the
5  government asked you about, right?
6  A.   Yes.
7  Q.   You also found other WhatsApp communication strings between
8  me and Ms. Daniels and one or more third parties, right?
9  A.   Yes.
10 Q.   You also found iMessage communications between me and Ms.
11 Daniels, correct?
12 A.   Yes.
13 Q.   You also found iMessage communications or strings between
14 me and Ms. Daniels and one or more third parties, right?
15 A.   Yes.
16 Q.   In total, how many communication strings did you find
17 showing communications between or among me and Ms. Daniels?
18 A.   From my recollection, there were two strings where it was
19 just you two, one which was this WhatsApp, one with the
20 iMessage, and then maybe ten where you were both parties to a
21 larger conversation, so group chats.
22 Q.   And that took just seconds?
23 A.   Yes.
24 Q.   So in total, you found, if my math is correct, 12 different
25 communication strings where I was communicating with Ms.

1    Daniels or she was communicating with me?

2    A.  Yes.

3    Q.  But the government only asked you to take a look at one of

4    the 12?

5    A.  Yes.

6    Q.  Was that one of the prosecutors here today?

7    A.  Yes.

8    Q.  Which one?

9    A.  Mr. Sobelman.

10   Q.  Then after Mr. Sobelman asked you to take a look at one of

11   the 12 communication chat strings, you then exported that

12   string, am I right about that?

13   A.  Yes.

14   Q.  What did you do with the other 11?

15   A.  They still remain in a larger report.  So they weren't

16   altered or anything.

17   Q.  But you didn't do anything with them before you testified

18   here today, did you?

19   A.  No.

20   Q.  And the reason is because nobody asked you to?

21   A.  Correct.

22   Q.  How did you go about then exporting the single

23   communication string out of the 12, how did you go about

24   exporting that one of 12 communication strings?

25   A.  Well, once that string was identified and I was asked to

1  export it, Cellebrite has an option for exporting just that one

2  conversation string.  So I just selected that option and it

3  created another report.

4  Q.  And you could have exported all 12, but you just exported

5  the one, right?

6          MR. SOBELMAN:  Objection.

7          THE COURT:  Sustained.

8  Q.  Sir, you had the ability in the software to export all 12,

9  but you only exported -- I am focusing on the export -- the

10 one?

11         MR. SOBELMAN:  Objection.

12         THE COURT:  Sustained.

13         I think we have covered this ground, Mr. Avenatti.

14 Q.  How long did it take you to export the one string?

15 A.  Two, three minutes, maybe.

16 Q.  Did you look for any e-mails on the forensic copy?

17         MR. SOBELMAN:  Objection.

18         THE COURT:  Overruled.

19 A.  No.

20 Q.  Was that also because no one asked you to?

21         MR. SOBELMAN:  Objection.

22         THE COURT:  Overruled.

23 A.  Correct.

24 Q.  Did you look for any further communications -- strike that.

25         Did you look for any other communications between or among

M1R8AVE2                          Santos – Cross

1   Ms. Daniels and I in any other messaging apps, like Signal or

2   Telegram?

3   A.  I only have the data that was provided to us by Apple.

4   It's not a one-to-one copy to whatever was on the original

5   phone, and those apps were not included in that backup.

6   Q.  So there may have been communications on the original phone

7   that Apple did not have a copy of, am I right about that?

8            MR. SOBELMAN:  Objection.  Speculation.

9            THE COURT:  Overruled.

10  A.  It's possible.

11  Q.  Did you undertake any efforts to find out if any other

12  messages were on the phone?

13           MR. SOBELMAN:  Objection.

14           THE COURT:  Sustained.

15  Q.  Did you ask anyone to attempt to find if there were any

16  other messages on the phone?

17           MR. SOBELMAN:  Objection.

18           THE COURT:  Sustained.

19  Q.  At any point in time, did you -- strike that.  I want to go

20  back to that Cellebrite report.

21           Did you ever search for the name Luke Janklow?

22  A.  No.

23  Q.  Did you ever search for the name Sally Richardson?

24  A.  No.

25  Q.  Did you ever search for the name Denver Nicks?

M1R8AVE2                          Santos – Cross

1   A.  No.

2   Q.  Did you ever search for the name Judy Regnier?

3   A.  No.

4   Q.  Did you ever search for the name Sean Macias?

5   A.  No.

6   Q.  So as you sit here today, you don't know one way or the

7   other as to whether conversations with those individuals

8   relating to this case are within the Cellebrite report, am I

9   correct?

10  A.  Correct.

11  Q.  Because no one ever asked you to look?

12          MR. SOBELMAN:  Objection.

13          THE COURT:  Sustained.

14  Q.  Now, if we could please go to Exhibit 5.

15          MR. SOBELMAN:  It's not in evidence, your Honor.

16          MR. AVENATTI:  Just for the benefit of the witness.

17          THE COURT:  Just for the witness.

18  Q.  Mr. Santos, can you refresh my recollection of exactly what

19  Exhibit 5 is?

20  A.  This is the complete conversation string between the

21  contact saved as Stormy Daniels and yourself or the owner of

22  this iPhone 10S.

23  Q.  And you used this Exhibit 5 in preparing to testify here

24  today, correct?

25  A.  Yes.

M1R8AVE2                        Santos - Cross

1   Q.  And you relied on Exhibit 5 in preparing to testify here

2   today, correct?

3   A.  Yes.

4   Q.  And Exhibit 5 is a true and correct copy of the messages

5   between me and Ms. Daniels, according to the Cellebrite report

6   which came from the forensic copy, correct?

7   A.  Yes.

8           MR. AVENATTI:  Your Honor, the defense offers

9   Government Exhibit 5.  We have a redacted portion at DX AC,

10  Apple Charlie.

11          MR. SOBELMAN:  Objection, your Honor.  This document

12  is hundreds of pages and it includes 2500 messages, most of

13  which are irrelevant.

14          THE COURT:  Sustained.

15  Q.  Within the communication string that we are looking at, the

16  one of five --

17          MR. AVENATTI:  Can I just have it for the witness

18  again, Juliet.

19  Q.  Now, this is one of the 12, correct?

20  A.  Excuse me, one of 12?

21  Q.  Yes.  This is one of the 12 communication strings on the

22  Cellebrite report, this was the only one?

23          MR. SOBELMAN:  Objection.

24          MR. AVENATTI:  I am just orienting ourselves.

25          THE COURT:  I think we have gotten that point down.

1    So just ask your question.

2    Q.  So in this one of 12, there are 2457 messages between me

3    and Ms. Daniels, correct?

4              MR. SOBELMAN:  Objection.

5              THE COURT:  You may answer if you know the answer.  Is

6    that accurate?

7    A.  Can you repeat the question?

8    Q.  Sure.  In the extraction report that you obtained or ran in

9    Cellebrite, in preparing to testify here today, there are 2,457

10   messages between me and Ms. Daniels.  Am I correct about that?

11   A.  As part of this WhatsApp conversation, yes.

12   Q.  Now, if any WhatsApp messages were deleted before you

13   obtained the information from Apple, they would not be included

14   within this report, true?

15   A.  I don't know the answer to that.  We certainly have the

16   ability to recover deleted messages, but I don't know if

17   Apple -- if WhatsApp includes the database as part of the IOS

18   backup.  So with this being an IOS backup, I don't know.

19   Q.  Well, this information came from the cloud from Apple, not

20   from a cell phone, correct?

21   A.  The original source is a cell phone that was backed up to

22   the cloud, to Apple's iCloud service, which was then turned

23   over to us.  But I don't know which databases from that

24   original phone get backed up into the iCloud.  So I am less

25   certain about the whole issue about deletions and recovering

1   deleted items.

2   Q.  And you don't know if this came from the most recent

3   backup, do you?

4   A.  I don't know the date that Apple preserved this backup, no.

5   Q.  So it could have been the most recent backup or it could

6   have been an old backup, fair?

7   A.  I don't know either way.

8   Q.  Just so we are clear, so if there is a WhatsApp

9   communication between two people, and one of the people delete

10  one or more messages before the conversation is backed up to

11  the Cloud, those messages would not be in the Cloud, true?

12  A.  True.

13  Q.  And, therefore, those messages would not be on a copy, in

14  my hypothetical, that would be provided to you, true?

15  A.  True.

16  Q.  So you cannot tell the jury here today that all of the

17  WhatsApp communications between me and Ms. Daniels relating to

18  any topic are included within this Exhibit 5 and your

19  Cellebrite report, right?

20           MR. SOBELMAN:  Objection.

21           THE COURT:  Sustained.

22  Q.  Mr. Santos, you would agree, would you not, that the 2,457

23  messages are not all the messages between me and Ms. Daniels,

24  correct?

25           MR. SOBELMAN:  Objection.

M1R8AVE2                        Santos - Cross

 1            THE COURT:  Asked and answered.  Sustained.

 2            Mr. Avenatti, please.

 3  Q.  Mr. Santos, out of the 2,457 messages, you looked at

 4  excerpts, I think was either your word or the word that was

 5  used in the question.  Am I right about that?

 6            MR. SOBELMAN:  Objection.

 7            THE COURT:  Overruled.

 8  A.  Yeah, we focused on certain excerpts.

 9  Q.  Who is "we"?

10  A.  By "we," I mean the prosecution asked me to focus on

11  certain excerpts for the purpose of trial today.

12  Q.  Who asked you to do that?

13            THE COURT:  Sustained.

14            Mr. Avenatti, let's move on to the next line of

15  questioning, please.

16  Q.  Mr. Santos, the prosecution team identified the excerpts,

17  correct?

18            THE COURT:  Sustained.  Next line of questioning,

19  please.

20  Q.  Mr. Santos, out of the 2,457 messages, you did not focus on

21  all of them?

22            THE COURT:  Sustained.  Next line of questioning,

23  please.

24  Q.  Mr. Santos, are there any text messages that were not

25  included in the excerpts that relate to this case, or do you

M1R8AVE2                              Santos - Cross

1    know?

2              THE COURT:  Sustained.

3              A couple more questions, Mr. Avenatti.

4              MR. AVENATTI:  Your Honor, could I have one moment?

5              THE COURT:  You may.

6              MR. AVENATTI:  Thank you.

7              (Defense counsel confer)

8    Q.  Mr. Santos, if I could direct your attention to GX 7.

9              MR. AVENATTI:  For the witness only.

10   A.  OK.

11   Q.  Do you have that in front of you?

12   A.  Yes.

13   Q.  This is one of the text messages, one of the excerpts that

14   you focused on in preparing to testify here today, correct?

15   A.  Yes.

16   Q.  Did you review all Exhibits 6 through 60 in preparing to

17   testify here today?

18   A.  Yes.

19   Q.  Did that review refresh your recollection in order to

20   prepare you to testify here today?

21   A.  Yes.

22             MR. AVENATTI:  Your Honor, at this time the defense

23   offers Exhibit 7.

24             MR. SOBELMAN:  Objection.

25             THE COURT:  Sustained.

1    Q.  Can you please turn to Exhibit 8.

2         Exhibit 8 is one of the excerpts that you focused on,

3    correct?

4    A.  Yes.

5              MR. AVENATTI:  Your Honor, defense offers Exhibit 8.

6              MR. SOBELMAN:  Objection.

7              THE COURT:  Sustained.

8              Mr. Avenatti, a couple more questions and then we will

9    wrap this up.

10   Q.  Mr. Santos, I want to direct your attention to Exhibits 9,

11   10, 11, 12, 13, 14, 15, 18, 22, 23, 24, 30, 31 and 43, all

12   government exhibits.

13        Do you have a binder?

14   A.  I don't.

15             MR. AVENATTI:  Your Honor, could I approach?

16             THE COURT:  You may.

17   Q.  Mr. Santos, I will give you the numbers again, if that

18   would help.

19   A.  Yes, please.

20   Q.  Would you like a piece of paper, maybe, to write them down

21   on?

22             THE COURT:  Just ask your question, Mr. Avenatti.

23   Q.  7, 8, 9, 10, 11, 12, 13, 14, 15, 18, 22, 23, 24, 30, 31,

24   and 43.

25   A.  Got them.

1  Q.  Those are all text messages between me and Ms. Daniels

2  within the same WhatsApp conversation string, correct?

3  A.  Yes.

4  Q.  Those are all text messages that you reviewed in preparing

5  to testify here today and which refreshed your recollection

6  like the others, correct?

7  A.  WhatsApp messages, yes.

8          MR. AVENATTI:  Your Honor, at this time the defense

9  offers those text messages into evidence.

10         MR. SOBELMAN:  Objection.

11         THE COURT:  Give me a moment, please.

12         Counsel and Mr. Avenatti, can I see you at sidebar,

13  please.

14         (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

M1R8AVE2                        Santos – Cross

1          (At the sidebar)

2          THE COURT:  What is your theory of admissibility here,

3    why they are not hearsay?

4          MR. AVENATTI:  First of all, they are not offered for

5    the truth of the matter asserted.  The witness testified that

6    he reviewed all of the text messages, 6 through 60.

7          THE COURT:  I am not concerned about the foundation

8    authenticity.  The question is what is the purpose for which

9    they are offered.

10          MR. AVENATTI:  They are not offered for the truth of

11   the matter asserted.

12          THE COURT:  What are they offered for?

13          MR. AVENATTI:  To show the level of communication, the

14   back and forth between Ms. Daniels during this time period.

15          THE COURT:  You have in the record that, just in this

16   chat alone, of which this is one of 12, there is something in

17   the nature of 2,475.  That fact is before the jury.  You don't

18   need the communication to establish that.

19          What is your next argument?

20          MR. AVENATTI:  My next argument, your Honor, is that

21   the witness testified on the stand that these text messages

22   refreshed his recollection in preparing to testify here today.

23   And I believe that if the witness testifies that the witness

24   used the documents to prepare to testify, and that those

25   documents refreshed his recollection, I believe that I am

M1R8AVE2                          Santos - Cross

1   entitled to explore that and certainly publish them and get

2   them into evidence.

3          THE COURT:  You're wrong about that.  What is your

4   next argument?

5          MR. AVENATTI:  Your Honor, these text messages are not

6   indistinguishable from the text messages that the government

7   was permitted to introduce over my objections.

8          THE COURT:  Mr. Avenatti, the government is entitled

9   to offer your statements because you're the defendant in this

10  matter and a party opponent.  You are not allowed to offer your

11  statements for the truth because you are not a party opponent,

12  you are yourself.

13         So my question is -- I will give you one more

14  opportunity -- can you articulate a nonhearsay basis to admit

15  these statements of yours?

16         MR. AVENATTI:  Yes, your Honor.  Each of these

17  statements also go to my state of mind during the course of the

18  representation and during the course of the conduct that the

19  government -- the time period of the conduct and the conduct

20  that the government alleges substantiates their case.  So each

21  of these text messages go directly to my state of mind and the

22  knowledge that I had during the time period at issue.

23         MR. SOBELMAN:  There is still a relevance problem.

24  But even setting that aside, it's just a backdoor nonhearsay

25  exception.  It doesn't exist.  If they are not true and they

M1R8AVE2                         Santos - Cross

1    are not being asserted for the truth, it doesn't matter.

2              THE COURT:  Hold on.  If they are relevant to Mr.

3    Avenatti's state of mind, then that's a different question, and

4    if his state of mind at the time of those messages is relevant,

5    then I think that's a proper nonhearsay basis.  So my question

6    is focused on that.

7              I think one problem we have is at least through GX 22

8    they are from March of 2018, or thereabouts, and as far as I

9    understand, the government's theory is that the scheme here

10   began in or about July, and in that sense I think his state of

11   mind in March is not relevant.

12             MR. SOBELMAN:  Yes, your Honor.

13             THE COURT:  Focusing then on the texts from July or

14   thereabouts.

15             MR. SOBELMAN:  I think we would have to go document by

16   document.  We had no notice from the defendant that he intended

17   to offer these.  We told him two days ago which ones we were

18   going to offer.

19             MR. AVENATTI:  I would also add that these text

20   messages document the work, the quantity, and the quality of

21   the work that I did in connection --

22             THE COURT:  Hold on.

23             Anyone have an objection if I tell the jurors, if they

24   want to use the restrooms, they can just walk through and use

25   the restrooms?

1          MR. AVENATTI:  No objection.

2          MR. SOBELMAN:  No.

3          THE COURT:  Just tell anyone, if they need the

4     restroom, this is a good opportunity.

5          MR. AVENATTI:  So, your Honor, the text messages also

6     go to establish the amount of work that I did, the quality of

7     the work, the quantity of the work, all of these issues which

8     bear on whether I had a reasonable expectation -- my

9     expectation doesn't even have to be reasonable, frankly -- a

10    belief that I was entitled to the money.  All of these text

11    messages go to that issue.  They all go to my state of mind.

12    They all relate to the fee contract, the work that was done

13    pursuant to the fee agreement.

14          I have one last point that I would like to make.  The

15    government was permitted to put into evidence on direct not

16    only my statements, but also the statements of Ms. Daniels.

17    Some of those may be contextual, they can make that argument,

18    some of them are not contextual.  But the statements of Ms.

19    Daniels are not my admissions or my statements.  So those

20    statements are hearsay.  I made a hearsay objection.  Your

21    Honor overruled the objection.  I respect your decision.

22          THE COURT:  That's a separate issue, and if you

23    request it, I will consider instructing the jury that her

24    statements from these texts are not to be considered for their

25    truth, but merely for her state of mind and for context.

1          Any objection to that?

2          MR. PODOLSKY:  No.  It should be clear that they are

3    to explain Mr. Avenatti's responses.

4          THE COURT:  That's what context means.

5          I am going to go back on the bench and review the last

6    few messages and decide whether they are probative to Mr.

7    Avenatti's state of mind at any time that is relevant here, and

8    then I will give you my ruling.

9          MR. AVENATTI:  Your Honor, I just want to note for the

10   record, the same issues are present as it relates to Exhibit 5

11   and the defense's ability to put in the text messages that

12   comprise Exhibit 5.  I attempted to put in the entirety of the

13   text communications by way of Exhibit 5, which the witness had

14   utilized in preparing to testify.  The Court denied that.

15         THE COURT:  I rejected that, and we are not going to

16   revisit that.

17         MR. AVENATTI:  There are other text messages within

18   that that also go to my state of mind.

19         THE COURT:  If you want to move a particular text

20   message and you have an argument as to why it is admissible, I

21   am happy to consider that.  What you cannot do is try to

22   smuggle a ton of hearsay and a ton of irrelevant evidence into

23   the record by offering 2,475 messages.  That's not happening.

24   To the extent that they are relevant, it is vastly outweighed

25   by the potential for unfair prejudice, including the issue of

1    misleading the jury and waste of time, and it's not happening.

2    Thank you.

3              (Continued on next page)

1           (In open court)

2           THE COURT:  Ladies and gentlemen, just give me a

3    minute or two to review a couple of things and then we will

4    proceed.

5           (Pause)

6           THE COURT:  All right.  The government's objections

7    are sustained with respect to all the exhibits except the

8    following:  22 and 31, and 43.  So those three exhibits are

9    admitted.  The remainder are not admitted.

10          Mr. Avenatti, you may proceed, unless please wrap this

11   up.

12          MR. AVENATTI:  Your Honor, may I retrieve my binder?

13          THE COURT:  You may.

14          Ladies and gentlemen, while Mr. Avenatti does that,

15   let me give you a couple of instructions.

16          First of all, in those three exhibits, 22, 31 and 43,

17   you may consider Mr. Avenatti's statements not for the truth of

18   anything asserted in the statement, but only for the fact that

19   the statement was sent and for what it says, if anything, about

20   his state of mind.  So those are the only purposes for which

21   you may consider his statements in these text messages or these

22   messages.

23          More broadly, the messages that were admitted earlier

24   that the government had offered, just to clarify and make

25   clear, you may consider Mr. Avenatti's statements in those for

M1R8AVE2                          Santos - Cross

1   the truth -- that is to say, the limiting instruction does not

2   apply to those exhibits that are offered by the government.

3   With respect to any statements in those that are not Mr.

4   Avenatti's, that came from the account associated with the name

5   Stormy Daniels, you can consider those for context, for

6   understanding Mr. Avenatti's statements, and you can consider

7   them for the state of mind of the person who sent those

8   messages.  So those messages you can't consider for the truth,

9   but you can consider for either of those two purposes.  Mr.

10  Avenatti's statements in the exhibits that the government

11  offered you may consider for their truth.

12          I hope that is clear.  I will give you further

13  instructions on that at the end of the case, but I just want to

14  make that clear at this stage.

15          So again, with those instructions, the exhibits 22, 31

16  and 43 are admitted.

17          (Government's Exhibits 22, 31 and 43 received in

18  evidence)

19          MR. AVENATTI:  Thank you, your Honor.

20          Could we have Exhibit 22 for the jury, please.

21  BY MR. AVENATTI:

22  Q.  Mr. Santos, do you have that?

23  A.  I do.

24  Q.  I want to have a read-along with you like you did with the

25  government moments ago.  So you are going to read Ms. Daniels's

1    part, and I am going to read my part.  Fair?

2    A.  OK.

3    Q.  Go ahead.

4    Q.  I will start.

5         "Just tried you.  The publisher sees a big potential

6    for the audio so now wants to find two dates before August 15

7    (instead of August 30) for you to record."

8    A.  I don't have the next page.

9         MR. AVENATTI:  Can I have the next page, please.

10   A.  "Getting luggage.  Call you when get to hotel.  Totally

11   impossible to dates before August 15.  Unless I manage to get

12   out of Big Brother.  It's giving me anxiety and I can't talk on

13   the phone except one hour the whole week.  As of now I can't do

14   the audio till August 29."

15   Q.  "OK.  I will handle with the publisher.  Don't worry.  I

16   got it."

17        MR. AVENATTI:  Please turn to, or can we please have

18   Exhibit 31 for the witness and the jury.

19   A.  "I don't give a shit anymore.  You did same with Kimmel.

20   You talked mad shit about him to me and next thing I know you

21   turn up at Disney with him and he thinks you love him.  Then

22   I'm surprised with news that you are going to the show with me.

23   I don't care if you do it or not."

24        THE COURT:  I think it was going on the show with me,

25   not to the show.  Is that correct?

```
 1              THE WITNESS:  Sorry.  You're correct.
 2              MR. AVENATTI:  Next page, please.
 3    Q.  "I was never going on the show with you!  I have no idea
 4    what you are talking about.  I never discussed that with them
 5    or him.  I saw him and his producer at Disney and it was a live
 6    fest about how great you are.  I never speak badly about you,
 7    Stormy, ever.  Why would I go on with you?  That's your gig.  I
 8    was never going on.  Never discussed it, ever."
 9    A.  "It's about you taking stuff out of my book and thinking I
10    will buy the excuse of it being client privilege.  It's not.  I
11    checked the bar info myself.  It's about conversations going on
12    behind my back.  FYI Luke still has not called me.  Not that I
13    even want to speak to him at this point.  I hope he fucking
14    chokes on the money he makes off of me.  And I know you never
15    speak poorly of me.  I'm sure of that, if for no other reason
16    then you would look bad too."
17    Q.  "Please stop lashing out at me.  I don't speak badly about
18    you because I have your back and I am your friend and I care
19    about you.  I don't know what you are upset about being deleted
20    from your book.  I am happy to discuss this with you.  I don't
21    know what you reviewed, but I'm very familiar with the
22    attorney-client privilege and have litigated those issues many,
23    many times.  I know how it works and how it plays out.  95
24    percent of attorneys would advise their client to not even do a
25    book until the case was concluded.  Also, the publisher made
```

M1R8AVE2                          Santos - Cross

some of the changes for legal reasons.  But I am not sure what
sections you are upset about so I can't comment on who did what
until I know."

"BTW, I constantly build you up in the press, on TV, and on
social media.  I am infusive about you, what you stand for and
how terrific and heroic you are.  People always comment on it
at the highest levels.  I go out of my way to compliment you
and stand up for you.  I hope you see that because it is
sincere."
A.  "I do.  And same here.  That is not my issue."
Q.  "OK.  I would like to better understand your issue.  I
think that you think that a lot more stuff is going on 'behind
your back' than really is.  But I have heard you loud and clear
the last few days and will ensure that you are informed and in
control.  I apologize if I didn't do my part.  I really want
you happy and will do what I can to make that a reality."

            MR. AVENATTI:  If you could please turn to 43.
Q.  "Can you call me?"

"Stormy, the campaign is basically a continuation of the
prior campaign.  I was simply trying to jump start the efforts
again.  Nothing more, nothing less.  I thought in light of
Efran, etc. you could use the money.  I didn't think it was a
big deal.  No different than the prior updates.  I'm sorry."

"You can't send that statement, Stormy.  I don't deserve
that, please."

1          "I understand you are upset about Keith, et al., but I have

2     been your advocate and friend.  I don't know why you would go

3     after me in the press like this.  That's not good or fair."

4          Mr. Santos, did I read that correctly?

5     A.  Yes.

6               MR. AVENATTI:  Nothing further.

7               THE COURT:  Redirect.

8               MR. SOBELMAN:  Yes, your Honor.

9     REDIRECT EXAMINATION

10    BY MR. SOBELMAN:

11              MR. SOBELMAN:  If we could please take a look at

12    Government Exhibit 802 on one side and 22 on the other.

13              THE COURT:  Mr. Sobelman, if you could move the mic a

14    little closer.

15              MR. SOBELMAN:  Sorry.  Is this better?

16              THE COURT:  Yes.

17              MR. SOBELMAN:  Thank you.

18              (Continued on next page)

19

20

21

22

23

24

25

1          MR. SOBELMAN:  Go to page 3 of 802 on the left and

2    page 2 of 22 on the right.

3    Q.  Mr. Santos, do you see Government Exhibit 802, page 3, on

4    the side of your screen?

5    A.  Yes.

6    Q.  And do you see there's a column that says "payment"?

7          MR. AVENATTI:  Outside the scope, your Honor.

8          THE COURT:  Sorry.  Give me a moment.

9          Overruled.

10   BY MR. SOBELMAN:

11   Q.  Do you see the column that says "payment"?

12   A.  Yes.

13   Q.  Do you see where it says "payment to" in the middle row?

14   A.  Yes.

15   Q.  What are the dates on those two payments in the date

16   column?

17   A.  August 1, 2018, and August 3, 2018.

18   Q.  Do you recall the defendant asking you to read Government

19   Exhibit 22 with you?

20   A.  Yes.

21   Q.  And when were those messages sent?

22   A.  August 1, 2018.

23   Q.  Did any of those messages mention Ms. Daniels's book

24   advance payments?

25         MR. AVENATTI:  Objection.  Best evidence, your Honor.

1           THE COURT:  Sustained.

2           MR. SOBELMAN:  Let's take a look, leave 802 up and put

3    up Government Exhibit 31.

4    Q.  Mr. Santos, do you recall the defendant asking you to read

5    from Government Exhibit 31?

6    A.  Yes.

7    Q.  And what's the date on those messages?

8    A.  September 20, 2018.

9    Q.  OK.  And on the left here, Government Exhibit 802, do you

10   see where it says "payment 3"?

11   A.  Yes.

12   Q.  What's the date next to that?

13   A.  September 17, 2018.  Of.

14   Q.  And in Government Exhibit 31, how many messages were about

15   Ms. Daniels's book advance payments?

16          MR. AVENATTI:  Same objection, your Honor.

17          THE COURT:  All right.  Sustained.

18          You'll have an opportunity to make closing arguments

19   later.

20          MR. SOBELMAN:  Take a look at Government Exhibit 43,

21   please.  If we can put 802, page 3, up next to it.

22   Q.  During your cross-examination, Mr. Avenatti read these

23   messages, is that right?

24   A.  Yes.

25   Q.  And what's the date on those?

1    A.  November 28, 2018.

2              MR. SOBELMAN:  Sorry.  Can we just take a look at 802,

3    page 3.

4    Q.  And what's the date on the third payment?

5    A.  September 17, 2018.

6              MR. SOBELMAN:  OK.  Just a few more questions.  You

7    can take down the exhibits.

8    Q.  Mr. Santos, do you recall being asked questions about

9    searches you did or did not run in the defendant's iCloud

10   account?

11   A.  Yes.

12   Q.  And as part of your responsibility in processing the

13   forensic evidence, did you provide a copy of the iCloud account

14   to the investigative team?

15   A.  Yes.

16   Q.  Do you have any idea what searches the investigative team

17   ran in that iCloud account?

18   A.  No.

19   Q.  And you provided that to the investigative team more than

20   two years ago, right?

21   A.  Yes.

22   Q.  So there would have been plenty of time for the

23   investigative team to conduct any searches that they thought

24   were appropriate, right?

25             MR. AVENATTI:  Objection.  Argumentative.

M1rWave3                          Santos – Redirect

1   Speculative.

2                THE COURT:  Sustained as to form.

3   BY MR. SOBELMAN:

4   Q.  Mr. Santos, aside from processing forensic evidence, did

5   you have any other role in the investigation of this case?

6   A.  No.

7   Q.  Do you recall being asked some questions on

8   cross-examination about whether messages could have been

9   deleted?

10  A.  Yes.

11  Q.  Whose account did the messages we looked at come from?

12  A.  The iCloud account of the phone by Mr. Avenatti.

13  Q.  And those messages were between him and Ms. Daniels,

14  correct?

15  A.  Yes.

16  Q.  If Ms. Daniels had deleted a message on her phone, would

17  that have had any effect on the version in Mr. Avenatti's

18  iCloud account?

19               MR. AVENATTI:  Speculation.

20               THE COURT:  I'll allow it.

21  A.  No.

22  Q.  So the only way a message could have been deleted in the

23  version we looked at is if the defendant deleted it, correct?

24  A.  Correct.

25               MR. SOBELMAN:  No further questions.

1            MR. AVENATTI:  Your Honor, I have four questions on
2    recross.
3            THE COURT:  I will give you four and only four.
4            MR. AVENATTI:  Thank you, your Honor.
5            Could I have Government Exhibit 107, please.
6            Your Honor, one moment?
7            For the record, your Honor, it's 802, page 3.  I was
8    mistaken.
9    RECROSS EXAMINATION
10   BY MR. AVENATTI:
11   Q.  Mr. Santos, I want to direct your attention to this date
12   column.  Do you see that?
13   A.  Yes.
14   Q.  At any point in time were you asked to look for all
15   messages with Ms. Daniels occurring on or about any of these
16   dates?
17           MR. SOBELMAN:  Objection.
18           THE COURT:  Sustained.
19   BY MR. AVENATTI:
20   Q.  Mr. Santos, you don't know if there were other WhatsApp
21   messages, iMessages, emails, or any other communications
22   between me and Ms. Daniels around these dates because you never
23   looked for them, isn't that true?
24           MR. SOBELMAN:  Objection.
25           THE COURT:  Sustained.

1          You have one more question, Mr. Avenatti.

2    BY MR. AVENATTI:

3    Q.  Were there any iMessages sent between me and Ms. Daniels on

4    any of these dates, if you know?

5          MR. SOBELMAN:  Objection.

6          THE COURT:  Sustained.

7          Thank you.

8          Mr. Santos, you may put your mask back on and step

9    down.  You're excused at this time.

10          (Witness excused)

11          THE COURT:  Next witness, please.

12          MR. SOBELMAN:  The government calls Stephanie

13    Clifford, also known as Stormy Daniels.

14     STEPHANIE CLIFFORD,

15        called as a witness by the government,

16        having been duly sworn, testified as follows:

17          THE COURT:  You may proceed, Mr. Sobelman.

18    DIRECT EXAMINATION

19    BY MR. SOBELMAN:

20    Q.  Good morning.

21        Can you see me?  Scoot over maybe a little.  The setup is

22    not ideal.

23        Good morning.

24    A.  Good morning.

25    Q.  What is your legal name?

1    A.  Stephanie Clifford.

2    Q.  What, if any, other name do you prefer to use?

3    A.  Stormy Daniels.

4    Q.  Why do you use the name Stormy Daniels?

5    A.  That's my stage name.

6    Q.  Do you use the name Stormy Daniels in both your personal

7    and professional lives?

8    A.  Yes.

9    Q.  Do you prefer to be called Ms. Daniels today in court?

10   A.  Yes, please.

11   Q.  Ms. Daniels, are you familiar with an individual named

12   Michael Avenatti?

13   A.  Yes.

14   Q.  Have you met him in person?

15   A.  Yes.

16   Q.  Can you please take a look around the courtroom, and if you

17   see Michael Avenatti, please identify where he is and an item

18   of clothing he is wearing?

19   A.  He's the gentleman standing up --

20             THE COURT:  Indicating Mr. Avenatti.

21   A.  -- in the blue shirt.

22             THE COURT:  Indicating Mr. Avenatti.

23   BY MR. SOBELMAN:

24   Q.  Ms. Daniels, generally how do you know the defendant?

25   A.  He was my attorney.

1  Q.  Is he still your attorney today?

2  A.  No, he is not.

3  Q.  Approximately when did he stop being your attorney?

4  A.  February 2019.

5  Q.  What is your understanding of why he stopped being your

6  lawyer?

7  A.  Because I hired a new attorney because he stole from me and

8  lied to me.

9  Q.  In particular, what did you believe he had lied to you

10  about?

11  A.  Payments from the publisher about my book.

12  Q.  I'm going to ask you some more questions about that later,

13  but first, let's take a step back.

14      Where do you live?

15  A.  New Orleans, Louisiana.

16  Q.  What do you currently do for work?

17  A.  I am a writer, director, actress, currently in production

18  of a television show about paranormal activity.

19  Q.  Approximately when did you first meet the defendant?

20  A.  February of 2018.

21  Q.  At that time what did you do for work?

22  A.  All of the above, actress, model, director, writer.  I was

23  also a dancer and worked in adult films.

24  Q.  How did you come to meet the defendant?

25  A.  He was introduced to me or recommended to me from another

1     attorney.

2     Q.  Who was that attorney?

3     A.  His name was Sean.

4     Q.  Do you recall his last name?

5     A.  I don't.

6     Q.  Why were you looking for an attorney at that time?

7     A.  Because I was trying to find out the -- my legal rights and

8     how to get out of a nondisclosure deal.

9     Q.  What is a nondisclosure --

10    A.  It was --

11    Q.  -- deal or agreement?

12    A.  -- a contract about not talking about certain things.

13    Q.  And who did you have that agreement with?

14    A.  Donald Trump.

15    Q.  Where did you first meet the defendant?

16    A.  Beverly Hills.

17    Q.  Where specifically in Beverly Hills?

18    A.  The Waldorf Astoria hotel.

19    Q.  Who chose that location to meet?

20    A.  It was either Michael or Sean.  It wasn't me.

21         MR. SOBELMAN:  Ms. Abrams, can we please show the

22    witness what's been marked for identification as Government

23    Exhibit 603.

24    Q.  Ms. Clifford, can you see the exhibit?

25         MR. SOBELMAN:  We seem to be having a technical issue,

M1rWave3                        Clifford - Direct

1   your Honor.  Give me one moment.

2              THE COURT:  All right.  Thank you.  You have it now.

3   Q.  Ms. Daniels, do you recognize what is shown in this

4   photograph?

5   A.  Where am I looking?

6   Q.  Is it appearing on the screen in front of you?

7   A.  No.

8              THE COURT:  We'll --

9              THE WITNESS:  It's black.

10             THE COURT:  Hang on one second, Ms. Daniels.  You

11  prefer to be called Ms. Daniels.

12             THE WITNESS:  Uh-huh.

13             THE COURT:  Ms. Daniels, sorry to inconvenience you.

14  Do you mind putting on your mask and just stepping down from

15  the witness box for one moment --

16             THE WITNESS:  Sure.

17             THE COURT:  -- so our AV staff can take a look and see

18  what the problem is?  Thank you.

19             Mr. Sobelman, do we have a hard copy of this exhibit,

20  perhaps?  If we can't figure this out now, maybe we can keep

21  going and get to the break and figure it out.

22             MR. SOBELMAN:  Yes, your Honor.

23             THE COURT:  All right.  We'll do this at 11:30 and try

24  to fix the problem.  Thank you.

25             All right.  Now that you're back in the box, you may

1   remove your mask.

2           Sorry for the delay.

3           Mr. Sobelman, go ahead.

4   BY MR. SOBELMAN:

5   Q.  Ms. Daniels, can you please turn in the binder I just

6   handed you to the tab marked 603?

7   A.  Would that be GX --

8   Q.  Yes, Ms. Daniels.  GX-603.  Thank you.

9   A.  OK.

10  Q.  Do you recognize what's shown in this photograph?

11  A.  Yes.

12  Q.  What is it?

13  A.  It is the lobby/bar area of the Waldorf Astoria in Beverly

14  Hills.

15  Q.  That's where you met the defendant for the first time?

16  A.  Yes.

17          MR. SOBELMAN:  The government offers Government

18  Exhibit 603.

19          THE COURT:  Any objection?

20          MR. AVENATTI:  No objection.

21          THE COURT:  Admitted.

22          (Government Exhibit 603 received in evidence)

23          MR. SOBELMAN:  Please display it for the jury.

24          THE COURT:  Folks, can you give me a thumbs up if

25  you're able to see it?

1          It appears things are working.  Thank you.

2     BY MR. SOBELMAN:

3     Q.  Ms. Daniels, who was there for your first meeting with the

4     defendant?

5     A.  It was myself, Michael, and my then assistant, Michaela.

6     Q.  And generally, what did you discuss with the defendant in

7     that very first meeting?

8     A.  We got to know each other, and then he asked me about the

9     nondisclosure agreement and the history with Donald Trump, the

10    legalities of that, and whether or not he would consider taking

11    the case.

12    Q.  During that first meeting, what, if anything, did you and

13    the defendant discuss regarding payment for him to represent

14    you?

15    A.  I explained to him that I didn't have a large deposit or

16    retainer to spend and that I was concerned about finding

17    someone that I could afford.

18    Q.  Why did you tell him that you were concerned about finding

19    someone you could afford?

20    A.  Because I didn't have a lot of money.

21    Q.  How, if at all, did the defendant respond at that meeting

22    when you told him that you were concerned about affording an

23    attorney?

24    A.  He said he'd -- we could work it out; he'd think about it.

25    Q.  How did that meeting end?

1    A.  Pleasantly, with us saying good night and he would be in

2    touch.

3    Q.  When did you next see the defendant?

4    A.  Less than 24 hours later.

5    Q.  Where did you meet him?

6    A.  A restaurant, for lunch, in Beverly -- I mean Los Angeles.

7         MR. SOBELMAN:  We can take this exhibit down.

8    Q.  Who was there for that second meeting with the defendant?

9    A.  It was the same three of us, myself, Michael and Michaela.

10   Q.  Generally, what did you discuss with the defendant in that

11   second meeting?

12   A.  More of the same, but with more attention to the cost of

13   representation and what that would entail.

14   Q.  What, if anything, did the defendant say during that

15   meeting about how much you would pay him to be your attorney?

16   A.  He said it would be a hundred dollars.

17   Q.  What, if anything, did he say about whether he would

18   receive other payments later in addition to the $100?

19   A.  He said he was going to set up a legal defense fund that

20   was crowd funded and that he would win -- he would take a lot

21   of money from the winnings against Donald Trump.

22   Q.  At that meeting, was there any mention of a book deal?

23   A.  Yes.

24   Q.  What, if anything, did the defendant say at that meeting

25   about a book deal?

1   A.  A book -- that when it came to a book deal or a movie or a

2   documentary, we would discuss it later.

3   Q.  What, if any, documents did the defendant bring to that

4   meeting?

5   A.  A retainer.

6           MR. SOBELMAN:  Ms. Abrams, could you please show in

7   evidence what's in evidence as Government Exhibit 3 and focus

8   on the top half of the page.

9   Q.  Ms. Daniels, if you could turn to GX-3 in the binder in

10  front of you.

11          Do you have it in front of you?

12  A.  Yes.

13  Q.  Ms. Daniels, do you recognize this document?

14  A.  Yes.

15  Q.  What is it?

16  A.  It is the retainer that Michael gave me.

17  Q.  At the meeting we were just talking about?

18  A.  Yes.

19  Q.  Did you sign this agreement?

20  A.  I did.

21  Q.  And what is your understanding of who wrote this agreement?

22  A.  Michael.

23  Q.  What, if any, edits did you make to this agreement before

24  signing it?

25  A.  None.

1   Q.  Can you please read the name of the law firm at the top of

2   the agreement?

3   A.  Eagan Avenatti, LLP.

4   Q.  Aside from the defendant, do you recall dealing with any

5   other lawyers at his firm?

6   A.  No.

7   Q.  What's the date on this agreement?

8   A.  February 27, 2018.

9   Q.  What's the title on the agreement?

10  A.  Attorney-client fee contract.

11  Q.  Can you please read the first paragraph?

12  A.  The top or No. 1?

13  Q.  The first paragraph that starts this attorney-client fee

14  contract.

15  A.  OK.  "This attorney fee contract (this 'agreement') is the

16  written fee contract that California law requires lawyers to

17  have with their client.  It is between Eagan Avenatti, LLP,

18  Avenatti & Associates, APC, and Michael J. Avenatti, Esq.,

19  (collectively, the 'attorney') on one hand, and Stephanie

20  Clifford a/k/a Stormy Daniels (collectively the 'clients' and

21  each a 'client') on the other."

22  Q.  Who is Stephanie Clifford, a/k/a Stormy Daniels?

23  A.  Me.

24  Q.  What does a/k/a mean?

25  A.  Otherwise known -- also known as.

M1rWave3                          Clifford - Direct

1   Q.  Let's take a look at the paragraph that says "2, scope of

2   services."

3   A.  Yes.

4   Q.  Could you please read the first sentence that starts

5   "clients are hiring"?

6   A.  Yes.  "Clients are hiring attorney to represent clients in

7   connection with (a)" --

8                THE COURT:  Slow down, please.

9                THE WITNESS:  Sorry.

10                THE COURT:  Thanks.

11   A.  "With (a) providing clients with counsel and advice

12   relating to clients' prior negotiation and execution of various

13   alleged agreements concerning clients' prior relationship with

14   Donald Trump; (b) providing clients with counsel and advice

15   concerning various media appearances; and (c) assisting clients

16   with voiding various alleged" service -- I'm sorry, "alleged

17   agreements concerning clients' prior relationship with Donald

18   Trump.  Attorney will provide those legal services reasonably

19   required to represent clients and take reasonable steps to

20   inform clients of progress and to timely respond to clients'

21   inquiries."

22   Q.  You can stop there.  Thank you.

23        If we can go down to the paragraph entitled "4, legal fees,

24   costs and billing practices."

25        Ms. Daniels, could you please read the first sentence that

1   starts "for legal services rendered"?

2   A.  "For legal services rendered, attorney will receive (a) a

3   one-time payment of $100; and (b) attorney's standard hourly

4   fees and out-of-pocket costs if a legal defense fund is

5   established to benefit clients and has sufficient funds to pay

6   such fees and costs."

7   Q.  Let's stop there for a moment.

8       Did you make the $100 one-time payment?

9   A.  Yes.

10  Q.  When did you make that payment?

11  A.  Right then, at lunch.

12  Q.  The lunch we were talking about where you signed this

13  agreement?

14  A.  Yes.

15  Q.  How did you make that payment?

16  A.  A hundred in cash.

17  Q.  What, if anything, did the defendant do with that $100

18  payment?

19  A.  He paid for our lunch.

20  Q.  Do you see subsection (b), which references a legal defense

21  fund?

22  A.  Yes.

23  Q.  What is your understanding of what a legal defense fund is?

24  A.  A crowd funding where people could donate to help with

25  legal services.

1  Q.  Was a legal defense fund ever established for you?

2  A.  Yes.

3  Q.  Who set up the legal defense fund?

4  A.  Michael.

5  Q.  How was it set up?

6  A.  Online.

7  Q.  Approximately how much was raised for your legal defense

8  fund?

9  A.  Approximately 650,000.

10 Q.  What is your understanding of who controlled those funds?

11 A.  Michael.

12 Q.  Take a look at the second sentence that starts, "In

13 addition, in the event."  Please read that.

14 A.  "In addition, in the event attorney assists clients in

15 finalizing any book or media opportunity that results in

16 clients being paid, attorney and client agree that attorney

17 shall be entitled to a reasonable percentage to be agreed upon

18 between clients and attorney."

19 Q.  Ms. Daniels, at any point, did you and the defendant later

20 agree that the defendant would actually get any portion of

21 money paid for a book or media opportunity?

22 A.  No.

23 Q.  At any point did you and the defendant have any written

24 agreement aside from the one we're looking at right now?

25 A.  No.

```
1              MR. SOBELMAN:  Ms. Abrams, could you please display
2     the second page of this exhibit and enlarge paragraph 10.
3     Q.  Ms. Daniels, can you please read the sentence after
4     "conclusion of services"?
5     A.  "After attorney's services conclude, attorney will, upon
6     clients' request, deliver clients' entire file to clients,
7     along with any client funds or property in attorney's
8     possession."
9     Q.  Ms. Daniels, at any time after the defendant was no longer
10    your attorney, did he provide you with any funds that he had
11    held for you?
12    A.  No.
13             MR. SOBELMAN:  Ms. Abrams, could you please display
14    the signatures at the bottom of the page.
15    Q.  Ms. Daniels, aside from this document, are you familiar
16    with what the defendant's signature looks like?
17    A.  Yes.
18    Q.  How are you familiar with what the defendant's signature
19    looks like?
20    A.  I've seen him sign things, like bar tabs and restaurant
21    receipts.
22    Q.  Under attorney, whose signature appears?
23    A.  Mine.
24    Q.  Take another look.  Under attorney --
25    A.  Oh, I'm sorry.
```

1   Q.  -- whose signature appears?

2   A.  Michael Avenatti.

3           MR. AVENATTI:  Objection.  Leading.

4           THE COURT:  Overruled.

5   BY MR. SOBELMAN:

6   Q.  Just to be clear, under attorney, whose signature appears?

7   A.  Michael.

8   Q.  And under clients, whose signature appears?

9   A.  That's mine.

10  Q.  Did you, in fact, sign this agreement?

11  A.  Yes.

12          MR. SOBELMAN:  We can take this down.

13          THE COURT:  All right.  With that, we're going to take

14  our lunch break.

15          Ladies and gentlemen, you know the instructions, but

16  let me repeat them just to be clear.

17          No. 1, please keep an open mind.  You have not heard

18  all the evidence in the case, let alone the parties' closing

19  arguments.  No. 2, please do not discuss the case with each

20  other, with anyone.  Please don't do any research about the

21  case or investigate it in any way, shape, or form.

22          And with that, have a pleasant lunch.  Let's be ready

23  to go, why don't you start getting ready at 12:10 so that we

24  can resume at 12:15.

25          With that, you are excused.  Thank you.

M1rWave3                          Clifford - Direct

1              THE WITNESS:  What do I do with this?

1          (Jury not present)

2          THE COURT:  You may be seated.

3          Ms. Daniels, you can leave that right there.  You may

4    step down.  Please be --

5          Well, counsel, if there's nothing for us to discuss

6    for which Ms. Daniels needs to be excluded, please have her

7    back in here at 12:10, ready to continue at 12:15.

8          With that, you're excused, Ms. Daniels.  You may step

9    out of the courtroom.

10         Does the government have anything we need to discuss?

11         MR. SOBELMAN:  No, your Honor.

12         THE COURT:  Mr. Avenatti, anything you need to

13   discuss?

14         MR. AVENATTI:  No, sir Honor.

15         THE COURT:  All right.  Just give me one moment to let

16   Ms. Daniels out.

17         (Witness not present)

18         THE COURT:  All right.  Mr. Avenatti, under the order

19   previously entered in this case, I think you were required, by

20   5 p.m. the day before, to provide notice to the government of

21   any exhibits that you intend to offer.  I take it that did not

22   happen with respect to the messages that you offered through

23   Mr. Santos today, which required a lengthy sidebar and my

24   consideration of the rule.  The order was intended to avoid

25   that and avoid the jury having to sit there during that kind of

M1rWave3                              Clifford - Direct

1    colloquy and my review.  So I would urge you -- not urge you,

2    require you to comply with that, and to the extent you

3    anticipate offering exhibits through Ms. Daniels or otherwise,

4    share that with the government in advance so I have an

5    opportunity to review them if I need to do that.  All right?

6              MR. AVENATTI:  Your Honor, I will do that.

7              Just to explain to the Court, I understood they were

8    moving all of 6 through 60 in, because that was my

9    understanding.  If that understanding was false, I apologize to

10   the Court.  But that's why I did not point to those other

11   exhibits, but I'll ensure that I follow the Court's directives,

12   as all directives.

13             THE COURT:  All right.  I don't need to hear whether

14   that was true or not true.  Just going forward, let's do

15   better.

16             Thank you very much.  Please back here no later than

17   12:10.  As stated, unless there's something that we need to

18   discuss for which Ms. Daniels should not be present, please

19   have her back as well.

20             MR. SOBELMAN:  Thank you, your Honor.

21             THE COURT:  Thank you.

22             (Luncheon recess)

23

24

25

```
 1                       AFTERNOON SESSION

 2                           12:10 p.m.

 3            (Jury not present)

 4            THE COURT:  You may be seated.

 5            Anything we need to discuss?

 6            MR. SOBELMAN:  Nothing from the government.

 7            THE COURT:  Mr. Avenatti, anything?

 8            MR. AVENATTI:  Nothing, your Honor.

 9            THE COURT:  Let's get Ms. Daniels and we will get the

10   jury.

11            Ms. Daniels, just have a seat.  You can remove your

12   mask and we will wait for the jury to return.

13            (Jury present)

14            THE COURT:  You may be seated.

15            Welcome back, ladies and gentlemen.  I hope you had an

16   enjoyable break.

17            We will resume with the direct testimony of Ms.

18   Daniels.

19            Ms. Daniels, I remind you that you remain under oath.

20            Also, I think one of you left your notebook here

21   before the break.  My staff secured it and has it for you.  But

22   just a reminder, if you can take that to the jury room and then

23   we will secure it there if you're not in there.

24            With that, we will continue.

25            Mr. Sobelman, you may proceed.
```

M1R8AVE4                    Clifford - Direct

1   BY MR. SOBELMAN:

2   Q.  Good afternoon, Ms. Daniels.

3   A.  Good afternoon.

4   Q.  Ms. Daniels, have you ever authored a book?

5   A.  Yes.

6   Q.  What was the name of that book?

7   A.  Full Disclosure.

8   Q.  Who published your book?

9   A.  St. Martin's Press.

10  Q.  Was a contract associated with the publication of that

11  book?

12  A.  Yes.

13          MR. SOBELMAN:  Ms. Abrams, can you please display what

14  is in evidence as Government Exhibit 102 and focus on the top

15  half of the page.

16  Q.  Ms. Daniels, do you recognize this?

17  A.  Yes.

18  Q.  What is it?

19  A.  The author contract from my publisher.

20  Q.  Can you please read the title at the top of the page?

21  A.  "St. Martin's Press, Author Contract."

22  Q.  What is the date in the first paragraph?

23  A.  April 3, 2018.

24  Q.  Who is the contract between?

25  A.  Myself, Stephanie Clifford and St. Martin's Press.

1    Q.  What, if anything, did the defendant tell you about his

2    role in negotiating this contract?

3    A.  That he worked with the literary agent to get me a good

4    contract.

5    Q.  Let's go to the second page of this document.

6        Can you please read the first paragraph underneath

7    "advance" and then after the number 2?

8    A.  "The publisher will pay the author, or the author's duly

9    authorized representative, as an advance against the author's

10   earnings from all sources under this agreement, the sum of

11   $800,000 (the Author Advance) payable as follows:"

12   Q.  Just generally, what is set forth underneath that

13   paragraph?

14            MR. AVENATTI:  Best evidence, your Honor.

15            THE COURT:  Overruled.

16   A.  How much the publisher was going to pay me and when those

17   payments would be sent to me.

18   Q.  Can you please read the first paragraph that starts "250"?

19   A.  "$250,000 upon signing of this agreement."

20   Q.  Is that the first payment you were due to receive?

21   A.  Yes, it is.

22   Q.  Can you please read the second paragraph that starts "175"?

23   A.  "$175,000 upon the author's delivery and the publisher's

24   acceptance of the complete and final manuscript of the work."

25   Q.  Is your understanding that the term "author" here means

1    you?

2    A.   Yes.

3    Q.   And that "publisher" is St. Martin's Press?

4    A.   Yes.

5    Q.   Does this paragraph refer to the second payment you were to

6    receive?

7    A.   Yes.

8    Q.   Please read the third paragraph.

9    A.   "$175,000 upon the publication of the publisher's initial

10   edition of the work, but in no event later than six months from

11   the author's delivery and the publisher's acceptance of the

12   complete and final manuscript of the work, provided the author

13   has satisfactorily completed the three weeks' publicity

14   requirement and complied with all media restrictions pursuant

15   to paragraph 13(b)."

16   Q.   Ms. Daniels, what does "the work" refer to here?

17   A.   The book.

18   Q.   The book that you authored?

19   A.   Yes.

20   Q.   Do you understand this paragraph relates to the third

21   payment you were to receive?

22            MR. AVENATTI:  Leading.

23            THE COURT:  Sustained.

24   A.   Yes.

25            THE COURT:  Hold on.  Ms. Daniels, if I sustain an

1   objection, then don't answer the question.  Thank you.

2            MR. AVENATTI:  Move to strike.

3            THE COURT:  The jury will disregard the last answer.

4            Mr. Sobelman, you can ask another question.

5   Q.  How many payments did you understand you were to receive

6   under this book contract?

7   A.  Four.

8   Q.  And the paragraph you just read, what number of those four

9   payments did you understand that was?

10  A.  Three out of four.

11  Q.  Can you please read the last paragraph on this page?

12  A.  "$200,000 upon the later of six months from the publication

13  of the publisher's initial edition of the work, or the author's

14  satisfactory completion of the three weeks' publicity

15  requirement and compliance with all media restrictions pursuant

16  to paragraph 13(b), but in no event later than 12 months from

17  the author's delivery and the publisher's acceptance of the

18  complete and final manuscript of the work, provided the author

19  has satisfactorily completed the three weeks' publicity

20  requirement and complied with all media restrictions pursuant

21  to paragraph 13(b)."

22  Q.  Of the four payments that you were to receive under this

23  agreement, what number payment does this paragraph refer to?

24  A.  Number four.

25            MR. SOBELMAN:  Can we just zoom out to show the whole

1  document.

2  Q.  Ms. Daniels, did you review the entire contract in

3  preparation for your testimony today?

4  A.  Yes.

5  Q.  Can you point us to the part or tell us what page there is

6  anything referencing the defendant getting any portion of your

7  book advance payments?

8  A.  There is none.

9         MR. SOBELMAN:  Go to page 35, which is the last page

10  of the document.

11  Q.  Ms. Daniels, whose signature appears under author?

12  A.  Mine does.

13  Q.  Did you in fact sign this contract?

14  A.  Yes, I did.

15  Q.  On what date did you sign this contract?

16  A.  April 11, 2018.

17  Q.  At any time before you signed this contract, what, if

18  anything, did the defendant tell you about taking some of your

19  book advance payments for himself?

20  A.  Nothing.

21  Q.  Do you recall where you were when you signed this contract?

22  A.  Yes, I do.

23  Q.  Where were you?

24  A.  I was in California, Sun Valley, California.

25  Q.  What, if anything, did you do -- how did this document come

M1R8AVE4                          Clifford - Direct

1   to be, what did you do after you signed the contract?

2   A.  Got really excited with my friends, and I texted Michael or

3   contacted Michael, I sent him a picture of it.

4   Q.  Just to be clear, you had a hard copy of the document,

5   correct?

6   A.  Yes.

7            MR. AVENATTI:  Leading.

8            THE COURT:  Overruled.

9   Q.  Then you signed it?

10  A.  Correct.

11  Q.  What did you do after you signed it?

12  A.  I took a picture of it.

13  Q.  What did you do with that picture?

14  A.  I text it to Michael.

15  Q.  Why did you text it to the defendant?

16  A.  I didn't have access to a scanner or printer at that very

17  moment and he asked me for it.

18           MR. SOBELMAN:  Ms. Abrams, can we please display what

19  is in evidence as Government Exhibit 16 and 16A next to each

20  other.

21  Q.  Ms. Daniels, what does Government Exhibit 16 show, just

22  generally?

23  A.  A text message.

24  Q.  Who sent this text message?

25  A.  I did.

1   Q.  Who did you send it to?

2   A.  To Michael.

3   Q.  What type of application did you use to send this text

4   message?

5   A.  The messaging app WhatsApp.

6   Q.  What did you send in this message?

7   A.  The photo of the last page of my book contract.

8   Q.  Is that the same document that's up as 16A?

9   A.  Yes.

10          MR. SOBELMAN:  One moment.

11  Q.  How soon after receiving the contract did you send the

12  signed signature page to the defendant?

13  A.  The same day.

14  Q.  Why did you send -- just to be clear, why did you send it

15  to the defendant?

16  A.  Because he asked me to.

17  Q.  Why did you not ask the defendant to sign your name for

18  you?

19  A.  Because I can sign my own name.  I sign all my own

20  contracts.

21  Q.  Was it difficult for you to sign the document, take a

22  photograph of it, and send it to the defendant?

23  A.  Not at all.

24          MR. SOBELMAN:  We can take down the document now.

25  Q.  Ms. Daniels, can you please remind us, under your contract

1    with St. Martin's Press, when were you to receive the first

2    payment?

3    A.  The day I signed the contract.

4    Q.  What, if any, instructions did you give the defendant about

5    where your book payments should be sent at the time the first

6    payment was to be made?

7    A.  I asked that it be wired directly into my business checking

8    account.

9             MR. SOBELMAN:  Ms. Abrams, can you please display what

10   is in evidence as Government Exhibit 202.

11   Q.  Ms. Daniels, who is this e-mail from?

12   A.  From Michael Avenatti.

13   Q.  Who is it sent to?

14   A.  Luke Janklow.

15   Q.  What date was it sent?

16   A.  April 11, 2018.

17   Q.  Is that the same day you signed the book contract?

18   A.  Yes, it is.

19   Q.  What is the subject line of this e-mail?

20   A.  Wire instructions.

21   Q.  Do you recognize the information in the body of this

22   e-mail?

23   A.  Yes, I do.

24   Q.  What is listed here?

25   A.  My banking account information.

Clifford - Direct

 1   Q.  Is that the account you told the defendant to have your

 2   book payments sent to?

 3   A.  Yes, it is.

 4           MR. SOBELMAN:  Ms. Abrams, can you please display what

 5   is in evidence as Government Exhibit 301B.

 6   Q.  Ms. Daniels, do you recognize this?

 7   A.  Yes.

 8   Q.  What is it?

 9   A.  One of my bank statements.

10   Q.  What time period is it for?

11   A.  The month of April 2018.

12   Q.  What is Stormy Entertainment, Inc.?

13   A.  That is myself; it is the name of my company.

14   Q.  Let's go to the third page of this document.

15       Ms. Daniels, looking at the line under deposits and other

16   credits, April 11, 2018, what is your understanding of what is

17   reflected here?

18   A.  This reflects payment number one of my book advance minus

19   the literary agent's fee.

20   Q.  When did you actually learn of this payment?

21   A.  The same day, pretty instantly.

22   Q.  How did you learn of this payment?

23   A.  A notification on my mobile app, on my phone.

24   Q.  Do you recall where you were when you got that

25   notification?

Clifford - Direct

```
 1    A.  Yes, I do, very clearly.

 2    Q.  Where were you?

 3    A.  I was sitting in the car at a gas station in Sun Valley,

 4    California.

 5    Q.  Were you with anyone?

 6    A.  Yes.  I was with my bodyguard Travis.

 7    Q.  How did you react when you got that notification?

 8    A.  I screamed really loud and scared him.

 9    Q.  Why did you scream?

10    A.  Because I never had a payment for that much, never saw that

11    much money in my account, and it kind of solidified that I was

12    a real author, something I had been working for for ten years.

13    Q.  You had been working on writing a book for ten years?

14          MR. AVENATTI:  Leading.

15    A.  Yes.

16          THE COURT:  Overruled.

17          MR. SOBELMAN:  Ms. Abrams, let's now display what is

18    in evidence as Government Exhibit 17.

19    Q.  Ms. Daniels, just generally, what does this document show?

20    A.  Text messages.

21    Q.  Who are these text messages between?

22    A.  From me to Michael Avenatti.

23    Q.  Who sent the message in the blue bubble?

24    A.  I did.

25    Q.  Who sent the message in the green bubble?
```

1   A.  He did.

2   Q.  Can you read the message in the blue bubble, please.

3   A.  "Got the wire.  I can't feel my face."

4   Q.  I am going to ask you about that.  But before I do, what is

5   the date of these messages?

6   A.  April 11, 2018.

7   Q.  That's the same day we were just talking about when you got

8   the wire transfer?

9   A.  Yes.

10  Q.  What did you mean by "got the wire"?

11  A.  That I received my first payment.

12  Q.  What did you mean by "I can't feel my face"?

13  A.  That my face was numb from smiling so much.

14  Q.  The defendant responded, "Congrats.  We make a good team.

15  Enjoy.  Smiley face."  Do you see that?

16  A.  I do.

17  Q.  On that same day, April 11, 2018, did you also speak to the

18  defendant about the wire transfer?

19  A.  Yes.

20  Q.  How did you speak to the defendant?

21  A.  On the phone.

22  Q.  Was that a regular phone call or a call over WhatsApp or

23  something else?

24  A.  I don't remember.

25  Q.  What, if any, method do you usually use to speak to the

1    defendant by phone?

2    A.  It was usually WhatsApp, but sometimes we did use cell

3    phone.

4    Q.  Where were you during that phone conversation?

5    A.  I was in the house I rented a room in, in Sun Valley,

6    California.

7    Q.  What were you doing there?

8    A.  I was there to film a television commercial for an adult

9    film company.

10   Q.  Do you have a specific recollection of the phone call with

11   the defendant you had that day?

12   A.  I do.

13   Q.  To the best of your recollection, can you please describe

14   the circumstances of the phone call and what was discussed?

15   A.  Yes.  I was with my team in the living room dining area of

16   the house when I received a phone call.  I went to the room,

17   everybody was excited and high-fiving each other and screaming.

18   So I went into my bedroom and closed the door so I could hear,

19   and I talked about how excited I was, and Michael congratulated

20   me, he seemed very happy for me.  He told me congrats, I

21   deserved it, I worked really hard, it's a great book, I'm an

22   American hero, I love you Stormy Daniels, and onward and upward

23   kind of thing.  And then I said, what about you?  And he told

24   me not to worry about it, that he would never take a penny from

25   me for the book, that I earned it and I worked for it.

1    Q.  After that phone call, did you speak with the defendant on

2    other occasions about whether he would receive a portion of

3    your book advance payments?

4    A.  Yes.

5    Q.  Approximately how many other times did you speak with the

6    defendant about whether he would receive a portion of your book

7    advance payments?

8    A.  Around three.

9    Q.  Generally, what did the defendant say during those

10   conversations?

11   A.  That he would never take a penny from my book.

12   Q.  What, if anything, did he say about why he wouldn't take a

13   penny from your book advance payments?

14   A.  Because I was courageous, and I earned it, and I deserved

15   it.

16   Q.  What, if anything, did the defendant say during those

17   conversations about how he would earn money from representing

18   you?

19   A.  That he was going to get a big payday from winning against

20   Trump and not to worry about him, plus we had crowd funding

21   money.

22          MR. SOBELMAN:  Ms. Abrams, can you please show the

23   witness what is in evidence as Government Exhibit 103 and focus

24   on the top half of the page.

25   Q.  Ms. Daniels, do you recognize this document?

M1R8AVE4                     Clifford - Direct

1   A.  Yes.

2   Q.  What is it?

3   A.  It is a document between Janklow, to Michael I guess.

4            MR. SOBELMAN:  Why don't we zoom out for a moment.

5   Q.  Is this a contract?

6   A.  Yes.

7   Q.  Who is it between?

8   A.  It is between the literary agent and Stormy Entertainment.

9   Q.  What is Stormy Entertainment?

10  A.  Me.

11  Q.  It's a company you own?

12  A.  Yes.

13  Q.  What does it say at the top of the document?

14  A.  The very top?

15  Q.  Yes.

16  A.  "Janklow & Nesbit Associates, literary agent," with the

17  address.

18  Q.  What is the date on this document?

19  A.  April 13, 2018.

20  Q.  Can you please read the first paragraph that starts "you

21  have asked us."

22  A.  "You have asked us to be your sole and exclusive

23  representative and agent to negotiate for the disposition

24  through the world of any and all rights (as hereinafter

25  defined) to the next literary property you propose to write, a

1    currently untitled work of nonfiction about the story of

2    Stephanie Clifford, the literary work) to be written by Ms.

3    Clifford and a professional writer to be approved by Ms.

4    Clifford.  We accept this engagement."

5    Q.  Ms. Daniels, what did you understand this paragraph to

6    mean?

7    A.  That Luke Janklow was agreeing to be my literary agent.

8    Q.  Let's go down to the end of this page.  If we could focus

9    on the paragraph starting "in consideration."

10        Ms. Daniels, can you please read this paragraph?

11   A.  "In consideration of our services hereunder, and as

12   compensation therefor, you agree to pay and you hereby

13   irrevocably assign to us the following percentages of the gross

14   proceeds (as hereinafter defined) received by you pursuant to

15   all contracts covered by this agreement."

16   Q.  What is set forth below this paragraph?

17   A.  The percentage that the literary agent was going to get

18   from the book sales.

19   Q.  What percentage was that?

20   A.  15 percent.

21   Q.  Let's take a look at the third page.

22        MR. SOBELMAN:  Can you please focus on the signature

23   blocks.

24   Q.  Whose signature appears below Stormy Entertainment, Inc.?

25   A.  Mine does.

1   Q.  Did you in fact sign this?

2   A.  Yes, I did.

3   Q.  Why didn't you ask the defendant to sign this on your

4   behalf?

5   A.  Because I can sign my own name.  I sign all my contracts.

6   Q.  Could you please -- let me ask a different question.  Did

7   you review this whole contract before testifying today?

8               MR. AVENATTI:  Leading.

9               THE COURT:  Overruled.

10  A.  Yes.

11  Q.  Is there any reference in this contract to any portion of

12  your book payments going to the defendant?

13  A.  No.

14  Q.  Is there any reference in this contract to any of

15  Mr. Janklow's commission going to the defendant?

16  A.  No.

17  Q.  At any time before you signed this contract, what, if

18  anything, did the defendant tell you about him receiving a

19  portion of Mr. Janklow's commission?

20  A.  Nothing.

21  Q.  At any time after you signed this --

22              THE COURT:  Sorry, just clearing my throat.

23              Sometimes it doesn't have meaning.

24              MR. SOBELMAN:  Understood, your Honor.

25  Q.  At any time after you signed this contract, what, if

1   anything, did the defendant tell you about him receiving a

2   portion of Mr. Janklow's commission?

3   A.  Nothing.

4          MR. SOBELMAN:  We can take down this document.

5   Q.  Ms. Daniels, after receiving the first book advance payment

6   on April 11, 2018, what was the next major step with regard to

7   your book?

8   A.  To write it.

9   Q.  Did you write it on your own or did you have assistance?

10  A.  I had a little help from Kevin.

11  Q.  Who is Kevin?

12  A.  An editor, a ghost writer, somebody that St. Martin's had

13  recommended.

14  Q.  Was Kevin publicly given credit for the help he gave you

15  writing the book?

16  A.  Yes.

17  Q.  Approximately when did you complete a full draft of the

18  book?

19  A.  July 2018.

20         MR. SOBELMAN:  Ms. Abrams, can you please display what

21  is in evidence as Government Exhibit 19.

22  Q.  Ms. Daniels, who sent this message?

23  A.  Michael did.

24  Q.  Who did he send it to?

25  A.  To me.

 1    Q.  What is the date on the message?

 2    A.  July 13, 2018.

 3    Q.  It states, "I started reviewing your manuscript on the

 4    plane.  I am blown away, Stormy Daniels, blown away.  This is

 5    going to be huge and I am so excited for you.  I also want to

 6    tell how much I generally love you as a human being.  Thank you

 7    for allowing me into your life."

 8         Do you see that?

 9    A.  Yes.

10         MR. SOBELMAN:  Ms. Abrams, can you please display

11    Government Exhibit 20.

12    Q.  Ms. Daniels, who sent this message?

13    A.  I did.

14    Q.  Who did you send it to?

15    A.  To Michael.

16    Q.  What is the date you sent this message?

17    A.  July 29, 2018.

18    Q.  Please read the message you sent.

19    A.  "Do you know when I get another book payment?"

20    Q.  Let's go to the next page.

21         Defendant wrote, "I think you get a payment in the next two

22    weeks."

23         Ms. Daniels, please read the next message that you wrote.

24    A.  "That must mean payments two and three come close together.

25    I thought number two was when draft was completed which was a

M1R8AVE4                         Clifford - Direct

1    while ago."

2    Q.  The defendant responded, "Two comes on acceptance, which

3    should be shortly.  And three very soon thereafter."

4            MR. SOBELMAN:  Ms. Abrams, can you please display what

5    is in evidence as Government Exhibit 102.

6            Go to the second page, please.

7    Q.  Ms. Daniels, which of these paragraphs refers to the second

8    book payment you were to receive?

9    A.  The third paragraph.

10   Q.  That's the one that starts "175,000" and ends with "the

11   work"?

12   A.  Yes.

13   Q.  The second bold paragraph?

14   A.  Yes.

15   Q.  When were you to receive the second payment?

16   A.  When I turned in the final version of the book.

17   Q.  As of the messages we just looked at, late July 2018, had

18   you delivered the manuscript?

19   A.  Yes.

20   Q.  What was your understanding at that time of whether the

21   publisher had accepted the manuscript?

22   A.  That they had.

23           MR. SOBELMAN:  Ms. Abrams, can you please display what

24   is in evidence as Government Exhibit 25.

25   Q.  Ms. Daniels, who sent these messages?

M1R8AVE4                    Clifford - Direct

1    A.  Michael did.

2    Q.  Who did he send them to?

3    A.  To me.

4    Q.  What is the date on these messages?

5    A.  August 23, 2018.

6    Q.  The defendant wrote, "Are you good with this?"

7         "Maggie Siff's television roles have included department

8    store heiress Rachel Menken Katz on the AMC drama Mad Men, Tara

9    Knowles on the FX drama Sons of Anarchy, and psychiatrist Wendy

10   Rhodes on the Showtime series Billions.  Attached is a sample

11   from Boomer 1, a title that she read for us recently."

12            Then what is below that?

13   A.  An audio clip.

14   Q.  What did you understand this to be in relation to?

15   A.  He wanted me to check out the people that were going to

16   read the audio version of my book and approve it.

17   Q.  Let's go to the second page.

18        How did you respond?

19   A.  "Sure."

20   Q.  The defendant then wrote, "Thanks."

21        Now, as of August 23, 2018, had you received your second

22   payment of your book advance?

23   A.  No.

24   Q.  Take a look at Government Exhibit 26.

25        Who sent this message?

1    A.  Michael did.

2    Q.  Who did he send it to?

3    A.  To me.

4    Q.  What is the date on the message?

5    A.  August 25, 2018.

6    Q.  The defendant wrote, "The other woman has a schedule

7    conflict on the audio.  Are you OK with this?"

8            MR. SOBELMAN:  Next page, please.

9    Q.  Ms. Daniels, what is your understanding of what this next

10   message is?

11   A.  Another option for the person to read the audio book.

12   Q.  Then below that defendant wrote, "Hi.  Are you OK with this

13   woman reading the audio?  I'm fine with it.  Let me know.  Hope

14   you are having fun."

15           At the bottom of the page he wrote, Please respond on

16   the audio question so I can get back to the publisher."

17           MR. SOBELMAN:  Go to the next page, please.

18   Q.  Ms. Daniels, what is the date on these messages?

19   A.  August 27, 2019.

20   Q.  '19 or '18?

21   A.  Sorry.  '18.

22   Q.  Can you please read what you wrote in these messages?

23   A.  I said, "That's fine.  Pretty annoying how they are all

24   over us for something they need but still have not paid me

25   despite final version being submitted a while ago.  I'm going

M1R8AVE4                        Clifford - Direct

1   to e-mail Elizabeth about it."

2              THE COURT:  Does it say "now" at the end of it?

3              THE WITNESS:  Now, yes.

4   Q.  Who were you referring to when you wrote "they"?

5   A.  The publisher.

6   Q.  Who is Elizabeth?

7   A.  She worked at St. Martin.

8   Q.  After this message, did you in fact e-mail Elizabeth that

9   day?

10  A.  I can't remember.

11  Q.  As far as you can recall, did the defendant respond to

12  these particular messages?

13  A.  No.

14             MR. SOBELMAN:  Ms. Abrams, can you please display what

15  is in evidence as Government Exhibit 27.

16  Q.  Who is this message sent from?

17  A.  Michael.

18  Q.  Who did he send it to?

19  A.  To me.

20  Q.  What is the date of this message?

21  A.  August 30, 2018.

22  Q.  The defendant wrote, "Call me when you have service.  I

23  have an update on payment doc, book media, etc.  All good, no

24  rush."  Do you see that?

25  A.  Yes.

M1R8AVE4                          Clifford - Direct

 1   Q.  At some point after this message did you speak with the

 2   defendant?

 3   A.  Yes.

 4   Q.  What, if anything, did the defendant say during that

 5   conversation about having already received your second book

 6   advance payment?

 7   A.  Nothing.

 8            MR. SOBELMAN:  Ms. Abrams, can you please display what

 9   is in evidence as Government Exhibit 28 next to Government

10   Exhibit 28A.

11   Q.  Ms. Daniels, who sent this message?

12   A.  Michael did.

13   Q.  Take another look.

14   A.  I'm sorry.  I did.

15            MR. AVENATTI:  Leading.

16            THE COURT:  Overruled.

17            Can we get the question and answer again, please.

18            MR. SOBELMAN:  Yes, your Honor.

19   Q.  Who sent this message?

20   A.  I did.

21   Q.  What name does it say at the top of the message?

22   A.  Stormy Daniels.

23   Q.  Is that your name?

24   A.  Yes.

25   Q.  On what date did you send this message?

M1R8AVE4                    Clifford - Direct

1    A.  September 4, 2018.

2    Q.  Who did you send this message to?

3    A.  To Michael.

4    Q.  As of September 4, 2018, what was your understanding

5    regarding whether your second book advance payment had been

6    made by the publisher?

7    A.  Michael told me it hadn't.

8           THE WITNESS:  Can I move this so there is not a glare?

9    I don't want to touch it.

10          THE COURT:  The screen?

11          THE WITNESS:  Yes.  Can I tilt it?

12          THE COURT:  I hope so.  Try it and we will keep our

13   fingers crossed.

14          Is that better?

15          THE WITNESS:  Thank you.

16          THE COURT:  No worries.

17   BY MR. SOBELMAN:

18   Q.  Just to make sure I didn't miss it, as of September 4,

19   2018, what was your understanding of whether the second book

20   payment on your book contract had been paid?

21   A.  That it had not.

22   Q.  How did you come to that understanding?

23   A.  Because I had not received it.

24   Q.  What, if anything, did the defendant tell you about the

25   status of the second book advance payment on your book contract

1    as of September 4, 2018?

2    A.  That it had not been sent.

3    Q.  Let's take a look at these messages.  What did you send in

4    this first message?

5    A.  A screenshot.

6    Q.  Is that what appears on the right here in 28A?

7    A.  Yes.

8    Q.  What is it a screenshot of?

9    A.  My banking information.

10   Q.  Let's go down to the next message.

11       What did you write immediately after sending this

12   screenshot of your banking information?

13   A.  "My new account info for publisher."

14   Q.  What did you write after that?

15   A.  "Still Stormy Entertainment, just new account."

16   Q.  What did you mean by this message?

17   A.  This is where I would like my payments sent to.

18   Q.  What did you mean by "still Stormy Entertainment, just new

19   account"?

20   A.  That it was still my account information, my name on the

21   account, but the account number was different.

22   Q.  And the defendant responded, "Got it."

23       Do you see that?

24   A.  Yes.

25   Q.  Why did you send these messages to the defendant?

1   A.  So that they could wire my payment to me.

2   Q.  Payment for what?

3   A.  My second payment of my book advance.

4   Q.  Why were you changing the account information for your book

5   advance payments?

6   A.  Because I opened a second account.

7   Q.  Why did you open a second account?

8   A.  Because my husband and I were having problems and some of

9   the money I was receiving was production money and I wanted to

10  keep it separate.

11  Q.  When you sent these messages, what was your understanding

12  of which of your book advance payments would be sent into this

13  account?

14  A.  Two, three, and four.

15  Q.  At any point did the defendant tell you they would not be?

16  A.  No.

17          MR. SOBELMAN:  Ms. Abrams, could you please display

18  what is in evidence as Government Exhibit 29.

19  Q.  Who sent these messages?

20  A.  I did.

21  Q.  Just to be clear, who sent the message in the blue?

22  A.  I did.

23  Q.  Who sent the message in the green?

24  A.  Michael.

25  Q.  Can you please read the message you sent at the top?

1    A.  "I did not get paid today.  I am not fucking happy.  They

2    are in breach of contract by about four weeks."

3    Q.  What is the date on this message?

4    A.  September 5, 2018.

5    Q.  What did you mean "I did not get paid today"?

6    A.  That I didn't get paid; as of this date, I did not receive

7    the payment I was due.

8    Q.  Is that the second book advance payment we were just

9    talking about?

10   A.  Yes.

11   Q.  What did you mean when you said "they are in breach of

12   contract by about four weeks"?

13   A.  Because it was my understanding that the second payment was

14   due when I turned in the manuscript, which was a month before

15   that.  Way before that, actually.

16        MR. SOBELMAN:  Ms. Abrams, can you please display what

17   is in evidence as Government Exhibit 301A.

18   Q.  Ms. Daniels, what is this?

19   A.  A cashier's check.

20   Q.  What is the date on the cashier's check?

21   A.  September 5, 2018.

22   Q.  Who is it addressed to?

23   A.  Stormy Entertainment.

24   Q.  What, if anything, did the defendant tell you about this

25   cashier's check?

M1R8AVE4                          Clifford - Direct

 1   A.  He said that the publisher had mailed him my second book

 2   payment to his office.

 3   Q.  How did you respond to the defendant when he told you that

 4   this check had arrived from the publisher at his office?

 5   A.  I was confused and extremely irritated.

 6   Q.  Why?

 7   A.  Because I had given specific wire instructions to send it

 8   into my account, so I didn't understand why they would, one,

 9   send a check, and two, send it not to me but to Michael

10   Avenatti's office.

11   Q.  What, if anything, did the defendant say in response when

12   you told him you were confused and annoyed?

13   A.  He pointed out at least we got it, and I agreed.

14   Q.  What, if anything, did the defendant say he would do with

15   this check?

16   A.  That he would go and deposit it for me.

17   Q.  Look at the back of this document, which is on the next

18   page.

19       Do you know whose handwriting this is?

20   A.  I do not.

21   Q.  What bank account is listed there?

22   A.  Mine.

23   Q.  On the right-hand side?

24   A.  Yes, mine.

25   Q.  7417?

M1R8AVE4                          Clifford - Direct

1   A.  Yes.

2              MR. SOBELMAN:  Ms. Abrams, could you please go to the

3   third page of 301A.

4   Q.  Ms. Daniels, what is this?

5   A.  A bank statement.

6   Q.  For what bank account?

7   A.  Mine, Stormy Entertainment.

8   Q.  What time period is this statement for?

9   A.  September of 2018.

10             MR. SOBELMAN:  Can you please display page 5 of this

11  exhibit next to page 3.

12             Can you please focus on the top part of the fifth

13  page.

14  Q.  Ms. Daniels, this is under the deposits and credits

15  section, is that correct?

16  A.  Correct.

17  Q.  Can you please read the date on the left side of this line?

18  A.  September 5, 2018.

19  Q.  What is the description written next to the date?

20  A.  Counter credit.

21  Q.  How does the amount of the counter credit compare to the

22  amount on the cashier's check?

23  A.  It's the same.

24  Q.  Let's put the cashier's check up one more time, page 1 of

25  this document.

1        Ms. Daniels, by looking at this cashier's check, could you

2   figure out specifically what bank account this money came from?

3   A.  City National Bank.

4   Q.  Who owned the bank account?

5   A.  I don't know.

6   Q.  You can't tell based on seeing this, right?

7           MR. AVENATTI:  Leading.

8           THE COURT:  Overruled.

9   A.  No, I cannot.

10          MR. SOBELMAN:  Ms. Abrams, please display what is in

11  evidence as Government Exhibit 33 alongside Government Exhibit

12  33A.

13  Q.  Ms. Daniels, do you see in Government Exhibit 33 there are

14  messages?

15  A.  Yes.

16  Q.  Who are they between?

17  A.  Myself and Michael.

18  Q.  What is the date on these messages?

19  A.  October 1, 2018.

20  Q.  Can you please read the first message that you wrote?

21  A.  "That means I get paid tomorrow, right?"

22  Q.  What does the message underneath that?

23  A.  It's a screenshot.

24  Q.  It's an attachment?

25  A.  Attachment.

M1R8AVE4                    Clifford - Direct

1    Q.  So what is it a screenshot of?

2    A.  My book contract.

3    Q.  Is that what we see in 33A?

4    A.  Yes.

5    Q.  Who took this screenshot?

6    A.  I did.

7    Q.  Why did you take this screenshot?

8    A.  To reiterate, I circled that I had a payment due, and sent

9    it to him.

10   Q.  Why did you send it to the defendant?

11   A.  Just in case he didn't have it handy and to clarify that I

12   was correct that I was supposed to receive a payment.

13   Q.  Which payment are we talking about, the first, the second,

14   the third or the fourth?

15   A.  The third.

16   Q.  As of this date, what was your understanding of whether the

17   third payment on your book contract had been paid?

18   A.  The publisher had not paid it.

19   Q.  What was that understanding based on?

20   A.  That I didn't have the money and that's what Michael told

21   me.

22   Q.  Do you see down here that he just responds, "Yes "?

23   A.  Yes.

24   Q.  By the way, why were you asking the defendant for help with

25   your book advance payments?

1    A.  Because he was my attorney and he said run everything by

2    him.  I trusted him to handle it.

3    Q.  Why did you trust him?

4    A.  Because he was my attorney.

5         MR. SOBELMAN:  Ms. Abrams, can ask you please display

6    what is in evidence as Government Exhibit 35.

7    Q.  Ms. Daniels, who are these messages between?

8    A.  From myself to Michael Avenatti.

9    Q.  What date are these messages sent?

10   A.  October 2, 2018.

11   Q.  Would you please read the first message?

12   A.  "Which reminds me ... publisher owes me a payment today."

13   Q.  And the defendant responded, "On it.  We need to make sure

14   we have the publicity requirement met."

15        Do you see that?

16   A.  Yes.

17   Q.  Let's take a look at the second page, please.

18        The defendant then wrote, "It's Stormy Daniels day 2.0."

19        How did you respond?

20   A.  "Haha."

21   Q.  Please read the next message you wrote.

22   A.  "The PR requirement is very broad.  Just says three weeks,

23   which I've already done stuff for."

24   Q.  Please read your next message.

25   A.  "I know Denver is on it though."

1    Q.  Who is Denver?

2    A.  Denver was handling my PR at the time.

3    Q.  The defendant responded, "I know.  Don't sweat it.  I spoke

4    with Denver."

5             Do you see that?

6    A.  Yes.

7    Q.  Can you just point to where in this document the defendant

8    said that he had already received your third book payment?

9             MR. AVENATTI:  Best evidence.

10            THE COURT:  Overruled.

11   A.  He doesn't.

12            MR. SOBELMAN:  Ms. Abrams, can we take a look at

13   Government Exhibit 36, please.

14   Q.  Ms. Daniels, who are these messages between?

15   A.  Myself and Michael Avenatti.

16   Q.  What date were these messages sent?

17   A.  October 3, 2018.

18   Q.  Can you please read the first two messages that you wrote?

19   A.  "Watch Kimmel tonight.  And are publishers trying not to

20   pay me?"

21   Q.  What did you mean by "watch Kimmel tonight"?

22   A.  I wanted Michael to see my appearance on the Jimmy Kimmel

23   show.

24   Q.  Why were you on the Jimmy Kimmel show?

25   A.  To promote the book.

1   Q.  When approximately was the book released?

2   A.  That day.

3   Q.  In the second message you wrote, "And are publishers trying

4   not to pay me?"  What did you mean by that?

5   A.  That it was late that day and I hadn't received my payment.

6   Q.  Just to be clear, what was your understanding at this time

7   about whether the defendant had -- what is your understanding

8   at this time about whether your third book payment had been

9   paid by the publisher?

10  A.  That it hadn't.

11  Q.  What was that understanding based on?

12  A.  Because I didn't have the money.

13  Q.  Who, if anyone, talked to you about whether that payment

14  had been paid?

15  A.  Michael.

16  Q.  What, if anything, did he tell you in this time period

17  about whether that payment had been paid?

18  A.  That it had not been sent.

19  Q.  The defendant then responded, "I did.  It was great.  No on

20  the publishers.  We are not going to have any issues.  Awesome

21  job."

22          Ms. Daniels, can you just point to where in this

23  message the defendant told you that he had your third book

24  advance payment?

25  A.  I can't because he didn't.

M1R8AVE4                          Clifford – Direct

1    Q.  At this time, and I mean around October 3, 2018, how often

2    were you speaking to the defendant by phone?

3    A.  Almost daily.

4    Q.  In any of those telephone conversations, did the defendant

5    tell you that he had your third book advance payment?

6    A.  Absolutely not.

7             MR. SOBELMAN:  Ms. Abrams, please display what is in

8    evidence as Government Exhibit 37.

9    Q.  Who are these messages between?

10   A.  Myself and Michael Avenatti.

11   Q.  What date were they sent?

12   A.  October 26, 2018.

13   Q.  Can you please read the message that you wrote?

14   A.  "The publisher owes me a payment.  It's been over three

15   weeks of intense press for the book.  Also, what time on Monday

16   can I expect an answer from Efran.  This is bullshit.  I am

17   going to call Sean on Tuesday if we don't have something on

18   Monday.  It's been months."

19             (Continued on next page)

20

21

22

23

24

25

M1rWave5                        Clifford - Direct

1   BY MR. SOBELMAN:

2   Q.   The defendant responded:  "Hi.  Agreed.  I can call you

3   later or tomorrow to discuss, whichever you want.  I'm

4   available.  Good luck tonight.  Not that you need it."

5        Did the references to Sean or Efran have any connection to

6   the book deal or book advance payments?

7   A.   No.

8             MR. AVENATTI:  Leading.

9             THE COURT:  Overruled.

10  A.   No.

11  Q.   Did you talk to the defendant shortly after these messages

12  were exchanged?

13  A.   Yes.

14  Q.   And in that conversation, what, if anything, did the

15  defendant say about whether he had received your third book

16  advance payment?

17  A.   Nothing.

18  Q.   What, if anything, did he say about whether your third book

19  advance payment had been paid by the publisher?

20  A.   Nothing.

21  Q.   Just to be clear, did he make any statements about the

22  status of your third book advance payment?

23  A.   He said he hadn't received anything, but it shouldn't be a

24  problem.

25  Q.   In this message, Government Exhibit 37, can you please

1    point to me where the defendant said that he'd already received

2    your third book advance payment?

3    A.  I can't, because he didn't.

4    Q.  Move on to Government Exhibit 38, please.

5        Ms. Daniels, who are these messages between?

6    A.  Myself and Michael Avenatti.

7    Q.  What date were they sent?

8    A.  October 29, 2018.

9    Q.  Ms. Daniels, can you please read the messages that you

10   wrote?

11   A.  "Also...did you ask publisher about my payment?  Tomorrow

12   it will be one week late."

13   Q.  Ms. Daniels, what payment were you referring to in the

14   first message?

15   A.  Payment No. 3 of 4.

16   Q.  These are your book advance payments?

17   A.  Yes.

18   Q.  The defendant responded:  "Yes, they are on it.  Will call

19   you when I land."  Do you see that?

20   A.  Yes.

21   Q.  What did you understand the defendant to mean when he

22   responded "yes, they are on it"?

23   A.  That they were processing my payment.

24   Q.  Can you please point to me where in the defendant's message

25   that he said that your third payment had already been paid and

1    he had it?

2    A.  I can't, because he didn't.

3            MR. SOBELMAN:  Ms. Abrams, could you please display

4    what's in evidence as Government Exhibit 224.

5            Actually, I'm not sure this is in evidence.  Please

6    just for the witness.

7    Q.  Ms. Daniels, what is this?

8    A.  Text messages.

9    Q.  Who sent them?

10   A.  I did.

11   Q.  Who did you send them to?

12   A.  Elizabeth from St. Martin Press.

13           MR. SOBELMAN:  The government offers Government

14   Exhibit 224.

15           THE COURT:  Any objection?

16           MR. AVENATTI:  Objection, your Honor.  Hearsay.

17           MR. SOBELMAN:  Your Honor, they're not offered for

18   their truth.

19           THE COURT:  All right.  The objection is overruled.

20   In light of that, it is admitted.

21           (Government Exhibit 224 received in evidence)

22           THE COURT:  Ladies and gentlemen, as with some of the

23   other exhibits that have been admitted, you may not consider

24   any of the statements in this exhibit for their truth but

25   merely for the fact that the message was sent and what it

1   reveals about the sender's state of mind.

2              Thank you.

3              MR. SOBELMAN:  Let's focus on the top half of the

4   page, please.  If you could include the date and time in

5   zooming in.  Thank you.

6   Q.  Ms. Daniels, who sent these messages?

7   A.  I did.

8   Q.  Who did you send them to?

9   A.  Elizabeth from St. Martin Press.

10  Q.  And on what date did you send these?

11  A.  November 12, 2018.

12  Q.  Could you please read what you wrote?

13  A.  "Hi, Elizabeth.  I hope you are doing well.  I am flying to

14  the U.K. tomorrow and wanted to touch base about my next

15  payment.  It was due a bit ago, but I was unable to reach Luke.

16  Do you need my wire info?"

17  Q.  Did Elizabeth respond to these messages?

18  A.  No.

19  Q.  Do you know why she did not respond?

20  A.  No idea.

21             MR. SOBELMAN:  Ms. Abrams, please display what's in

22  evidence as Government Exhibit 39.

23  Q.  Ms. Daniels, who are these messages between?

24  A.  Myself and Michael Avenatti.

25  Q.  What date were they sent?

1  A.  November 13, 2018.

2  Q.  Could you please read the first two messages you sent to

3  the defendant on that date?

4  A.  "Where is my book payment?  I've texted Elizabeth but no

5  response."

6  Q.  What did you mean by "where is my book payment"?

7  A.  Did he know the whereabouts of my third book payment

8  advance?

9  Q.  And the defendant responded, "Let me check."  Do you see

10  that?

11  A.  Yes.

12  Q.  Where in that message did the defendant say that he'd

13  already received your third book payment?

14  A.  He didn't.

15  Q.  Where in that message did the defendant say he'd already

16  spent your third book payment?

17  A.  He didn't.

18  Q.  Please read the next text message you sent to the

19  defendant.

20  A.  "What did they say?"

21  Q.  The defendant responded:  "Waiting for call back.  Just got

22  out of court."  What did you say next?

23  A.  "Got it."

24  Q.  Approximately how long after the "let me check" message did

25  you send the "what did they say" message?

1              MR. SOBELMAN:  If we can zoom out for a moment.

2    A.  A couple hours, two and a half hours.

3    Q.  What did you mean when you wrote "what did they say"?

4    A.  I was asking for a follow-up.

5    Q.  What did you understand the defendant to mean when he wrote

6    "waiting for call back"?

7    A.  That he had called St. Martin's Press and they had not

8    returned his phone call.

9    Q.  Do you know if he actually did that?

10   A.  I have no way of knowing.

11   Q.  Please read the last message on the page.

12   A.  "Got it."

13   Q.  What did you mean when you wrote "got it"?

14   A.  Message received.

15   Q.  Please go to Government Exhibit 40.

16       Ms. Daniels, who are these messages between?

17   A.  Myself and Michael Avenatti.

18   Q.  What is the date on these messages?

19   A.  November 20, 2018.

20   Q.  Could you please read the first message you sent to the

21   defendant?

22   A.  "When you get a min, please give me an update on and my

23   book payment.  I have emailed and called with no response."

24   Q.  What did you mean by "give me an update on my book

25   payment"?

1  A.  I was asking for the status on my payment No. 3.

2  Q.  What did you mean by "I have emailed and called but no

3  response"?

4  A.  That I wasn't getting an answer or a call back from the

5  publisher.

6  Q.  At that time did you know why you had gotten no response?

7  A.  No.

8  Q.  The defendant responded:  "No problem.  Talk in a.m."  And

9  you responded "OK"?

10  A.  Correct.

11  Q.  Did you, in fact, speak to the defendant shortly after

12  these messages were exchanged?

13  A.  Yes.

14  Q.  In that conversation, what, if anything, did he say about

15  your third book advance payment?

16  A.  He said that he was working on getting it from the

17  publisher.

18  Q.  What, if anything, did he say about what he might do to try

19  to get the money from your publisher for your third book

20  advance payment?

21  A.  He told me they were being difficult and that we would

22  probably have to -- he would probably have to send them a

23  letter, a demand letter.

24  Q.  What, if anything, did he explain would be in that letter?

25  A.  Demanding that they pay me; they were in breach of

1    contract.

2    Q.  Let's move to Government Exhibit 41.

3        Who are these messages between?

4    A.  Myself and Michael Avenatti.

5    Q.  What is the date on these messages?

6    A.  November 27, 2018.

7    Q.  Please read what you wrote in these messages.

8    A.  "What about the publisher?  And reimbursement for dragons?

9    How much is in the legal fund?"

10   Q.  What did you mean by "what about the publisher"?

11   A.  I was once again asking for an update.

12   Q.  Update on what?

13   A.  Where my book payment was.

14   Q.  Which one?

15   A.  Three.

16   Q.  What did you mean by "and reimbursement for dragons?"

17   A.  Dragons were my bodyguards.  That was the nickname we gave

18   them.  I called them my dragons, and Michael was responsible

19   for paying them from the legal fund.  At this point in time,

20   they were having difficulty getting paid from him, and they

21   were looking to me.  So they were physically with me at the

22   time, always with me.  And so Michael told me just to pay them

23   back out of my -- just to pay them myself and he was going to

24   have his secretary send me the reimbursement for the 26,000.

25   Q.  Do you remember the name of his secretary?

1   A.  Her name is Judy.

2   Q.  You also wrote, "How much is in the legal fund?"  What did

3   you mean by that?

4   A.  I wanted to know what the balance was left in the crowd

5   funding.

6   Q.  Let's go to the next page.

7       The defendant responded:  "1, waiting on PR list from

8   Denver to finalize letter to publisher.  2, will get the

9   reimbursement sent.  Judy is back from vacation late today.  3,

10  will also get the accounting on the legal fund."  What did you

11  understand the defendant to mean when he said "waiting on PR

12  list from Denver to finalize letter to publisher"?

13  A.  That he was still drafting the demand letter for my book

14  payment No. 3 to send to the publisher and he wanted to send an

15  attachment along with the letter that included all of the

16  press, PR, appearances, bookstore signings, television

17  appearances, all of the things I had done to promote the book

18  so that it was able to be proved that I had completed the

19  requirement for PR.

20  Q.  So at that point, what was your understanding of whether

21  the third book payment had been paid?

22  A.  That it hadn't; that's why he was sending a letter.

23  Q.  What was that understanding based on?

24  A.  That he was sending them a letter and I hadn't received it.

25  Q.  And to be clear, who told you it hadn't been paid?

M1rWave5                    Clifford - Direct

1    A.  Michael did.

2    Q.  Let's stay with that message for a second.

3        The defendant wrote:  "Will get the reimbursement sent.

4    Judy is back from vacation late today."  What did you

5    understand him to mean by "will get the reimbursement sent"?

6    A.  That Judy would send me back the $26,000 that I had -- I

7    had given the dragons per Michael's request.

8    Q.  Can you point me to where in this message the defendant

9    wrote that you're responsible for your own security costs?

10   A.  Nowhere.

11   Q.  Can you point me to where in this message the defendant

12   said he had loaned you money?

13   A.  Nowhere.

14   Q.  Can you point me to where in this message the defendant

15   said that he'd advanced you costs that you were going to have

16   to pay back later?

17   A.  Nowhere.  I advanced him the money.

18   Q.  After 3, it says "will also get the accounting on the legal

19   fund."  What did you understand the defendant to mean when he

20   wrote that?

21   A.  That he would send me an updated balance of what was left

22   from the crowd fund.

23   Q.  Ms. Daniels, can you please read the next message you

24   wrote?

25   A.  "He should be done with it anytime now.  I did 80 percent

1    of it and sent it to him to fill in the blanks for me."

2    Q.  Please scroll down to the next message.  Can you please

3    read that one too?

4    A.  "There is a lot of stuff I bet they don't know about.  I

5    hope they feel like assholes."

6    Q.  What did you mean when you wrote that?

7    A.  That we were compiling the list of all the things I did to

8    promote the book.  It was a very lengthy list, and at this

9    point I was told that that was the sticking point, that they

10   weren't happy with the press, the amount of press I had done.

11   And in fairness, I had my own publicist who was doing things

12   that -- I was assuming that perhaps the publisher didn't know

13   and that when they found out how much I had done, that they'd

14   feel like jerks for not paying me.

15   Q.  Not paying you which payment?

16   A.  Payment No. 3.

17            THE COURT:  Just to clarify, you said that you had

18   been told that that was the sticking point.  Who had told you

19   that?

20            THE WITNESS:  Michael Avenatti.

21   BY MR. SOBELMAN:

22   Q.  The defendant responded:  "Agreed.  They should feel like

23   assholes.  It's bullshit."  Do you see that?

24   A.  Yes.

25   Q.  Where in that message did the defendant tell you your third

1    book payment had already been paid?

2    A.   Nowhere.  He didn't say that.

3    Q.   Where in that message did the defendant tell you he'd

4    already spent your third book payment?

5    A.   He didn't.

6    Q.   Let's go down.

7        Ms. Daniels, please read the next message starting "I

8    know."

9    A.   "I know sales plummeted when we lost the defamation case.

10   So did all my other money because people think we lost

11   everything, which they think means I lost credibility."

12   Q.   And the defendant responded:  "Sales actually never got off

13   the ground according to the publisher although I have asked for

14   the numbers.  The defamation case was dismissed two weeks after

15   the book was released.  According to the publisher.  And again,

16   I have not confirmed this, the sales in the next ten days did

17   not meet their expectations but didn't have anything to do with

18   your publicity as you and I both know."

19       Let's go to the next page.

20       Ms. Daniels, please read your next message?

21   A.   "Then how is it ranked so high on New York Times and 4 in

22   Canada?"

23   Q.   The defendant responded:  Good question.  I think due to

24   preorders, but again, we need to confirm this."

25       What did you write next?

Clifford - Direct

1   A.  "Regardless, my contract does not say it has to sell or I

2   don't get paid."

3   Q.  Let's go down and read the responses.

4       The defendant wrote:  Exactly," with four exclamation

5   points.  "You did your part and then some."

6       Ms. Daniels, how did you respond?

7   A.  "Then why are they being dicks?"

8   Q.  Who did you mean by "they"?

9   A.  The publisher.

10  Q.  And why did you think they were being dicks?

11  A.  Because they weren't upholding their part of the contract

12  by paying me my third payment.

13  Q.  And why did you think that you had not been paid your third

14  payment?

15  A.  Because I didn't have it, and Michael told me they hadn't

16  sent it.

17  Q.  Let's go to the next page.

18      Ms. Daniels, can you read your next message?

19  A.  "Check your email."

20  Q.  The defendant responded:  "Got it.  Thanks."

21      And what did you write next?

22  A.  "Seems like a decent list."

23  Q.  And the defendant responded:  Yeah, beyond," with three

24  exclamation points.

25      Ms. Daniels, we just went through four pages of messages,

M1rWave5                          Clifford - Direct

1  correct?

2  A.  Correct.

3  Q.  And where in there did the defendant say there was no need

4  to make a list of PR appearances because he had already

5  received your third book payment?

6  A.  Nowhere.

7  Q.  Take a look at Government Exhibit 42.

8      Ms. Daniels, who are these messages between?

9  A.  Myself and Michael Avenatti.

10  Q.  What are they dated?

11  A.  November 28, 2018.

12  Q.  Please read your first message.

13  A.  "Any news?"

14  Q.  What did you mean when you wrote "any news?"

15  A.  I was asking, once again, for an update on where my third

16  payment was and if he had had any correspondence with the

17  publisher.

18  Q.  The defendant responded:  "I should also have the publisher

19  letter finalized and out."  What did you understand that to

20  mean?

21  A.  That he was moving forward with sending them the demand

22  letter about my payment and the PR list.

23  Q.  Where in this message does it say that a letter to the

24  publisher about your PR is entirely unnecessary because he had

25  already received and spent your book advance payment?

1   A.   Nowhere.

2   Q.   Take a look at Government Exhibit 43.

3        Ms. Daniels, who sent these messages?

4   A.   Michael did.

5   Q.   Who did he send them to?

6   A.   To me.

7   Q.   And what date were they sent?

8   A.   November 28, 2018.

9   Q.   The defendant wrote:  "Can you call me?"

10       Next message:  "Stormy, the campaign is basically a

11  continuation of the prior campaign.  I was simply trying to

12  jump-start the effort again.  Nothing more, nothing less.  I

13  thought in light of Efran, etc., you could use the money.  I

14  didn't think it was a big deal.  No different than the prior

15  updates.  I'm sorry."

16       What did you understand the defendant to be referring to in

17  this message?

18  A.   A post I put on social media.

19  Q.   And what was that post about?

20  A.   I had discovered I was being -- my email and social media

21  accounts were being blown up by people asking me about

22  accounting for the crowd funding, the legal defense fund.  They

23  sent me a link to a second legal defense fund that I knew

24  nothing about, and they were making fun of me, saying I must be

25  broke.  And I was upset.

M1rWave5                    Clifford - Direct

 1  Q.  Who set up that legal defense fund?

 2  A.  Michael did.

 3  Q.  And before it was set up, what, if anything, did he tell

 4  you about that second legal defense fund?

 5  A.  Nothing.

 6  Q.  With respect to the first legal defense fund we talked

 7  about earlier, who did you understand controlled how that money

 8  was spent?

 9  A.  Michael.

10  Q.  Let's read on.  It says:  "You can't send that out" -- that

11  statement.

12      Sorry.  Let me start over.  It says:  "You can't send out

13  that stmt, Stormy.  I don't deserve that.  Please.  I

14  understand you are upset about Keith, *et al.*, but I've been

15  your advocate and friend.  I don't know why you would go after

16  me in the press like this.  That's not good or fair."

17          MR. SOBELMAN:  Go to the next page.

18          Maybe there isn't a next page.

19  Q.  Again, what did you understand these messages to refer to?

20  A.  Michael was upset about what I had posted publicly.

21  Q.  Why did you make that public post?

22  A.  Because it was true.  I didn't know anything about a second

23  crowd funding campaign, and I didn't know the accounting.

24  Q.  Let's go to Government Exhibit 44.

25      Ms. Daniels, who sent this message?

1    A.  Michael did.

2    Q.  Who did he send it to?

3    A.  To me.

4    Q.  And what date did he send it?

5    A.  November 29, 2018.

6    Q.  The defendant wrote:  "You should not be attacking me

7    publicly.  It puts me in a very difficult spot because I have

8    to defend myself and I don't want to respond in kind.  We have

9    to work this out."

10       Let's go to the next page.

11       The defendant wrote:  "We need to get on the phone, Stormy.

12   We have to figure out a soft landing.  We can't be fighting

13   publicly.  I don't know where that stmt came from."

14       Ms. Daniels, can you please read your response?

15   A.  "I did not attack you.  I stated all of -- I stated all my

16   truths.  Are you threatening me now?"

17   Q.  Please read your next message.

18   A.  "I was very careful to state my side and give you credit

19   and thanks, but facts are facts.  Checks have bounced.  I have

20   not been paid.  I've asked for accounting.  I'm tired of

21   finding shit out on Twitter.  I was being attacked about a fund

22   I never heard of.  I'm not a liar and not a thief.  You are an;

23   incredible and brilliant man with balls of steel.  I will

24   always admire you."

25   Q.  Ms. Daniels, what did you mean by "I have not been paid"?

1    A.   That I had not received my payment from the publisher.

2    Q.   The defendant responded:  "I'm not threatening you, Stormy.

3    I've never threatened you."  Do you see that?

4    A.   Yes.

5         Can I add something?

6    Q.   What, if anything else, did you mean --

7              THE COURT:  Wait for counsel's question, please.

8    BY MR. SOBELMAN:

9    Q.   What, if anything, did you mean by the prior message that

10   starts "I was very careful"?

11   A.   That I stated just the truth and was careful to give

12   Michael credit, but I was upset that people hadn't been paid

13   and checks were bounced.  I had not nod received my payment

14   from the publisher and I had not been reimbursed for the

15   $26,000 to the -- my security team that I, that Michael asked

16   me to front.

17   Q.   When you wrote checks have been bounced or "checks have

18   bounced," what did you mean?

19   A.   Several payments to the security team had bounced, and they

20   were physically with me.  So they were looking to me every day

21   for answers, and I didn't know what to tell them.  It was

22   embarrassing.

23   Q.   Who wrote those checks?

24   A.   Michael did.

25   Q.   And you wrote, "I've asked for accounting."  What did you

1   mean by that?

2   A.  That I was wondering how much money was in the crowd fund,

3   the legal defense fund, because I couldn't understand why I

4   hadn't been reimbursed and why checks were bouncing.  I wanted

5   to make sure that I wasn't overspending.

6   Q.  Before this date, November 29, 2018, had the defendant ever

7   provided you a list of what the crowd funding money had been

8   spent on?

9   A.  No.

10  Q.  Had you asked?

11  A.  Yes.

12  Q.  On one occasion or more than one occasion?

13  A.  I can't remember.

14  Q.  Let's take a look at what's in evidence as Government

15  Exhibit 2.

16      Do you recognize this?

17  A.  Yes.

18  Q.  What is it?

19  A.  It was a letter from Michael to me.

20  Q.  What's the date on this letter?

21  A.  November 30, 2018.

22  Q.  Who sent it to you?

23  A.  Michael did.

24  Q.  What did you understand this letter to be when you received

25  it?

1    A.  An accounting for the -- the crowd fund.

2    Q.  And what is your understanding of why the defendant sent

3    you this letter?

4    A.  Because I asked him to.

5    Q.  What is your understanding of whether this was supposed to

6    include all the costs expended for all of your matters with him

7    and his firm?

8    A.  I thought it included everything.

9    Q.  Is there any reference in this letter to your book advance

10   contract?

11   A.  No.

12   Q.  Is there any reference in this letter to your book advance

13   payments?

14   A.  No.

15           MR. SOBELMAN:  Ms. Abrams, can you please display

16   what's in evidence as Government Exhibit 45.

17   Q.  Ms. Daniels, who sent these messages?

18   A.  I did.

19   Q.  You sent the ones in the blue?

20   A.  Yes.

21   Q.  Who sent the ones in the green?

22   A.  The green are Michael Avenatti.

23   Q.  What is the date on these messages?

24   A.  November 30, 2018.

25   Q.  Please read your first message.

1   A.  "And let's not forget the publisher."

2   Q.  What did you mean by that?

3   A.  Don't forget to give me an update or find out where my

4   money's at.

5   Q.  By your money, what were you referring to?

6   A.  Book payment No. 3.

7   Q.  And at this time, November 30, 2018, what did you

8   understand the status of your third book payment to be?

9   A.  That it was almost two months late -- I'm sorry.  Yes,

10  almost two months late.

11  Q.  Who, if anyone, told you that?

12  A.  Michael did.

13  Q.  And the defendant responded:  "I haven't.  That's complete

14  bullshit."  Do you see that?

15  A.  Yes.

16  Q.  Where in that message did the defendant say I've already

17  received your third book payment and I've spent it?

18  A.  Nowhere.

19  Q.  Please read your next message.

20  A.  "I think the press list is impressive."

21  Q.  The defendant responded:  "No question.  100 percent."  Do

22  you see that?

23  A.  I do.

24  Q.  Where in this message exchange did the defendant say we

25  don't need to send a press list because we already got your

1    third book payment?

2    A.  He didn't say that.

3         MR. SOBELMAN:  Please display what's in evidence as

4    Government Exhibit 46.

5    Q.  Ms. Daniels, who are these messages between?

6    A.  Between myself and Michael Avenatti.

7    Q.  And what date were they sent?

8    A.  December 2, 2018.

9    Q.  The defendant wrote:  "Now that Michael and I have sorted

10    everything out and we know the accounting is on the up and up,

11    we are going to kick ass together on two coasts tomorrow.

12    #TeamStormy."  Then he wrote:  "Let me know when you have

13    tweeted and I will re-tweet that and the next one."

14       Ms. Daniels, what did you understand he was communicating

15    to you in these messages?

16    A.  This was a post that Michael wanted me to put up on my

17    social media as a statement from myself.

18    Q.  What was your understanding of why he wanted you to put

19    this statement on your social media as if it was from you?

20    A.  So that it appeared we had worked things out, that there

21    was no more questions.

22    Q.  Please read your response below.

23    A.  "Tweeted.  Had to add a curse word so no one would be

24    suspicious."

25    Q.  What did you mean when you wrote "tweeted"?

1   A.   That I had posted it on my Twitter account.

2   Q.   What did you mean when you wrote "had to add a curse word

3   so no one would be suspicious"?

4   A.   Because my fans know that I have a potty mouth, so I -- I

5   changed his statements to put in a curse word.

6   Q.   Why did you post the tweet with the curse word added that

7   he asked you to post?

8   A.   So that people didn't know that I was having him control

9   what I was putting out.

10  Q.   At the time you posted this tweet, based on your

11  conversations with the defendant, what did you understand the

12  status of your third book payment to be?

13  A.   That the publisher had not released it and Michael had to

14  send them a letter.

15  Q.   Why did you think that?

16  A.   Because I had not received any money and Michael hadn't

17  told me he -- any different.

18  Q.   Let's turn to Government Exhibit 47.

19       Ms. Daniels, who are these messages between?

20  A.   Myself and Michael Avenatti.

21  Q.   What date were they sent?

22  A.   December 3, 2018.

23  Q.   The defendant wrote:  "Morning.  I think I should publish

24  the accounting numbers, not the whole letter, so people won't

25  think money was misappropriated and can see where the money

1  went.  You don't have a problem with that, right?  I think it's

2  important for both of us so nobody can claim either of us

3  'misspent' their money."  What did you understand this message

4  to mean?

5  A.  That he wanted to put up the list of numbers that were in

6  the previous letter, where, so people could see what the money

7  from the crowd funding had been used for.

8  Q.  At that time did you believe the defendant had misspent

9  your money?

10  A.  No.

11  Q.  At that time what did you understand the status of your

12  third book payment to be?

13  A.  That the publisher still had it.

14  Q.  How did you respond?

15  A.  "OK."

16  Q.  And then the defendant responded:  "Thanks."  Do you see

17  that?

18  A.  Yes.

19  Q.  Let's turn to Government Exhibit 48.

20      Ms. Daniels, who are these messages between?

21  A.  Myself and Michael Avenatti.

22  Q.  What date were they sent?

23  A.  December 5, 2018.

24  Q.  Please read the first message here.

25  A.  "When is the publisher going to cough up my money?"

M1rWave5                          Clifford – Direct

1    Q.  What did you mean by that?

2    A.  That I was very quickly out of patience and I wanted my

3    third book payment.

4    Q.  Let's turn to the next page.

5        The defendant responded:  "As for publisher -- working them

6    and threatening litigation.  They need to pay you are the money

7    as you did your part and then some."  Do you see that?

8    A.  Yes.

9    Q.  Where in that message does it say that the defendant

10   received and spent your third book payment months ago?

11   A.  It doesn't say that.

12   Q.  Let's scroll down.

13       Please read your message

14   A.  "Ummm...yes."

15   Q.  Continue down.

16       Please read your message.

17   A.  "How can they think for one moment that they can get away

18   with not paying me?"

19   Q.  Let's go to the next page.

20       The defendant responded:  "No.  They will have to pay you,

21   Stormy."  Ms. Daniels, where in this message did the defendant

22   tell you they had already made the payment but the defendant

23   took it?

24   A.  Nowhere.

25   Q.  Turn to Government Exhibit 49.

M1rWave5                          Clifford - Direct

1          Ms. Daniels, who are these messages between?

2     A.   Myself and Michael Avenatti.

3     Q.   What date were they sent?

4     A.   December 20, 2018.

5     Q.   Please read your first message on the screen.

6     A.   "Where are we with publisher?  I'm about 2 seconds from

7     blasting them publicly".

8     Q.   What did you mean when you wrote "where are we with

9     publisher"?

10    A.   I was, once again, asking for an update to see if they

11    responded to his letter and where my money was.

12    Q.   Do you know if the defendant ever actually sent the

13    publisher a letter about your third book payment?

14    A.   I have no way of knowing.

15    Q.   And as of December 20, 2018, what was your understanding of

16    the status of your third book payment?

17    A.   That the publisher still had it.

18    Q.   Who told you that?

19    A.   Michael did.

20    Q.   And you wrote, "I'm about 2 seconds from blasting them

21    publicly."  What did you mean?

22    A.   That I was going to post on my social media that St.

23    Martin's Press doesn't uphold contracts.

24    Q.   Why were you going to do that?

25    A.   Because they -- it was my belief that they had not paid me

1   and were almost two -- over two months late.

2   Q.  And the message below reads:  "And firing Luke."  Do you

3   see that?

4   A.  Yes.

5   Q.  Why did you write that?

6   A.  Because Luke was my literary agent, and I couldn't get a

7   response from him.  I called him and text him, and he never

8   answered me.  And I didn't understand why I was giving somebody

9   15 percent to not help me.

10  Q.  Do you know why Luke had not responded to you?

11  A.  I have no idea.

12  Q.  Let's go to page 3 of this exhibit.

13      Let me just ask.  Did the defendant ever tell you if he had

14  told Mr. Janklow or the publisher not to contact you about your

15  book's finances?

16          MR. AVENATTI:  Objection.  Lacks foundation.

17          THE COURT:  Overruled.

18          You can answer.

19  A.  No, of course not.

20  Q.  He never said anything like that?

21  A.  No.

22  Q.  The defendant wrote:  "Call me and I can give you an

23  update.  I'm available all afternoon."  How did you respond?

24  A.  "OK.  Give me 15 min."

25  Q.  The defendant then wrote:  "No problem."

1    Ms. Daniels, did you speak with the defendant shortly after
2    these messages?
3    A.  Yes.
4    Q.  And during that conversation, what, if anything, did the
5    defendant say about how he had already received and spent your
6    third book payment?
7    A.  He didn't say anything like that.
8    Q.  What did he say about the third book payment?
9    A.  That he was still working on it.
10   Q.  What, if anything, did he say he was doing to, quote, work
11   on it.
12   A.  That at this point he had sent a letter; he was
13   negotiating; that he was going to make them pay me.
14        MR. SOBELMAN:  Ms. Abrams, please display what's in
15   evidence next to each other as Government Exhibits 50 and 50A.
16   Q.  Ms. Daniels, who are these messages between?
17   A.  Myself and Michael Avenatti.
18   Q.  What date were they sent?
19   A.  December 27, 2018.
20   Q.  Please read your first message.
21   A.  Uh-huh.  "I'm sending publisher a certified letter
22   demanding payment and firing Luke.  Then I may post it online
23   for fun.  I am trapped in this house with my ex until I get
24   paid.  Each day is one step closer to one of us going to jail."
25   Q.  What did you mean when you wrote, "I'm sending publisher a

1    certified letter demanding payment"?

2    A.  That I wanted to have a receipt, a physical receipt that

3    the -- I had sent correspondence to the publisher, demanding my

4    third book payment, and releasing Luke from our deal.

5    Q.  Why did you write, "I am trapped in this house with my ex

6    until I get paid"?

7    A.  Because this is between Christmas and New Year's, so it was

8    the holidays.  My husband and I were separated and staying in

9    the same house, and it was uncomfortable.

10   Q.  What, if anything, did you plan to do with your third book

11   payment when you received it?

12   A.  Put a down payment on a house.

13   Q.  If you could afford your own house, would you continue to

14   live with your ex-husband?

15          MR. AVENATTI:  Objection.  Relevance.

16          THE COURT:  Overruled.

17   A.  No.

18   Q.  What did you mean by "each day is one step closer to one of

19   us going to jail"?

20   A.  Because things were getting very tense between he and I.

21   Q.  What's the message underneath that one?

22   A.  It's a screenshot that I sent to Michael.

23   Q.  And just generally, what was that?

24   A.  It was a copy of the letter that I drafted to send to the

25   publisher.

M1rWave5                          Clifford - Direct

1    Q.  And do you recall whether or not you actually sent that

2    letter?

3    A.  I don't remember.

4    Q.  And let's look at the defendant's response.

5         The defendant responded:  "Call me re book."  Do you see

6    that?

7    A.  Yes.

8    Q.  Did you speak to the defendant shortly after these

9    messages?

10   A.  Yes.

11   Q.  During that conversation, what, if anything, did the

12   defendant say about the status of your third book payment?

13   A.  He told me nothing.  He told me he didn't have it.

14   Q.  At that point what was your understanding of whether the

15   publisher had paid your third book payment?

16   A.  I was under the understanding they still had it.

17   Q.  Who told you that?

18   A.  Michael did.

19        MR. SOBELMAN:  Ms. Abrams, let's take a look at

20   Government Exhibit 51.

21   Q.  Ms. Daniels, who are these messages between?

22   A.  Between myself and Michael Avenatti.

23   Q.  What date were these sent?

24   A.  January 3, 2019.

25   Q.  The defendant wrote:  "Making progress re book.  Hope your

1   travels are going well.  Call for an update when you can."  How

2   did you respond?

3   A.  "OK.  Getting checked in at airport, call in a bit."

4   Q.  What did you understand the defendant to mean when he wrote

5   "making progress re book"?

6   A.  That he was getting closer to securing my third book

7   payment from the publisher for me.

8   Q.  Where in this message did the defendant say that he had

9   already received and spent your third book payment?

10  A.  It doesn't say that anywhere.

11  Q.  Did you speak with the defendant shortly after exchanging

12  these messages?

13  A.  Yes.

14  Q.  And during that conversation, what do you recall him saying

15  about your third book payment?

16  A.  He didn't say he had it.  He was still working on it.

17  Q.  Let's take a look at Government Exhibit 52.

18      Ms. Daniels, who are these messages between?

19  A.  Between myself and Michael Avenatti.

20  Q.  What date were they sent?

21  A.  January 15, 2019.

22  Q.  Please read your first message.

23  A.  "Any word from publisher?"

24  Q.  What did you mean by "any word from publisher?"

25  A.  Have they responded to his letter?

1  Q.  And what payment did you understand was due at that time?

2  A.  Advance book payment No. 3.

3  Q.  Why did you think the third payment was still due?

4  A.  Because I had not received it.

5  Q.  Who, if anyone, told you the third payment had not been

6  paid?

7  A.  Michael did.

8  Q.  The defendant responded:  "Not yet, but I expect this

9  resolved this week.  Will be good to get you the money.  When

10 do you look at the property."  What did you understand the

11 defendant to mean when he said "when do you look at the

12 property?"

13 A.  Michael knew that I was going to look at a house in

14 Florida, so he was asking when I was going to see it.

15 Q.  What, if anything, were you going to do with respect to

16 that house?

17        MR. AVENATTI:  Objection, your Honor.  Relevance.

18 Speculation.

19        THE COURT:  Overruled.

20 A.  Live in it.

21 Q.  What, if any, funds did you need to purchase that house?

22 A.  My third book payment.

23 Q.  Ms. Daniels, can you please read your response at the

24 bottom?

25 A.  "Supposed to next week but not going to book until I have

1    the money."

2    Q.   What did you mean by that?

3    A.   That I didn't want to buy a plane ticket and travel all the

4    way to Florida and waste money and my time plus my real estate

5    agent's time if I didn't have my third book payment.  There was

6    no point to look at property that I didn't have money for.

7    Q.   Take a look at the next page.

8         The defendant responded:  "Got it."  Do you see that?

9    A.   Yes.

10   Q.   Where here does it say that you're never getting your third

11   book payment because the defendant had already received and

12   spent it?

13             MR. AVENATTI:  Objection.  Argumentative.

14             THE COURT:  Overruled.

15   A.   It doesn't.

16   Q.   Let's take a look at Government Exhibit 53.

17        Who are these messages between?

18   A.   Myself and Michael Avenatti.

19   Q.   What date were these messages sent?

20   A.   January 18, 2019.

21   Q.   Please read the first message that you wrote.

22   A.   "It's Fri...publisher?"

23   Q.   What did you mean by this?

24   A.   He would tell me he was going to have an answer by the end

25   of the week, and Friday is the end of the week, so I wanted to

M1rWave5                          Clifford - Direct

1    hear the answer.

2    Q.  Who is he?

3    A.  Michael.

4    Q.  He had told you that he was going to have an answer about

5    what?

6    A.  My third book payment.

7    Q.  How had he told you that?

8    A.  In a previous text message.

9    Q.  Is it a text message --

10   A.  Sorry.

11   Q.  -- or a phone conversation?

12           MR. AVENATTI:  Objection.  Leading.

13           THE COURT:  Overruled.

14   BY MR. SOBELMAN:

15   Q.  The conversation you just referenced, do you recall whether

16   that was a text message or a phone conversation or an in-person

17   conversation, or something else?

18           MR. AVENATTI:  Asked and answered.

19           THE COURT:  Overruled.

20   A.  It was in a WhatsApp message and probably a phone call as

21   well.  Resolved by the end of the week sounds to me like I will

22   have an answer for you by the end of the week, and at the end

23   of the week is Friday.  So I wanted to hear the answer.

24   Q.  That was the last text message we looked at, correct?

25   A.  Correct.

1  Q.  Then your next message, can you read that?

2  A.  "News?"

3  Q.  What did you mean by that?

4  A.  Still waiting on that answer.

5  Q.  How much time passed between the "it's Fri...publisher?"

6  And your "News" text message?

7  A.  Four days, so the weekend plus a day to give him time to

8  reach out to them.

9  Q.  And how many messages did the defendant send you between

10  those two messages?

11  A.  Zero.

12  Q.  Let's go to the next page.

13      The defendant wrote:  "Here is what the publisher claims.

14  I have asked for a formal report because I don't believe it.

15  Close to 24,000 hard cover Full Disclosures sold so far with

16  quite a few still out in the field (they believe that book

17  sellers, at least the indies, may feel disloyal returning them)

18  and still to come back at some point (according to them).

19  E-book sales are, of course, final and stand at 9,278 -- the

20  lion's share (6,250) sold at Amazon with something over 1,000

21  sold on iPad and 571 at BN/Nook, of the major e-retailers."  Do

22  you see that?

23  A.  Yes.

24  Q.  Do you understand that this message has anything to do with

25  your book advance payments?

1   A.  No.

2   Q.  Based on your understanding of the contract, do you get

3   paid -- does whether you get paid have anything to do with how

4   many books are sold?

5   A.  No, it doesn't have anything to do with it.

6   Q.  Let's take a look at Government Exhibit 54.

7       Ms. Daniels, who are these messages between?

8   A.  They're between myself and Michael Avenatti.

9   Q.  And what date were they sent?

10  A.  January 31, 2019.

11  Q.  Please read the first message you wrote.

12  A.  "Speaking of...where is my book money?"

13  Q.  What did you mean by "where is my book money?"

14  A.  That it's many months late and I still don't have it and I

15  would like to know the whereabouts for my third book payment.

16  Q.  The defendant responded:  "Call me for an update re book

17  and Florida."  Do you see that?

18  A.  Yes.

19  Q.  Did you speak with the defendant shortly after these

20  messages?

21  A.  Yes.

22  Q.  During that conversation, what, if anything, did the

23  defendant say about your third book payment?

24  A.  Nothing.  He -- nothing, didn't have it, never gave me an

25  answer where it was at.

M1rWave5                         Clifford - Direct

 1   Q.  Just to be clear, did he say he did not have the payment,

 2   or did he not say anything about the payment at all?

 3              MR. AVENATTI:  Objection.  Leading.

 4              THE COURT:  Overruled.

 5   Q.  You may answer.

 6   A.  I'm sorry.  I didn't hear.

 7   Q.  Let me ask a slightly different question.  What happened in

 8   the telephone conversation that followed these messages?

 9              MR. AVENATTI:  Asked and answered.

10              THE COURT:  Overruled.

11   A.  He didn't tell me that he had the book payment.  He said

12   the publisher was still being difficult.

13              MR. SOBELMAN:  Please display what's in evidence as

14   Government Exhibit 55 next to Government Exhibit 55A.

15   Q.  Ms. Daniels, who are these messages between?

16   A.  Myself and Michael Avenatti.

17   Q.  What date were they sent?

18   A.  February 4, 2019.

19   Q.  What did you send in this message?

20   A.  A screenshot of my banking information.

21   Q.  Is this the same as the screenshot of your banking

22   information we saw several messages ago?

23   A.  Yes, it is.

24   Q.  Why did you send this?

25   A.  Just in case he needed it for my payment.  It was just

1  another way to nudge, I suppose.  He said he was still working

2  on it at this -- at this point I just figured better give it to

3  him than not.

4  Q.  And what did you write in the next message?

5  A.  "Stormy Entertainment."

6  Q.  Why did you write that?

7  A.  Because it's not on the screenshot of the banking

8  information.  I just wanted to make it very clear that that's

9  also the name on the account, just so there was no questions.

10  Q.  How did the defendant respond?

11  A.  By saying "thanks."

12  Q.  Where in these messages did the defendant explain he'd

13  already received and spent your third book payment?

14  A.  He didn't.

15  Q.  Around the time of these messages, did you have a telephone

16  conversation with the defendant?

17  A.  Yes, I did.

18  Q.  And on that telephone conversation, what, if anything, did

19  the defendant say about receiving a late check?

20  A.  He said that they may send another check, like they did

21  before, and that there were -- strangely, they were talking

22  about making a deal, offering to pay me both the third book

23  payment and the fourth for a lower amount -- a settle -- a

24  settlement, like a compromise.

25  Q.  Just explain that to us, if you can.

A.  I was owed my third book payment.  It was at this point

four months late, and I knew that I had a fourth payment coming

up soon.  Michael had multiple times told me that they were

displeased with the book sales and the amount of press I did,

even though I provided them an extensive press list of things I

had done, appearances and television shows and whatnot, and

that it didn't say anywhere in my contract that my payments

were contingent upon how many sales the book made; that would

it be OK to accept one lump sum that was lower than those two

payments and just to be basically prepared, because we didn't

know how that might come, because once before, they had mailed

a check.

Q.  Who told you all of that?

A.  Michael did.

Q.  Did anyone else from the publisher or the book agent or

anyone else ever tell you that that might be a possibility?

A.  No.  I couldn't get either of them on the phone, ever.

Q.  And so just to be clear, the defendant told you you might

have to accept less than the full amount of the contract, is

that correct?

A.  He asked if I'd be open to it.

Q.  And what did you say in response?

A.  Hell, no.

Q.  Why did you say hell, no?

A.  Because we had a written agreement, and they -- I felt like

1   they had been jerking me around so long, I had zero patience

2   left.

3   Q.  Why did you feel that they, which I believe is the

4   publisher, had been jerking you around?

5   A.  Because Michael told me that the publisher had not sent the

6   payment, and I hadn't heard differently from anyone else.  So I

7   believed him.

8   Q.  Let's take a look at Government Exhibit 56.

9        Ms. Daniels, who are these messages between?

10  A.  They are between myself and Michael Avenatti.

11  Q.  What date were they sent?

12  A.  February 7, 2019.

13  Q.  Please read the message you sent.

14  A.  "Did that check show up?"

15  Q.  What were you referring to when wrote "did that check show

16  up?"

17  A.  My book payment.

18  Q.  Is that a reference to the conversation you just recounted

19  for us?

20  A.  Yes, it is.

21  Q.  The defendant responded:  "Great op-ed, by the way" --

22  B-T-W, exclamation point.  Do you see that?

23  A.  Yes.

24  Q.  What do you understand that was a reference to?

25  A.  He was complimenting me on an editorial I had written for a

1   publication.

2   Q.  Did that editorial have anything to do with your book

3   advance payments?

4   A.  Absolutely not.

5   Q.  Did the defendant ever actually respond to the message "did

6   that check show up?"

7   A.  No, he didn't.

8   Q.  Let's take a look at Government Exhibit 57.

9       Who is this a message to?

10  A.  Michael.

11  Q.  Who wrote it?

12  A.  I did.

13  Q.  What is the date of this message?

14  A.  February 9, 2019.

15  Q.  Please read what you wrote.

16  A.  "Guessing check wasn't there."

17  Q.  What was this a reference to?

18  A.  That they -- Michael had told me that perhaps they had

19  mailed a check, like they did once before.  I asked him for an

20  update a couple days before, and I figured no response when it

21  wasn't there.

22  Q.  Just to be clear, when you say the publisher mailed a check

23  once before, who told you that it happened?

24  A.  Michael did.

25  Q.  Do you know if that's true?

1    A.  I don't.

2    Q.  I should say did you know if that was true at the time?

3              MR. AVENATTI:  Objection, your Honor.  Asked and

4    answered.

5              THE COURT:  I think it's important to clarify it.

6              Just to be clear, did you know at that time whether

7    that was true?

8              THE WITNESS:  I didn't.  I believed Michael.

9    BY MR. SOBELMAN:

10   Q.  Did the defendant ever respond to this message where you

11   said "guessing check wasn't there"?

12   A.  No.

13   Q.  Let's take a look at Government Exhibit 58.

14        Who are these messages between?

15   A.  Myself and Michael Avenatti.

16   Q.  What date were they sent?

17   A.  February 12, 2019.

18   Q.  Ms. Daniels, can you please read the message you wrote?

19   A.  "Did you speak to publisher?"

20   Q.  The defendant responded:  "Yes.  Will call shortly.  We are

21   resolving."  Do you see that?

22   A.  Yes, I do.

23   Q.  Do you know if what he wrote was true?  I'm sorry.

24        Did you know if what he wrote was true at the time you

25   received this?

M1rWave5                        Clifford - Direct

1   A.  No.

2   Q.  Did you have a conversation with the defendant after this

3   message?

4   A.  Yes.

5   Q.  And what, if anything, did the defendant say in that

6   conversation about your third book payment?

7   A.  Nothing, that he was still working on it for me.

8   Q.  Let's take a look at Government Exhibit 59.

9       Ms. Daniels, can you please read the first message that --

10  sorry.  Let me take a step back.

11      Who are these messages between?

12  A.  Myself and Michael Avenatti.

13  Q.  What date were they sent?

14  A.  February 13 at 2000 -- sorry.  February 13, 2019.

15  Q.  Can you please read the first message you wrote?

16  A.  "I did not receive a wire today.  I just sent a text to

17  Sally and every single other person at the publisher and will

18  continue to do so every hour until I am paid."

19  Q.  What did you mean by "I did not receive a wire today"?

20  A.  That I had not received my third book payment.

21  Q.  What is a wire?

22  A.  A bank transfer.

23  Q.  Who is Sally?

24  A.  Sally Richardson.  She worked -- or she's one of my

25  contacts at St. Martin Press.

M1rWave5                        Clifford - Direct

1    Q.   Please read the second message you wrote here.

2    A.   "I'm giving them 24 hours and then I will start tweeting

3    and talking to press.  Fuck them."

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  Q.  Why did you write that?

2  A.  Because I was very, very upset and completely out of

3  patience.  I thought they were refusing to uphold the contract

4  and basically playing games with me and with my attorney, so I

5  was going to go public.

6  Q.  Who, if anyone, had told you that they -- they being the

7  publisher -- had not paid your third book payment as of

8  February 13, 2019?

9  A.  Well, Michael and my empty bank account.

10  Q.  Let's take a look at Government Exhibit 224.

11      If you could please take a look at the bottom of the page.

12  Just remind us, who wrote this message?

13  A.  I did.

14  Q.  Who did you write it to?

15  A.  Elizabeth.

16  Q.  Who is Elizabeth?

17  A.  One of my -- another one of my contacts at St. Martin's

18  Press.

19  Q.  What date was this message sent?

20  A.  February 13, 2019.

21  Q.  Please read the message.

22  A.  "Hi, Elizabeth.  This is Stormy Daniels.  I am very

23  confused why I have not been paid per my contract with your

24  company.  I've been lied to repeatedly about this and want to

25  hear directly from you when I will be receiving my check."

1    Q.  At that time, based on what you knew then, who, if anyone,

2    did you believe may have lied to you?

3    A.  Michael.

4    Q.  Why did you think that?

5    A.  Because multiple times he said it was being resolved, or I

6    would have an answer by the end of the week, or there was

7    probably a check in the mail, and nothing came.  So someone was

8    being dishonest and I wanted to find out who.

9    Q.  Let's go back to Government Exhibit 59, taking a look at

10   the second page.

11       Ms. Daniels, what is the date on these messages?

12   A.  February 14, 2019.

13   Q.  Would you please read the first message?

14   A.  "30 minutes till morning is over and still no wire.  I have

15   an interview in an hour and will be discussing how authors

16   should never do business with Macmillan."

17   Q.  What did you mean when you wrote "30 minutes till morning

18   is over and still no wire"?

19   A.  That I told him that they would have that morning to pay me

20   before I went public.

21   Q.  Who is "him"?

22   A.  Michael.  Sorry.

23   Q.  Please read the next message.

24   A.  "My interview is here.  Just sent final warning to Sally.

25   Fuck them."

1    Q.  Let's keep going.

2            Please read your next message.

3    A.  "Also ... there are reporters at my bus asking about you

4    losing your company and how my files/money was seized.  WTF is

5    going on?"

6    Q.  Please read the next message.

7    A.  "I will be speaking to an attorney tomorrow with literary

8    experience about moving forward with suing Macmillan."

9    Q.  Why did you write that you were considering suing

10   Macmillan?

11   A.  Because I had not received my payment, and they were very

12   far in breach of contract.

13   Q.  Why did you believe that they had breached their contract?

14   A.  Because I had not received payment.

15   Q.  Who told you that the payment had not been paid?

16   A.  Well, Michael, but I didn't need anyone to tell me, I

17   didn't have it.

18   Q.  Let's keep going.

19       The defendant responded, "You are not at all affected.

20   This is nonsense.  It's my old firm that we haven't used in

21   your case.  It has no bearing on you."

22       Before we read the last message on the page, what did you

23   understand the defendant's message to be referring to?

24   A.  The fact that I told him reporters were at my bus, my tour

25   bus for clarification, asking a bunch of questions about things

M1R8AVE6                          Clifford - Direct

1    going on with Michael.

2    Q.  Did this message respond at all to any of the messages

3    above about your book payment?

4    A.  No.

5              MR. AVENATTI:  Best evidence.

6              THE COURT:  I will sustain the objection and the jury

7    will disregard the answer.

8    Q.  Where in this message did the defendant respond and say

9    anything about your book payments?

10             MR. AVENATTI:  Same objection, your Honor.

11             THE COURT:  Overruled.

12   A.  He didn't.

13   Q.  Let's go down to the next message.

14             The defendant wrote, in quotes, "'It's Michael's old

15   firm.  They never represented me.  I'm represented by Avenatti

16   & Associates and always have been.  Check the case filings.  It

17   has nothing to do with me.  My case is not affected.  This is a

18   big nothing burger.'"

19        What, if anything, did you understand the defendant to be

20   trying to communicate to you by sending you this quote?

21   A.  This was the statement that he wrote that he wanted me to

22   tell the press in response to all the questions they were

23   asking.  He ignored all of my stuff and only cared about what

24   they were asking about him.

25             MR. AVENATTI:  Your Honor, move to strike the last

1   sentence as nonresponsive.

2          THE COURT:  Granted.  The jury will disregard the last

3   sentence of that answer.

4   Q.  Ms. Daniels, where in this message did the defendant say

5   anything about your book payments?

6   A.  He didn't.

7          MR. AVENATTI:  Best evidence, your Honor.

8   A.  He didn't.  This is simply a quote for press.

9   Q.  Let's go to the next page.

10         Ms. Daniels, please read your next two messages.

11  A.  "OK.  Now.  Find my fucking money."

12  Q.  What did you mean when you wrote "find my fucking money"?

13  A.  It's not in my account.  Please tell me where it's at.

14  Q.  What money were you referring to?

15  A.  My third book payment.

16  Q.  Let's scroll down and see the defendant's response.

17         He wrote, "Word" with, is that six exclamation points?

18  A.  Maybe seven.

19  Q.  What did you understand the defendant to mean when he wrote

20  "word" with six exclamation points?

21  A.  Affirmative.  Very affirmative.

22  Q.  Where in this message does the defendant say he already

23  received and spent your money?

24         MR. AVENATTI:  Best evidence, your Honor.

25         THE COURT:  Overruled.

1    A.  It doesn't.

2    Q.  Let's take a look at Government Exhibit 60.

3         Ms. Daniels, who are these messages between?

4    A.  Michael Avenatti and myself.

5    Q.  What is the date these messages were sent?

6    A.  February 15, 2019.

7    Q.  The defendant wrote, "I have good news re the book.  I can

8    call you in about two hours."

9         Do you see that?

10   A.  Yes.

11   Q.  He then wrote, "Just got out.  Can you call me?"

12        Do you see that?

13   A.  Yes.

14   Q.  He then wrote, "Trying to reach you.  Can you call me?

15   Thanks."

16        Do you see that?

17   A.  Yes.

18   Q.  He then wrote, "Can you give me a call re the book

19   payments, etc."

20        Do you see that?

21   A.  Yes.

22   Q.  He then wrote, "Been trying to reach you since Friday re

23   the book payments, etc.  Please get back to me.  Thanks."

24        Do you see that?

25   A.  Yes.

M1R8AVE6                           Clifford - Direct

1    Q.  Ms. Daniels, why did you not respond to the defendant

2    between February 15 and February 18, 2019?

3    A.  Because I had spoken to the publisher.

4    Q.  What, if anything, did you learn from the publisher?

5    A.  That Michael had been lying and stealing from me, and that

6    my payments were sent months before.

7               MR. SOBELMAN:  Scroll down, please.

8               If we can put this page, which is the second page of

9    Government Exhibit 60, up next to Government Exhibit 60A.

10   Q.  Ms. Daniels, what did you send in this message?

11   A.  I sent him another copy of my book contract.

12   Q.  Why did you do that?

13   A.  Because I wanted to circle a part and send it to him.

14   Q.  Which part did you circle?

15   A.  The part about my third payment, when it was due and the

16   amount.

17              MR. SOBELMAN:  Now, please, put up Government Exhibit

18   60B instead of 60A.

19   Q.  What did you send to the defendant next?

20   A.  The dates that Macmillan had sent my payments and how they

21   sent them.

22   Q.  Where did you receive what is screen-shotted in 60B from?

23   A.  From the literary agent's secretary.

24   Q.  Why did you send that to the defendant?

25   A.  So that it was perfectly clear that I knew what he had

1    done.

2    Q.  Let's take a look at the next message.

3        Ms. Daniels, please read what you wrote here on February

4    19, 2019?

5    A.  "I never received this payment that was sent to you.  Last

6    payment you gave me was number two via a check you deposited on

7    September 5th."

8    Q.  Why did you write this?

9    A.  Because it was all true.  This was proof that they sent him

10   my payments, or that my payments were sent from the publisher

11   and that Michael had received them, and the dates that he

12   received them.  It was just a continuation of my last text to

13   him that I knew that he had been lying to me and he had stolen

14   my money.

15   Q.  Let's go to the third page of Government Exhibit 60.

16       Ms. Daniels, please read the top message that you sent to

17   the defendant.

18   A.  "I didn't even know you had a trust account with my name on

19   it."

20   Q.  Why did you write that?

21   A.  Because the payment of my book payment wasn't -- it was

22   sent to a trust account that I had never heard of; it wasn't

23   this check that Michael claimed had come in the mail.

24   Q.  Just to be clear, at any point during the time the

25   defendant was your lawyer, did he ever tell you that he had a

1    trust account in your name?

2    A.   Absolutely not.

3    Q.   Did he ever give you an accounting of the money that came

4    into or went out of that trust account?

5    A.   No.

6    Q.   Did he ever ask you for permission before spending money

7    out of that trust account?

8    A.   No.

9    Q.   The defendant responded, "Let me find out if we even

10   received this payment."

11           Do you see that?

12   A.   Yes, I do.

13   Q.   Where in that message does the defendant say, I have

14   documentation of this payment, I received it and I spent it?

15   A.   Nowhere.

16   Q.   Let's keep going.

17       Ms. Daniels, can you please read this message.

18   A.   "Here is the wire proof.  You also waited over 30 days to

19   give me payment number two.  You've had payment number three

20   for over five months.  Last payment, which is number four, is

21   not due quite yet."

22   Q.   What did you mean when you wrote "here is the wire proof"?

23   A.   It was in reference to the screenshot that I sent to him

24   that proved Janklow, the literary agent, had sent him the money

25   that he said let me see if we could find it.  You don't need to

1   find it.  Here it is.  You had it.  You're lying.

2   Q.  You wrote, "You also waited over 30 days to give me payment

3   number two."  What did you mean by that?

4   A.  That according to the documentation I received from the

5   literary agent, Michael lied to me for over 30 days saying that

6   they hadn't sent that payment either, but he in fact had

7   received it.

8   Q.  What did you mean when you wrote "you've had payment number

9   three for over five months"?

10  A.  That they had sent the payment on time, with no question,

11  and he lied to me almost every day for five months.

12  Q.  You then wrote, "Last payment, which is number four, is not

13  due quite yet."

14          What did you mean by that?

15  A.  Just wanted to clear up any confusion, that I was only

16  talking about the ones that were already late, that I wasn't

17  looking for payment number four or additional money because

18  that time period hadn't come up yet, the due date.

19  Q.  Let's keep going.

20          MR. SOBELMAN:  Can we please put up Government Exhibit

21  60C next to this.

22  Q.  Ms. Daniels, did you then send another attachment?

23  A.  Yes, I did.

24  Q.  What was in this attachment?

25  A.  It was additional proof.  It was the actual screenshot with

M1R8AVE6                        Clifford - Direct

1   the account -- the receipts, the account numbers.  It was the

2   official one, not just the one typed from the literary agent.

3   They sent me the actual banking receipt that proved they had

4   transferred the wire.

5   Q.  Why did you send this to the defendant?

6   A.  Mic drop.

7   Q.  What do you mean by mic drop?

8   A.  There is no denying this came from a banking establishment.

9   I am tired of your lies, just stop, come clean.

10  Q.  Let's read what the defendant said next.

11      The defendant responded, "Let me find out what is going

12  on."

13          Do you see that?

14  A.  Yes.

15  Q.  Where in this message does it say, I received and spent

16  your money?

17  A.  It doesn't say that anywhere.

18  Q.  Where in this message does it say, I received your money

19  and I think I'm entitled to it?

20  A.  Nowhere.

21  Q.  Just to be clear, the documents that you sent him, those

22  you got, you said, from the literary agency, right?

23          MR. AVENATTI:  Objection.  Leading.

24          THE COURT:  Sustained.

25          Mr. Sobelman, can we just take a two-minute just to

M1R8AVE6                          Clifford - Direct

1   let people stand and stretch and push through the end of the

2   day.

3             MR. SOBELMAN:  Of course, your Honor.

4             THE COURT:  Ladies and gentlemen, if you want to just

5   stand up and stretch for a minute or so, and then we will carry

6   on.

7             I have a new plan, which is that we are actually going

8   to take a very short recess of about five minutes just to allow

9   folks to use the restroom.  For that reason, I am going to have

10  my clerks escort the jury out through this door here, so if the

11  government can move its chairs forward, please.  There are some

12  restrooms back there that the jury can use.  Please maintain

13  social distancing when you're there.  And we will pick up in a

14  couple of minutes.  Just wait in there when you're ready.

15            With that, everyone please rise.

16            (Jury exits courtroom)

17            (Continued on next page)

18

19

20

21

22

23

24

25

1           THE COURT:  You may be seated.

2           Ms. Daniels, if you want to step down, you can also

3      use the restroom, and we will pick up in a couple of minutes.

4      I will stay on the bench while we wait.

5           Mr. Avenatti, I thought you needed to --

6           MR. AVENATTI:  I do, but I didn't want to disrespect

7      your Honor.

8           THE COURT:  You're welcome to go as well.  Just be

9      back in a couple of minutes.

10          Counsel, if we can begin to get ready, I expect we

11     will get started shortly.

12          Everybody in your places, please.

13          Mr. Sobelman, any idea how much longer you have on

14     direct.

15          MR. SOBELMAN:  Maybe by the end of the day, but may

16     not.

17          THE COURT:  All right.  The jury will be entering in a

18     moment.

19          (Continued on next page)

20

21

22

23

24

25

1          (Jury present)

2          THE COURT:  Everybody may be seated.

3          Thank you, ladies and gentlemen.  I appreciate your

4    being prompt, and we will continue with the direct examination

5    of Ms. Daniels.

6          Ms. Daniels, you remain under oath.

7          Mr. Sobelman, you may proceed.

8          MR. SOBELMAN:  Thank you, your Honor.

9    BY MR. SOBELMAN:

10   Q.  Ms. Daniels, do you recall before the break we were going

11   over some text messages that you and the defendant exchanged on

12   February 19, 2019?

13   A.  Yes.

14   Q.  I believe the last message we read was the defendant

15   stating, "Let me find out what is going on"?

16   A.  Yes.

17   Q.  Ms. Daniels, do you recall where you received the

18   attachments that you sent in these messages, who you received

19   them from?

20   A.  Oh, they were an e-mail from the literary agent's office.

21   Q.  Did the defendant ever provide you a copy of those

22   documents?

23   A.  No.

24          MR. SOBELMAN:  Let's go down to the message on the

25   following page.

1          Actually, before we do that, let's take a look at

2     Government Exhibit 238.

3     Q.  Ms. Daniels, who sent this e-mail?

4     A.  Luke Janklow's assistant.  I am not really sure what

5     Claire's job title is.

6     Q.  Who did she send it to?

7     A.  To me.

8     Q.  Who is copied on the e-mail?

9     A.  Luke Janklow.

10    Q.  What is the subject line?

11    A.  Payment details.

12    Q.  Were there any attachments to this e-mail?

13    A.  Yes.

14    Q.  What is the date that you received this e-mail?

15    A.  February 19, 2019.

16    Q.  What was your reaction when you received this e-mail?

17    A.  Very, very angry, shocked, disbelief, hurt, and I felt very

18    betrayed and stupid.

19    Q.  Who, if anyone, were you angry with?

20    A.  Michael.

21    Q.  The e-mail reads, "Dear Stormy:  Just back in the office

22    after the holiday weekend and, further to our conversation

23    Friday, Luke asked me to send you this pertinent information."

24          Do you see that?

25    A.  Yes.

1   Q.  Then it says, "Your payout schedule:"

2            Do you see that?

3   A.  Yes.

4            MR. SOBELMAN:  Let's just zoom out for a minute.

5   Q.  Just generally, what follows here?

6   A.  An outline of when and how much I was paid from the

7   publisher through my literary agent, minus his percentage, of

8   course.

9   Q.  After the number 1, what information is there?

10  A.  It says that I received my payment, minus his fee, of

11  course, transferred to my account on the date that it was

12  supposed to, the day I signed my contract, which was April 11.

13  Q.  And we talked about that day at the beginning of your

14  testimony, right?

15  A.  Yes.

16  Q.  That was the day you had a call with the defendant?

17  A.  Yes.

18  Q.  What is after number 2?

19  A.  After 2, it says that Luke received my payment from the

20  publisher on August 3rd and forwarded my amount, minus his

21  percentage, of course, to a California account that I had never

22  heard of.

23  Q.  Let's take a look at the next one.

24       What does this one show?

25  A.  This is in regards to payment number three, that was sent

M1R8AVE6                         Clifford - Direct

1    to Michael, to that account that I had never heard of, minus

2    Luke's fee, of course, and that it was actually, according to

3    this, sent early.

4    Q.  What, if any, reaction did you have to learning that your

5    payment was actually sent early?

6    A.  I don't know if there is a word stronger than furious, but

7    that would be it.  And shock.

8    Q.  Let's take a look at the next page.

9            And the next one after that.

10        Is this an attachment to the e-mail we were just looking

11   at?

12   A.  Yes.

13   Q.  Before you received this e-mail from Mr. Janklow's

14   assistant, had you ever seen this document before?

15   A.  Absolutely not.

16   Q.  Had you ever heard about this document before?

17   A.  No.

18   Q.  Is that your signature?

19   A.  It is.

20   Q.  Did you sign this document?

21   A.  No.

22   Q.  Let's go to the next page.

23        These are the attachments to the e-mail from Mr. Janklow's

24   assistant?

25   A.  Yes.

1    Q.  Are these some of the same documents that you

2    screen-shotted that we talked about before?

3    A.  Yes.

4    Q.  What do these documents show?

5    A.  These are directly from the bank proving what Claire had

6    sent me was factual.  That the payments were sent and cleared,

7    what date, how much, where, those things.

8    Q.  Let's just take a look at one of those.  Let's go three

9    pages further, so I think it's page 8 -- sorry, 7.

10        Ms. Daniels, what is the wire date listed here?

11   A.  September 17.

12   Q.  Of what year?

13   A.  2018.

14   Q.  What is the wire amount?

15   A.  $148,750.

16   Q.  What account was the wire sent to?

17   A.  An Avenatti & Associates attorney-client trust.

18   Q.  At any point after September 17, 2018, were you provided a

19   letter or list or other documentation about this money going

20   into a trust account in your name?

21   A.  No.

22   Q.  At any point after September 17, 2018, were you provided

23   with any documentation or notification about any of this money

24   being spent out of that trust account?

25   A.  No.

1  Q.  At any point, were you asked to authorize money being spent

2  out of that trust account?

3  A.  No.

4  Q.  Were you even told of the existence of this account?

5  A.  No.

6  Q.  Let's go back to Government Exhibit 60, page 4.

7          And if we could put up next to it 60D, as in dog.

8          Ms. Daniels, is this the last message you sent in that

9  string that we looked at earlier?

10 A.  Yes, it is.

11 Q.  What did you write here in title on the left side of the

12 screen?

13 A.  "I have retained Clark Brewster.  Here is his contact

14 details.  You can reach out to him directly."  And I attached

15 Clark Brewster's contact information.

16 Q.  Who is Clark Brewster?

17 A.  My current attorney.

18 Q.  Why did you send this to the defendant?

19 A.  Because I didn't want to hear another word that Michael

20 Avenatti had to say, that he could talk directly to my new

21 attorney.

22          MR. SOBELMAN:  Please display what is in evidence as

23 Government Exhibit 4.

24 Q.  What is the date on this letter?

25 A.  February 19, 2019.

```
 1  Q.  Is that the same day as the messages we just read?
 2  A.  Yes, it is.
 3  Q.  Who is this letter sent to?
 4  A.  It's sent to me.
 5  Q.  Who is this letter sent by?
 6  A.  Michael Avenatti.
 7  Q.  Can you please read the first paragraph of the letter?
 8  A.  "Dear Stormy:  I have attempted to contact you repeatedly
 9  to discuss a multitude of issues, including the book proceeds
10  and payments, your allegations against, the situation with your
11  termination of your security detail, and the status of the
12  Columbus litigation and our attempts at settlement.
13  Unfortunately, you have not been responsive."
14  Q.  During the few days before you received this letter, just
15  those few days, were you responsive to the defendant?
16  A.  During those days?
17  Q.  Yes.
18  A.  No.
19  Q.  Why not?
20  A.  Because I knew he was lying to me and I wanted to secure
21  new counsel.
22  Q.  Before that time, before you found out the defendant was
23  lying to you, were you responsive to the defendant generally?
24  A.  Yes.  We talked almost daily.
25  Q.  Let's take a look at the next paragraph.
```

1      Ms. Daniels, if you could read starting with "after much"

2  and end with "financial issues," about half way down the

3  paragraph.

4  A.  Yes.

5           "After much contemplation and deliberation, we have

6  decided to terminate our representation of you effective

7  immediately.  This decision is not one we make lightly.

8  Unfortunately, however, we believe that we cannot continue to

9  effectively advocate on your behalf in light of your lack of

10  communication and responsiveness as to time-sensitive matters,

11  including financial issues."

12          Keep on?

13  Q.  No.

14      Aside from the few days that we just talked about before

15  this letter was sent, were you ever not responsive to the

16  defendant about financial issues?

17  A.  No.

18  Q.  In the messages that we reviewed today, who, if anyone,

19  initiated the conversations about the book payments?

20  A.  I did.

21  Q.  Let's go down and read the third paragraph now.

22      Would you please read the first sentence of the third

23  paragraph starting with "we will, of course."

24  A.  "We will, of course, ensure that any property, moneys,

25  documents, and materials that belong to you and that may remain

M1R8AVE6                     Clifford – Direct

1    in our possession will be timely transferred to you or your new

2    counsel as you direct."

3    Q.  At any point after you received this letter on February 19,

4    2019, did you receive any money from the defendant or his law

5    firm?

6    A.  No, I did not.

7    Q.  Were you ever paid your third book payment?

8    A.  No.

9    Q.  Were you ever paid it by the defendant?

10   A.  No.

11   Q.  Were you ever paid it by anyone else?

12   A.  No.

13   Q.  Are there any references in this letter to your book

14   contract?

15   A.  No.

16   Q.  Are there any references in this letter to your book

17   payments?

18   A.  No.

19   Q.  Where in this letter did the defendant explain what

20   happened to your second and third book payments?

21           MR. AVENATTI:  Best evidence, your Honor.

22           THE COURT:  Overruled.

23   A.  He never did.

24   Q.  Are there any references in this letter to you owing money

25   to the defendant or his law firm?

M1R8AVE6                              Clifford - Direct

 1   A.  No, there's not.

 2   Q.  Let's go back to Government Exhibit 60, page 3.

 3          Ms. Daniels, you see the messages the defendant sent

 4   you where he wrote, "Let me find out if we even received this

 5   payment," and, "let me find out what is going on"?

 6   A.  Yes, I do.

 7   Q.  After that message, "let me find out what is going on," on

 8   February 19, 2019, did the defendant ever tell you what was

 9   going on?

10   A.  No.

11   Q.  Have you had any communication with the defendant since

12   February 19, 2019?

13   A.  No.

14          MR. SOBELMAN:  You can take this down.

15   Q.  When the defendant was your lawyer, what, if anything, did

16   he tell you about his personal finances?

17   A.  He didn't.

18   Q.  When the defendant was your lawyer, what, if anything, did

19   he tell you about his law firm's finances?

20   A.  Just that they were great, the law firm.

21   Q.  When the defendant was your lawyer, what, if anything, did

22   he tell you about his law firm being evicted from its offices?

23   A.  He didn't.

24   Q.  When the defendant was your lawyer, what, if anything, did

25   the defendant tell you about his law firm's difficulties paying

1    its employees?

2    A.  He didn't.

3    Q.  When the defendant was your lawyer, what, if anything, did

4    the defendant tell you about his law firm's difficulties paying

5    its health insurance plan?

6    A.  Never mentioned it.

7    Q.  I want to shift gears for a moment.

8        Ms. Daniels, earlier in your testimony you mentioned that

9    you are on a TV currently, is that right?

10   A.  Yes.

11   Q.  What kind of show is it?

12   A.  It's about paranormal activity.

13   Q.  What is paranormal activity?

14   A.  Ghost hunting.

15   Q.  What is the TV show's name?

16   A.  Spooky Babes.

17   Q.  Spooky Babes?

18   A.  Yes.

19   Q.  Why is it called Spooky Babes?

20   A.  We went with spooky instead of ghost because we also do

21   historical stuff.  It's not just ghosts, it's legends of

22   vampires and other things, so we went with spooky instead of

23   ghost.  And babes because it's attractive people.

24   Q.  Including you?

25   A.  Yes.  Thanks for making me sound conceited.

Clifford - Direct

1   Q.  Approximately how long have you been a cast member on that

2   show?

3   A.  It will be two years in March.

4   Q.  Just to be clear, were you a cast member on that show when

5   the defendant was your lawyer?

6   A.  No.

7   Q.  Even before you started with Spooky Babes, did you have an

8   interest in paranormal activity and things like that?

9   A.  Yeah.

10  Q.  In addition to your role on Spooky Babes, what are some of

11  the other things you have done for work over the past few

12  years?

13  A.  I have directed some music videos.  I have written some

14  articles and scripts.  I read tarot cards for entertainment for

15  my fans.  I do some modeling.  I do have my website and

16  royalties and stuff from that.  And I work on some messaging

17  apps that pay me for video chats.

18  Q.  I only have a few more questions and then I think we will

19  be done.

20      After the defendant was charged in this case, did you make

21  any public statements about him?

22  A.  Yes.

23  Q.  What types of statements did you make?

24  A.  Angry ones.

25  Q.  Did you actually -- did you say that you wanted bad things

1  to happen to him?

2  A.  Yes.

3  Q.  Did you once say you hope he gets raped in prison?

4  A.  Yes.

5  Q.  Do you actually hope that happens to him?

6  A.  No.

7  Q.  Why did you say those things?

8  A.  Because he lied to me and betrayed both my trust, and I

9  thought he was my friend.  I felt violated.

10  Q.  Do you still feel that way today?

11  A.  Absolutely.

12  Q.  I think I only have one last topic.

13      Are you familiar with something called the attorney-client

14  privilege?

15  A.  Yes.

16  Q.  What is your understanding of the attorney-client

17  privilege?

18  A.  Things you say to your attorney they can't repeat.

19  Q.  After the defendant stopped being your lawyer, did there

20  come a time when you waived any privilege regarding your

21  conversations and communications with him?

22  A.  Yes.

23  Q.  Why did you waive any privilege regarding your

24  conversations and communications with the defendant?

25  A.  Because I had nothing to hide and I wanted the truth to

M1R8AVE6                         Clifford - Cross

1    come out, and I didn't want anybody to feel the way that he

2    made me feel.

3    Q.  Did you later share the communications and conversations

4    you had with the defendant with law enforcement?

5    A.  Yes.

6    Q.  Why did you do that?

7    A.  Because, once again, I had nothing to hide and I wanted

8    justice to be served.  I wanted everyone to know.

9              MR. SOBELMAN:  One moment, your Honor.

10             No further questions, your Honor.

11             THE COURT:  Cross-examination.

12   CROSS-EXAMINATION

13   BY MR. AVENATTI:

14   Q.  Ms. Daniels, good afternoon.

15   A.  Good afternoon.

16   Q.  The government asked you repeatedly whether particular

17   texts said that I had taken your money.  Do you recall that?

18   A.  No.

19   Q.  You don't recall the prosecutor just asking you repeatedly

20   whether particular texts that I had sent to you stated that I

21   had taken your money?

22   A.  They asked if you told me you took it, and I said no.

23   Q.  Ms. Daniels, do you have a single text message, e-mail,

24   voice mail, or recording that says I would not take any money

25   from your book deal, yes or no?

M1R8AVE6                          Clifford - Cross

```
 1   A.  No.
 2            THE COURT:  Mr. Avenatti, can you just move your
 3   microphone a little closer so we can all hear you.
 4            Thank you.
 5   Q.  Breaching a contract is a very big deal to you, isn't it?
 6   A.  Yes.
 7   Q.  Ms. Daniels, how was I supposed to get paid for all of the
 8   work that I and my law firm did for you over the course of 12
 9   months?
10            MR. SOBELMAN:  Objection.
11            THE COURT:  Overruled.
12   A.  From a legal defense fund and from winnings against Donald
13   Trump.
14   Q.  Any other ways?
15   A.  Not that we agreed upon.
16   Q.  And it's your testimony, is it not, that I was supposed to
17   get a percentage of anything that you won in your lawsuits
18   against Donald Trump, is that true?
19   A.  That's what you said, yes.
20   Q.  That was your understanding, right?
21   A.  Correct.
22   Q.  Now, let's clear up something right now, if we could.
23            I never told you that I would work for one dollar, did I?
24   A.  No, you did not.
25   Q.  And if someone were to come before this jury and tell them
```

Clifford - Cross

```
 1   that I told you that I would work for one dollar, that would be
 2   untrue, wouldn't it?
 3             MR. SOBELMAN:  Objection.
 4             THE COURT:  Sustained.
 5   Q.  Ms. Daniels, you're not aware of any point in time where I
 6   told you or agreed with you that I would work for one dollar,
 7   are you?
 8   A.  You never mentioned one dollar to me, no.
 9   Q.  Now, you pride yourself on always telling the truth,
10   correct?
11   A.  Correct.
12   Q.  And everything in your book is 100 percent true, right?
13   A.  To my knowledge, yes.
14   Q.  And the words in the book are your words?
15   A.  Yes.
16   Q.  And just like in your book, when you post something on
17   Twitter or on your Instagram account, people can trust what you
18   say, right?
19   A.  Unless they know I'm kidding or it's a joke, yes.
20   Q.  But your statements are honest statements, are they not?
21   A.  To the best of my knowledge.
22   Q.  Because you always tell the truth, just like you are here
23   today, correct?
24   A.  To the best of my knowledge, yes.
25   Q.  And just like in your book, when you give an interview,
```

M1R8AVE6                        Clifford - Cross

1  whether it be on CNN or some podcast or YouTube video, you

2  don't lie, do you?

3  A.  Not to the best of my knowledge.

4  Q.  And you shook your head no, you don't lie, do you?

5  A.  No.  I make mistakes.

6  Q.  And you have claimed that you have a perfect memory,

7  haven't you?

8  A.  Yes.

9  Q.  And you have claimed that you have a photographic memory as

10 well, haven't you?

11 A.  Yes.

12 Q.  And you have also claimed that you have the ability to see

13 and speak to dead people, haven't you?

14 A.  Yes, I have said that.

15 Q.  And you also claim to have the ability to have x-ray vision

16 and to be able to look into residences from the outside with

17 your vision, haven't you?

18 A.  That's not x-ray vision.

19 Q.  And you have also claimed that you have the ability to

20 speak with a haunted doll named Susan, who you speak to and she

21 speaks back to you, isn't that true?

22 A.  Susan speaks to everyone on the show; she is a character on

23 Spooky Babes.

24 Q.  Isn't it true, Ms. Daniels, that you have claimed that you

25 have the ability to speak to the doll and that she speaks back

M1R8AVE6                          Clifford - Cross

1  to you, yes or no?

2  A.  Yes.  She even has her own Instagram.

3          MR. AVENATTI:  Move to strike everything after "yes"

4  as nonresponsive.

5          THE COURT:  We will leave it.

6          Next question.

7          MR. AVENATTI:  Could I have GX 3, please.

8          THE WITNESS:  My screen is dark.

9          THE COURT:  I think they all are at the moment.

10 Q.  Let me ask you a question while we are waiting for that to

11 be fixed.

12     Here it is.

13     Do you have Exhibit 3, Ms. Daniels?

14 A.  Is that the attorney-client fee contract?

15 Q.  Yes.

16 A.  I see it.

17 Q.  Before you signed this document, you read it, right?

18 A.  Of course.

19 Q.  And you say of course because you always read contracts

20 very carefully before you sign them?

21 A.  I try my best.

22 Q.  Well, that's what you do, right?

23 A.  Yes.

24 Q.  Before you signed it, you understood the contract, am I

25 right?

M1R8AVE6                         Clifford - Cross

1    A.  Yes.

2    Q.  You then signed the contract, correct?

3    A.  Yes.

4    Q.  And you received a copy of the contract on multiple

5    occasions, did you not?

6    A.  Yes.

7    Q.  And you generally know what a contract means because you

8    have signed hundreds of contracts?

9    A.  Absolutely.

10   Q.  And, in fact, you have in the past mocked other people for

11   not reading or following their contracts, isn't that true?

12            MR. SOBELMAN:  Objection.

13            THE COURT:  Overruled.

14            You can answer it.

15   A.  Yes.

16   Q.  Can you please point the jury to the portion of the

17   contract where it states that me and my firm would advance all

18   of the costs associated with your legal representation?

19   A.  It says one-time payment and that you will take fees -- my

20   screen went black.  I'm sorry.  I can't read it.

21            THE COURT:  Do you want the full document as well?

22            THE WITNESS:  It's back.

23   Q.  Do you have it, Ms. Daniels?

24   A.  Yeah.  I'm sorry.  It came back on.

25   Q.  Where does it say that me and my firm will pay all of the

1  costs associated with your representation?

2  A.  Well, the legal fees and costs are pretty outlined in

3  number 4, where it outlines all of that.  It says one-time

4  payment of $100, which I made.  And you bought lunch for me.

5      Then it says hourly fees, out-of-pocket costs, legal

6  defense fund.  If it has sufficient funds to pay for such fees

7  and costs, that's how you were going to get paid.

8  Q.  So that's your interpretation of paragraph 4, correct?

9  A.  Absolutely.  Which is why I asked for an accounting.

10          MR. AVENATTI:  Move to strike everything after

11  "absolutely" as nonresponsive, your Honor.

12          THE COURT:  We will leave it.

13          Ms. Daniels, just answer the question, and if there is

14  a need to follow up, I am sure government counsel will do that

15  on redirect.

16  Q.  Ms. Daniels, could you please read paragraph 3 into the

17  record for the benefit of the jury?

18  A.  "Clients's duties.  Clients agree to be truthful with

19  attorney, to cooperate, keep attorney informed of developments,

20  to abide by this agreement, and to pay bills for reasonably

21  incurred costs on time."

22  Q.  Now, was this contract ever modified in any way?

23  A.  No.

24          THE COURT:  That brings us to 3:00 and the end of our

25  day.

M1R8AVE6

```
 1              Ladies and gentlemen, usual reminders.  Number one,
 2     please don't discuss the case with each other or with anyone
 3     else.  Please don't read anything about the case.  I want to
 4     underscore, if you see anything on the news, you hear anything
 5     on the news, you see anything online, do not read it, close it,
 6     turn the page, whatever you need to do to avoid being exposed
 7     to anything about this case while you are sitting on the jury.
 8     Do not do any research about the case, investigate anyone
 9     involved in it, anything of that sort, as you know.  And please
10     continue to keep an open mind.  We are making progress, but you
11     still have not heard all the evidence in the case so please
12     keep an open mind.
13              With that, you are excused for the evening.  Have a
14     good afternoon and night.
15              One quick word.  Lest anyone worries, I am monitoring
16     the weather forecast.  I know there is a storm, no pun
17     intended, coming tomorrow at some point.  I think it's probably
18     going to be OK -- not for everybody -- to get home safely, but
19     I will obviously monitor that and ensure that everybody can get
20     home safely.
21              With that, have a pleasant afternoon and evening, and
22     we will see you tomorrow morning usual time.
23              (Jury exits courtroom)
24              (Continued on next page)
25              THE COURT:  You may be seated.
```

1    Ms. Daniels, before you go, let me just give you an

2    instruction that, because you are now on cross-examination, you

3    are not permitted to communicate with the representatives of

4    the government, the lawyers or agents, about anything relating

5    to the substance of your testimony.  Logistics are fine, but

6    not the substance of it.  I know you have counsel.  You are

7    permitted to speak with him, but he may not speak with the

8    government and serve as an intermediary for you and the

9    government.

10    With that, please be here by 9:00 tomorrow.  I think

11    there is a witness room out there, and you can wait in there

12    until we are ready for you and ready to go.  And I wish you a

13    pleasant afternoon and evening.  Thank you very much.  And you

14    are excused.  Watch your step, please.

15    All right.  Anything to raise from the government?

16    MR. PODOLSKY:  Nothing of substance.  I just want to,

17    I suppose, just explain witness order and where we are in the

18    case so that we can see what is coming.

19    I know the defendant referenced six hours of

20    cross-examination this morning.  I don't know if it's going to

21    be six hours.  But if not, we intend to call Elizabeth Beier

22    from St. Martin's Press.  I think we estimate maybe an hour,

23    give or take, on direct examination.  At the moment, our final

24    witness will be Shamel Medrano, who is an analyst in our

25    office.  And on that note, I just want to flag, essentially,

M1R8AVE6

the function of that testimony will be to lay the foundation

for an offer of a summary chart, which is essentially a

timeline of the various communications and other items in this

case.  I have spoken with standby counsel just to sort of flag

that it would be helpful to the government and the Court, if

the defense has any objections to the chart, to raise them

ahead of time.  The reason I put this on the record is I just

don't want to have essentially the difficulty of trying to

change the chart or deal with objections right before the

witness takes the stand.

         THE COURT:  All right.

         Mr. Avenatti, have you had a chance to review that?

It's Government Exhibit 804, I believe.

         MR. AVENATTI:  Your Honor, I have not had a chance to

review it.  I am happy to do so tonight.

         I would like to also be heard, if you would like to

hear from me, relating to the scope of cross-examination and

duration.

         THE COURT:  We will get to that in one second.

         With respect to this chart, I want you to advise the

government if you have any objections or suggestions with

respect to it.  I will give you until 7:00 tonight.  If you

don't lodge an objection by that time, then I will treat any

objections as waived.  If you do, you should be prepared to

address them tomorrow morning.  And I assume the government

M1R8AVE6

 1   will be prepared to deal with whatever my rulings are on any

 2   objections.

 3            Anything else from the government?

 4            MR. PODOLSKY:  No, your Honor.

 5            THE COURT:  Mr. Avenatti, with respect to the scope of

 6   cross, I guess my question to you is, do you have any

 7   authority, as I discussed earlier, for the proposition that I

 8   can require you to ask any questions of Ms. Daniels on cross

 9   giving you appropriate latitude to ask things that may go

10   beyond the scope?

11            MR. AVENATTI:  I have not had a chance to research it,

12   your Honor.  It's number one on my list as soon as I leave here

13   momentarily.

14            THE COURT:  So, please do, and you can certainly bring

15   it to my attention tonight by letter if you find anything.  But

16   I think it's fairly common practice to handle it that way,

17   which is to say that I think it's appropriate for her to

18   testify once and only once, recognizing that if something

19   arises after she steps off the stand and there is a reason that

20   you weren't able to ask her on the stand, that you may be able

21   to recall her.  But absent that scenario, I think it's more

22   appropriate to inquire of her while you have her here at the

23   moment.  So if you find authority that suggests that's not

24   within my authority, I am certainly happy to consider it, but

25   otherwise you should plan your cross-examination accordingly.

M1R8AVE6

1          I would also urge you to take the evening and perhaps

2     cut back on the cross-examination.  Sometimes less is more, and

3     it's my experience that it's almost always the case on

4     cross-examination.  I think six hours for a direct that lasted

5     only about three hours is not likely to be productive for

6     anybody.  So I would urge you to pare it back as much as you

7     can, but obviously you should do whatever you need to do to try

8     your case.

9          Anything else you wish to say?

10          (Continued on next page)

M1rWave7

1          MR. AVENATTI:  Yes, your Honor.  Two things.

2          Obviously, the government has had consistent access to

3    this witness over the last three years.  We have not.  I have

4    not.  So the government was able to tailor their direct through

5    cooperation of the witness during the many meetings they had

6    with the witness, so I don't have that benefit, obviously.

7    That's No. 1.

8          THE COURT:  That is how trials generally work, Mr.

9    Avenatti.

10          MR. AVENATTI:  Yes.

11          THE COURT:  OK.

12          MR. AVENATTI:  No.  Understood, your Honor.

13          THE COURT:  OK.

14          MR. AVENATTI:  No. 2, your Honor, the government just

15    conducted the direct where they had Ms. Daniels testify --

16          THE COURT:  Mr. Avenatti, I'm not interested in a

17    discourse on the trial.  Do you have an application, or is

18    there something you're asking me for?

19          MR. AVENATTI:  I do not have -- well, I do actually

20    have one application, your Honor.

21          THE COURT:  Great.  Let's turn to that.  And just

22    speak directly into the microphone, please.

23          MR. AVENATTI:  In light of what your Honor ruled

24    yesterday relating to certain financial issues that were off

25    limits, I think that the government's direct today opened the

1    door to those issues and many more.  The government elicited

2    testimony relating to Ms. Daniels's financial condition and her

3    financial position over my objection, which was overruled,

4    relating to her need for the book payment in order to pay for a

5    house and the fact that she couldn't afford the house without

6    the book payment, and she tied her ability to buy the house

7    directly to the book payment.

8         In light of that, that opens the door, your Honor, for

9    me to get into her entire financial situation, her assets, her

10   debts, her income level.  I think the government has opened the

11   door to that line of inquiry during the cross-examination of

12   Ms. Daniels.  And therefore, I'm seeking permission to explore

13   those areas that were previously excluded, your Honor.

14        THE COURT:  Mr. Avenatti, that's not what I previously

15   excluded.  The government's application was to preclude

16   cross-examination on her payment of back taxes, her payment of

17   spousal support and her payment of child support.  I granted

18   that application, and nothing the government did today opened

19   door to that.  So to the extent that you're asking me to

20   revisit that ruling, the request is denied.

21        I said yesterday that you were entitled within some

22   limits to explore her financial circumstances to the extent

23   that it enables you to argue bias, motive, etc., within limits.

24   But you're not going to get into areas of potential prejudice

25   of that sort.  So I'm not revisiting that ruling.  But to be

M1rWave7

  1    clear, I did not preclude you from inquiring about her

  2    financial condition altogether.  And you certainly can ask her

  3    about the house and the need for money to pay for the house and

  4    what have you.  The door is certainly open on that front.

  5           MR. AVENATTI:  The additional application that I would

  6    make, your Honor, is earlier today the Court denied my effort

  7    to admit exhibit 5, which was the totality of the WhatsApp

  8    communications, at least as to that one conversation string.  I

  9    think the government has now opened the door to me being

 10    permitted to place that exhibit into evidence before the jury

 11    for the following reasons:

 12           The government asked Ms. Daniels on direct whether she

 13    was responsive to almost every inquiry that I made over the

 14    course of our relationship.  They elicited that testimony.  And

 15    in fact, I wrote it down.  They elicited testimony from her

 16    that she was never not responsive.  So the government has put

 17    into evidence now before the jury testimony relating to how

 18    responsive Ms. Daniels was, our standard method of

 19    communication and how often it occurred, and they have put that

 20    directly at issue.  And that is borne out, your Honor, within

 21    the text messages within exhibit 5.  So separate and apart from

 22    the other reasons that I had sought to admit exhibit 5 --

 23    namely, that they all go to my state of mind during the course

 24    of the representation -- I make an application now to admit

 25    exhibit 5, because each and every one of those text messages

M1rWave7

1    are either sent to or from me.

2           THE COURT:  All right.  Well, to the extent the

3    application is to admit the entirety of exhibit 5, it is denied

4    once again for the reasons that I stated earlier.  The entirety

5    of it is not relevant even to show what you just described, and

6    the 403 issues are quite significant.

7           To the extent that there is any discrete portion of it

8    that you think demonstrates that she failed to respond to you

9    and a query from you, I'll certainly consider any application

10   to admit that portion of it.

11          You can also, obviously, ask Ms. Daniels about it in

12   your cross-examination, and if she says that she did respond to

13   you in every instance, you're welcome to use exhibit 5 and

14   point her to something and attempt to elicit from her that she

15   didn't.  And perhaps that lays the groundwork for a foundation

16   for you to admit that portion of exhibit 5.  But you are not

17   going to use that excuse to get in the entirety of your

18   communications over however long the period was of 2,475

19   messages.  It's just not happening.  OK?  So it's not a

20   persuasive argument.  All right?

21          MR. AVENATTI:  I understand the Court's ruling.

22          THE COURT:  Good.  Anything else?

23          MR. SOBELMAN:  Nothing from the government.  Thank

24   you, your Honor.

25          THE COURT:  All right.  I don't think we're going to

M1rWave7

1   get to any defense case tomorrow, but for purposes of my

2   preparation of the charge and timing of the charge conference

3   and what have you, Mr. Avenatti, as you sit here now, do you

4   have a thought with respect to your intention to put on a

5   defense case?

6          MR. AVENATTI:  I will be putting on a defense case,

7   your Honor.  I anticipate that it's going to last two to three

8   days, probably closer to two days.

9          THE COURT:  OK.  All right.  Very good.  And I guess

10  because it informs whether we need to have a discussion about

11  the issue that I flagged earlier, as you sit here now, do you

12  anticipate whether you would be testifying on your own behalf?

13         MR. AVENATTI:  I have not made that decision yet, your

14  Honor.  I'm not being coy.  I obviously need to spend a lot of

15  time thinking about that, talking with some people that I trust

16  about it, and I intend on doing so over this weekend.

17         THE COURT:  All right.  Understood.  And I didn't take

18  you to be coy.  That is a serious decision and important

19  decision, and you should obviously give it the serious

20  consideration that it warrants.

21         I do want you to both consider how best to conduct

22  that testimony, if it occurs, that would give the government an

23  opportunity to object to any improper testimony.  Just

24  spitballing here, but a couple options.  One option is to allow

25  Mr. Avenatti -- and obviously, this is all hypothetical until

M1rWave7

1  he makes a decision to testify -- to provide a narrative of his

2  version of events.  To the extent that he would do that, I

3  would propose, at a minimum, that he sort of preface each

4  portion by saying I'm now going to describe X, so we know the

5  area and subject matter and the government can lodge an

6  objection on that basis.

7       Alternatively, I know some judges have had a defendant

8  write out the questions that he would answer and have somebody

9  read them.  We do have standby counsel here, and standby

10  counsel could be utilized for that purpose and I would give an

11  appropriate instruction to the jury that Mr. Avenatti has

12  prepared his examination, but in order for it to proceed

13  smoothly, that's the way we will conduct it so that there's no

14  suggestion that standby counsel is handling the defense.

15       I'm, again, just throwing out these for you to think

16  about, but I'm sure there may be other approaches to this.  But

17  I want to definitely make sure that we are all on the same page

18  about that and figure out an appropriate way to handle it so

19  that the government has an opportunity to object and that Mr.

20  Avenatti isn't able to testify to something that would be

21  improper under the rules of evidence.

22       So I want you to think about that and make sure we

23  have time to talk about it, perhaps at the time end of the

24  tomorrow or Monday morning if it looks like we will need to

25  decide before then.

M1rWave7

1    Anything else?

2    From the government.

3    MR. PODOLSKY:  No, your Honor.

4    THE COURT:  From Mr. Avenatti.

5    MR. AVENATTI:  No, sir.

6    THE COURT:  All right.  In that case, I will see you

7    same time tomorrow morning.

8    Have a good evening.

9    (Adjourned to January 28, 2022, at 9:00 a.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          INDEX OF EXAMINATION

2     Examination of:                              Page

3      SEAN ERNESTO MACIAS

4     Cross By Mr. Avenatti . . . . . . . . . . . 812

5      ENRIQUE SANTOS

6     Direct By Mr. Sobelman . . . . . . . . . . 832

7     Cross By Mr. Avenatti . . . . . . . . . . . 851

8     Redirect By Mr. Sobelman . . . . . . . . . 877

9     Recross By Mr. Avenatti . . . . . . . . . . 882

10     STEPHANIE CLIFFORD

11    Direct By Mr. Sobelman . . . . . . . . . . 883

12    Cross By Mr. Avenatti . . . . . . . . . . .1007

13                        GOVERNMENT EXHIBITS

14    Exhibit No.                              Received

15     S2    . . . . . . . . . . . . . . . . . . 834

16     612   . . . . . . . . . . . . . . . . . . 836

17     613   . . . . . . . . . . . . . . . . . . 838

18     6, 16, 16A, 17, 19, 20-21, 25, 26-28, . . . . 842

19              28A, 29, 32-33, 33A, 34-42,

20              44-50, 50A, 51-55, 55A, 56-60,

21              and 60A-60D

22     22, 31 and 43   . . . . . . . . . . . . . 873

23     603   . . . . . . . . . . . . . . . . . . 888

24     224   . . . . . . . . . . . . . . . . . . 939

25